IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AH AERO SERVICE, LLC dba OK3 AIR,<br><br>Plaintiff,<br><br>vs.<br><br>HEBER CITY, a municipal corporation, PAUL BOYER, an individual, in his individual and official capacity; DENIS GODFREY, an individual, in his individual and official capacity<br><br>Defendants. | ORDER AND MEMORANDUM DECISION<br><br><br>Case No. 2:17-cv-1118-TC |

AH Aero Service, LLC (OK3 AIR), a service provider for the Heber City airport, has filed this lawsuit against Heber City (the City) and the two most recent Airport Managers, Paul Boyer and Denis Godfrey (collectively, Defendants) for infringing upon their first amendment rights. OK3 AIR also seeks various breach of contract remedies and asserts a tortious interference with economic relations claim.

Defendants have filed two separate motions to dismiss.[1] OK3 AIR's action for failure to state a claim. The court finds that OK3 AIR's complaint has sufficient factual content to move forward. Accordingly, the court denies both of Defendants' motions.

## BACKGROUND[2]

The relationship between the parties began with OK3 AIR entering a Long-Term Ground-Lease Agreement (the Agreement). OK3 AIR became the airport's full-service Fixed Base Operator (FBO). As an FBO, OK3 AIR had various responsibilities in addition to paying rent. For example, OK3 AIR provided airport customers with aircraft maintenance, flight training, ramp parking, deicing, overnight hanger space, and weekly safety inspections. It also maintained the City's airport buildings and utilities. It ensured that restrooms are clean and vending machines stocked. One of the most important services OK3 AIR provided, and the most lucrative, was selling fuel.

The City had certain duties owed to its tenants. It maintained the runway, taxiway, and beacon lights, among other duties. The City created an Airport Advisory Board (AAB) to resolve issues arising at the airport. And the City appointed an airport manager for handling daily issues, who reported directly to the City Council.

---

[1] Mr. Boyer, who is no longer Airport Manager, has his own attorney and has filed his own motion. Heber City and Mr. Godfrey, the current Airport Manager, are jointly represented.

[2] The following facts are taken from the complaint.

To receive continuous funding from the Federal Aviation Administration (FAA), the City had to comply with FAA regulations. In order to ensure compliance with FAA regulaitons, the City developed and adopted the "Minimum Standards and Requirements of the Conduct of Commercial Aeronautical Services and Activities at the Heber City Municipal Airport" (Minimum Standards). The Minimum Standards lay out the obligations that must be met by any party seeking to become a commercial operator at the airport. The City must apply the Minimum Standards equally to all commercial operators.

The Agreement described when the Minimum Standards could be amended. Changes to FAA regulations would mandate amendments to the Minimum Standards. Similarly, changes to state law that affected the airport would require amendments. OK3 AIR and the City could jointly amend the Minimum Standards. Finally, the City could unilaterally amend the Minimum Standards to ensure safety.

OK3 AIR and the City had agreed to amend the Minimum Standards in 2009 and in 2010. OK3 AIR points to this as evidence that unless there was a change to FAA regulations, state laws or safety concerns existed, the City had to seek OK3 AIR's approval before amending the Minimum Standards.

2014 Revisionary Lease Debate

According to OK3 AIR, the relationship with the City began to sour in 2014. The members of the 2014 AAB, in consultation with a professional aviation consultant, developed a proposal for revisionary leases. These reversionary leases

would revert to the City at the end of their terms. And OK3 AIR's president, Mr. Nadim AbuHaidar, supported the proposal because he thought it was in the best interest of the city.

Numerous owners of hangar leaseholds, including Mr. Boyer, did not approve the proposal and consequently, they blocked it. Then they convinced the City to remove Mr. AbuHaidar from the AAB because, they argued, he had a "conflict of interest." Consequently, OK3 AIR is without a voice on the AAB.

2016 Amendments to the Long-Term Ground-Lease Agreement

In 2016, the City, without OK3 AIR's consent, sought to amend the 2010 Minimum Standards. The 2016 amendments would lower the financial investment new commercial operators would have to make to begin business at the airport. The City stated that it had done this to increase competition at the airport. OK3 AIR objected to the 2016 amendments throughout the year.

Before the 2016 Minimum Standards were adopted, OK3 AIR notified the City that it did not consent to the new amendments. To bolster its position, OK3 AIR hired an aviation expert to review the 2010 Minimum Standards. The pre-existing 2010 Minimum Standards, according to the expert, complied with state and federal rules and regulations and with FAA requirements. Further, the 2016 amendments did not address any legitimate safety issues. According to the expert, safety at the airport would be decreased if the 2016 Minimum Standards went into effect.

Even so, the City, citing safety concerns and changes to FAA regulations as justification, adopted the 2016 Minimum Standards in October of 2017. The 2016 Minimum Standards allowed the City to offer waivers and variances to commercial operators at the airport. As part of those waivers and variances, the City could offer a Specialized Aviation Service Operations Agreement (SASO) to operators. A SASO allows an operator to self-fuel rather than purchase fuel from OK3 AIR. Profits from the sale of fuel allowed OK3 AIR to provide other services at the airport.

Specialized Aviation Service Operations Agreements

    1. Mr. Hansen's SASO

So far, the City has issued two SASOs: one to Dave Hansen and one to Barry Hancock. The City granted a SASO to Mr. Hansen in May of 2016. He was not a hangar owner. Instead, he sublet a hangar and operated Dave's Custom Sheetmetal, a commercial aircraft maintenance business at the airport. At the time of his application, he had not paid rent for the hangar for two years. And he had not maintained his insurance, as required by his previous SASO. His previous SASO had expired.

OK3 AIR alerted the City to problems with Mr. Hansen's application. In short, OK3 AIR alleged that Mr. Hansen could not comply with the Minimum Standards and that an acceptance of his application would result in an unequal application of the Minimum Standards. An unequal application of the Minimum Standards, in turn, could jeopardize funding from the FAA.

In spite of this, the City approved Mr. Hansen's SASO application during a meeting of the City Council. The sole purpose of that meeting, alleges OK3 AIR, was the approval of Mr. Hansen's application. At the meeting, the City Council not only praised Mr. Hansen, but Mr. Boyer, a member of the City Council, criticized OK3 AIR for raising its concerns.

2. Mr. Hancock's SASO

The second SASO was issued to Mr. Hancock for the period of May, 2017, through October of 2017. Mr. Hancock operated Worldwide Warbird and Pilot Makers (Warbird) at the airport. According to OK3 AIR, Warbird did not have sufficient apron space[3] to comply with the Minimum Standards for commercial operators. OK3 AIR again raised its concerns regarding the unequal application of the Minimum Standards, and OK3 AIR repeated similar arguments that it had made about Mr. Hansen's SASO. The City issued the SASO nonetheless.

Improper Tie-Downs of Airplanes

In early July of 2016, the City, after a closed door meeting, hired Mr. Boyer as Acting Airport Manager. Mr. Boyer had previously argued against revisionary leases. He is also the same City Council member who criticized OK3 AIR for raising safety concerns about issuing a SASO to Mr. Hansen. As Airport Manager, Mr. Boyer became the contact point for safety concerns.[4]

---

[3] Apron spaces are where aircraft are parked and boarded, loaded and unloaded. Aprons provide a location for preflight activities. Between an apron and a runway is a taxiway.
[4] *See* Section Five of the Agreement, which required OK3 AIR to conduct safety inspections and report safety concerns.

On September 20, 2016, Mr. Boyer sent an email to the City stating that he intended to make an issue of OK3 AIR's apron use.  Use of the apron is covered by safety regulations.  In the email, Mr. Boyer suggested that a cease-and-desist letter be sent to OK3 AIR and that the City Council make a single "big-item change" to the Minimum Standards "like reducing [OK3 AIR's] required 8 acres to just 2 acres… and then wait for the lawsuit to come."  (Opp'n to Paul Boyer 21, ECF No. 41.)

Two days later on September 22, 2016, OK3 AIR reported to Mr. Boyer that airplanes were improperly tied down on the airport apron.  Mr. Boyer responded by telling OK3 AIR that it, too, would have to comply with the tie-down requirements, and because it had not tied down all of its aircraft, it also violated the Minimum Standards.[5]  Mr. Boyer went on to criticize OK3 AIR for "cherry picking" violations and applying them to other commercial operators while seeking to avoid meeting those obligations itself.

On September 30, 2016, Mr. Boyer urged the City's legal counsel to investigate whether OK3 AIR illegally parked its airplanes on apron space owned by the City.  OK3 AIR responded that that apron space was actually part of its leasehold.  The City pursued this claim until May of 2017 when it dismissed it without resolution.

Mr. McQuarrie's Hangar

---

[5] OK3 AIR claims that not all aircraft need to be tied down.  Jets, which are heavier than propeller airplanes, do not need to be tied down.

Another issue in the summer of 2016 was OK3 AIR's attempted purchase of Mel McQuarrie's leasehold. Mr. McQuarrie's leasehold allowed him to acquire a new lease term before selling it to a purchaser. In order to sell the leasehold to OK3 AIR, Mr. McQuarrie had to comply with two contractual contingencies. First, he had to obtain a new lease from the City. Second, he had to obtain that lease before the contract "expired by its own terms."

The Airport Manager typically has the right to approve lease renewals. Mr. Boyer was the Airport Manager at the time of OK3 AIR's attempted acquisition of the McQuarrie lease. Upon learning of Mr. McQuarrie's desire to renew and to sell his leasehold, Mr. Boyer initially agreed to approve the transaction. But when he learned that OK3 AIR was the perspective purchaser, he gave the application to the City Council for approval.

The City Council, meanwhile, initially refused to enter into a new lease with Mr. McQuarrie. City Council members delayed the application, announced that their personal views of OK3 AIR were unfavorable, and when the they finally did agree to a renewal, proposed new lease terms, which were not part of the initial lease. This process effectively delayed the approval of Mr. McQuarrie's renewal. Consequently, the contract between Mr. McQuarrie and OK3 AIR expired.

Complaint and Fuel Truck Parking

Throughout 2016, OK3 AIR had consistently raised its concerns regarding the application of the Minimum Standards. The City offered no meaningful response and, in the eyes of OK3 AIR, continued to jeopardize FAA funding by

violating FAA regulations. This threatened OK3 AIR's investment in the airport. In July, OK3 AIR sent a letter stating its intent to file a Part 16 Complaint[6] with the FAA if the City continued to violate the Minimum Standards.

In 2016, the City failed to adequately remove snow from the airport, leaving a fifteen foot swath of snow that the City claimed was on OK3 AIR's apron. However, during the previous seventeen years, the City had plowed the area. Because the snow was not adequately removed, OK3 AIR's customers were forced to land at other airports during peak season—Thanksgiving and Christmas. OK3 AIR alleges that Mr. Godfrey, who by then had replaced Mr. Boyer as Airport Manager, knew that inadequate snow removal would cause potential airport users to land at other airports. Having exhausted its options with the City, OK3 AIR filed the complaint with the FAA on January 6, 2017.

Two days later, Mr. Godfrey arrived unannounced on OK3 AIR's apron. He brought the Heber City police with him. He demanded that OK3 AIR remove a large fuel truck from its hangar. OK3 AIR sought a resolution from the City, but the issue remained unresolved.

This was not the first time that fuel truck parking had been an issue. During a period when Mr. Hansen was vice chair of the Airport Advisory Board, he alleged that OK3 AIR was engaged in predatory pricing, operated an illegal paint booth, and had parked the fuel truck within its hangar in violation of international fire code. The City considered requiring OK3 AIR to install a fire suppression system.

---

[6] A Part 16 Complaint is a formal complaint to the FAA alleging non-compliance with airport regulations.

OK3 AIR countered by explaining that such a reading of the fire code was inaccurate. But if the City insisted on interpreting the fire code in that manner, it should require all commercial operators to install fire suppression systems, including Mr. Hansen. OK3 AIR requested that the City reconsider the idea and requested a meeting on the issue. The City later dismissed the issue but refused to resolve it.

Access to the Public Apron

Just as fuel truck parking had been an issue with both Airport Managers, aircraft parking became a repeat problem. In January of 2017, after OK3 AIR filed its complaint with the FAA, Mr. Godfrey claimed that OK3 AIR was allowing customers to park on the airport's public apron. In an email sent to OK3 AIR, Mr. Godfrey threatened to directly contact OK3 AIR's customer and demand that the customer remove the airplane.

OK3 AIR responded that the area was not part of the public apron and that the aircraft was actually parked on OK3 AIR's apron. OK3 AIR sought resolution of the issue from the FAA. The FAA agreed with OK3 AIR. But the City continues to refer to this public apron as a public taxiway and characterizes OK3 AIR's practice of parking airplanes there as unsafe.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss all or a portion of a complaint if it fails to state a claim upon which relief can be granted.

To survive a motion to dismiss under Rule 12(b)(6), the complaint must

contain well-pleaded factual allegations that, if true, state a claim that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Under Twombly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 663 (quoting Twombly, 550 U.S. at 555). In addition, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Accordingly, the court must "disregard conclusory statements and look only to whether the remaining factual allegations plausibly suggest the defendant is liable." Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012).

## ANALYSIS

### I.    First Amendment Retaliation

OK3 AIR first alleges that the Defendants violated its First Amendment rights by retaliating against OK3 AIR in response to their complaints about the violations of the Minimum Standards. The Tenth Circuit Court of Appeals has developed a three-part test for considering First Amendment retaliation claims: 1) the plaintiff was engaged in constitutionally protected activity; 2) the defendant's

response would have chilled an ordinary person from continuing in that constitutionally protected activity; and 3) the defendant's response was substantially motivated by the exercise of the constitutionally protected activity. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

A. Constitutionally Protected Activity

To begin with, the parties do not dispute that OK3 AIR engaged in constitutionally protected activity. OK3 AIR engaged in constitutionally protected activity when it expressed concern about compliance with the Minimum Standards, FAA regulations, and by filing the formal complaint.

B. Chilling Speech

OK3 AIR alleges facts sufficient to show that a reasonable jury could find that the Defendants intended to threaten OK3 AIR in such a way as would chill an ordinary person. "The focus . . . is upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled." Smith v. Plati, 258 F.3d 1167, 1177 (10th Cir. 2001). In other words, the standard is objective. As the Tenth Circuit explained, "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Worrell, 219 F.3d at 1212 (quoting Lackey v. County of Bernalillo, No.97-2265 1999 WL 2461 at *3 (10th Cir. Jan.5, 1999) (internal quotations removed)); see also DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990)) ("An act taken in retaliation for the exercise of a constitutionally protected right is actionable under §

12

1983 even if the act, when taken for a different reason, would have been proper")
(internal citations omitted).

A reasonable jury could conclude that an ordinary person would have been
chilled in this case because the Defendants engaged in a bad faith investigation and
harassment after OK3 AIR complained about changes to the Minimum Standards
and compliance with FAA regulations. Further, when Mr. Godfrey became Airport
Manager, which was two days after OK3 AIR filed the complaint with the FAA, he
arrived with the Heber City Police to demand that a fuel truck be removed from
OK3 AIR's hanger. Failure to adequately plow a vital part of the airport runway
during the peak season could be viewed as having a chilling effect.

C. Substantially Motivated by Exercise of Constitutionally Protected Activity

To meet the third part of the test, OK3 AIR must show that it was protected
speech that substantially motivated the Defendants' actions. Worrell, 219 F.3d at
1212 ("We have required proof . . . . that 'defendant's adverse action was
substantially motivated as a response to the plaintiff's exercise of constitutionally
protected conduct.'") (quoting Lackey, 1999 WL 2461, at *3). When retaliatory
conduct "is motivated by a desire to discourage protected speech or expression[, it]
violates the First Amendment and is actionable under § 1983." Wolford v. Lasater,
78 F.3d 484, 488 (10th Cir. 1996).

The Tenth Circuit has recognized that a defendant's motive is a jury
question. See Seamons v. Snow, 206 F.3d 1021, 1028 (10th Cir. 2000) (stating
judgment should be withheld when "'questions concerning defendant's motives or

knowledge must be determined'")(quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2732.2, 153-54, 177 (3d ed. 1998)).

D. <u>Qualified Immunity</u>

The Defendants contend that they are entitled to qualified immunity on all claims related to First Amendment retaliation. "When evaluating a claim of qualified immunity, we 'must first determine whether the plaintiff has alleged the deprivation of a constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" <u>Marshall v. Columbia Lea Reg'l Hosp.</u>, 474 F.3d 733, 739-40 (10th Cir. 2007) (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999)).

Since OK3 has established a viable First Amendment retaliation claim, the court must decide whether the right was clearly established under the second step of the qualified immunity analysis. "In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shoes would understand that what he or she did violated that right." <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d 1323, 1327 (10th Cir. 2007). "The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." <u>Mimics, Inc. v. Village of Angel Fire</u>, 394 F.3d 836, 842 (10th Cir. 2005) (quoting <u>Roska v. Peterson</u>, 328 F.3d 1230, 1248 (10th Cir. 2003)).

The case law of this circuit is clearly established and on point. Because the First Amendment protects against retaliation for the exercise of free speech, the Defendants are not entitled to qualified immunity. Id. at 848 ("It has long been clearly established that the First Amendment bars retaliation for protected speech and association"); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990) (explaining "[i]t is also one aspect of the First Amendment right to petition the government for redress of grievances"); see also Casey, 473 F.3d at 1333-34.

## II.    Breach of Contract

OK3 AIR also alleges that the City breached the Agreement. A breach of contract in Utah requires showing that there was 1) a contract; 2) the recovery-seeking party performed; 3) the other party breached the contract; and 4) damages resulted from that breach. Am. W. Bank Members, L.C. v. State, 342 P.3d, 224, 240-32 (Utah 2014)(internal quotes and citation omitted).

There is no dispute on the first two elements: the City and OK3 AIR had a contract—the Agreement; and OK3 AIR has been performing its FBO duties as required. And there is no dispute that OK3 AIR would suffer damages in the event of a breach.

But the third element is disputed. Section Three of the Agreement mentions the four agreed upon ways to amend the Agreement. Section Three reads as follows:

> The property is leased to said Lessee [OK3 AIR] for the purpose of conducting a general aviation business as a Fixed Base Operator and as a Special Services Operator as per "Minimum Standards [...]" and as amended or changed by [1)] mutual consent between Heber City and [OK3 AIR] or [2)] as amended when deemed reasonable and necessary by the City Council for

15

safety reasons or [3)] in order to comply with State and Federal rules and regulations or [4)] in order to assure reasonable and competent service at said airport, and to do all things necessary to carry out said purposes.

(Agreement §3, ECF No. 34-1.)

The City claims that unilaterally amending the Minimum Standards for reasons unrelated to safety was not a breach of the Amendment. (See Mot. to Dismiss Pl's. First Am. Compl. 7-9, ECF No. 34.) In fact, the City reads Section Three of the Agreement to "define how other airport users must use other portions of the Airport." (Id. at 8 (emphasis and capitalization in the original).) As a result, Section Three places no limits on the City's decisions or ability to amend the agreement. (Id.) And nothing in Section Three protects OK3 AIR's investment or "competitive position at the Airport." (Id.) In brief, the City reads the Agreement as a set of restrictions applying uniquely to OK3 AIR, while the Minimum Standards apply to other operators. (Id. at 7.)

Conversely, OK3 AIR reads Section Three as giving four instances when the Minimum Standards can be amended: 1) by mutual consent; 2) unilaterally by the City for safety reasons; 3) in order to comply with state or federal authorities; or 4) the catchall phrase, to ensure service at the airport. The City's behavior seems to support this interpretation. The City previously agreed with the above interpretation. (First Am. Compl. ¶¶31-32, ECF No. 33.) They did so in 2009. (Id.) And they did so again in 2010. (Id.)

The court finds this language to be ambiguous. As a result, the court finds that OK3 AIR has sufficiently stated a claim for breach of contract, and the court denies the Defendants' motions to dismiss the claim.

## III.    Breach of Implied Covenant of Good Faith

OK3 AIR alleges that the City breached the implied covenant of good faith by changing the 2010 Minimum Standards, thereby making it financially less difficult for other operators to set up operations. Other operators, potentially including other FBOs, would not be required to make the same commitments OK3 AIR had.

The implied covenant of good faith requires that "each party [to a contract] impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." Iota, LLC v. Davco Mgmt. Co., 284 P.3d 681, 691 (Utah Ct. App. 2012). The question then is "whether a party's actions [are] consistent with the agreed common purpose and the justified expectations of the other party." See Oakwood Vill. LLC v. Albertsons, Inc., 104 P.3d 1226, 1239-40 (Utah 2004) (alteration in the original) (citations and internal quotations omitted). The court determines "the purpose, intentions, and expectations [of the parties by] considering the contract language and the course of dealings between and conduct of the parties." (Id. (internal quotes and citations omitted).)

Looking specifically to the language of Section Three of the Agreement, the court finds that a reasonable jury could interpret it as limiting the instances when the Minimum Standards could be modified. Moreover, the course of dealings

between the parties and their respective conduct during the 2009 and 2010 amendments seems to reinforce OK3 AIR's interpretation. A reasonable jury could find that the City amending the Minimum Standards in ways not agreed to by the parties injured OK3 AIR.

## IV.   Estoppel

In order to protect its investment and enterprise value, OK3 AIR asserts that the City should be estopped from denying the promises it made in 2009 and 2010. (See id. ¶265.)   As a general rule, parties may not estop the government or governmental entities.   Utah Sate Univ. of Agric. & Applied Sci. v. Sutro & Co., 646 P.2d 715, 718 (Utah 1982).  But "when it is plainly apparent that [applying the rule] would result in injustice, and there would be no substantial adverse effect on public policy, the courts will honor the higher purpose of doing justice by invoking the exception."  (Id.)   The exception applies "where it is plain that the interests of justice so require." (Id. at 720.)

To succeed in asserting estoppel against the government, a party must demonstrate that the traditional elements of estoppel are present.  Heckler v. Cmty. Health Serv. Of Crawford Cty., Inc., 467 U.S. 51, 61 (1984).   The traditional elements of estoppel in Utah are:

> 1) [t]he plaintiff acted with prudence and in reasonable reliance on a promise made by the defendant; 2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; 3) the defendant was aware of all material facts; and 4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff.

<u>Youngblood v. Auto-Owners Ins. Co.</u>, 158 P.3d 1088, 1092 (Utah 2007).

One of the hallmarks of success in asserting estoppel against a governmental entity is "very specific written representations by authorized government entities." <u>Anderson v. Public Serv. Com'n of Utah</u>, 839 P.2d 822, 827 (Utah 1992).

Here, OK3 AIR entered into contract negotiations with the City. The parties exchanged promises and memorialized those promises in the Agreement. Having satisfied the first two elements, OK3 AIR points out that its improvements and investments in the airport are evidence of its reliance on the City's promise.

This Agreement between the parties satisfies the requirement for a written representation by authorized government entities. [7] Further, OK3 AIR performed its duties as a FBO, as required by the contract. And an injustice would be the result of slavish application of the bar to estopping governmental entities. As a result, the court finds that OK3 AIR's estoppel claim is sufficiently articulated to survive the motions to dismiss, and the contract between the parties satisfies the requirement for a written representation by an authorized government entity.

## V.  Tortious Interference with Existing and Prospective Economic Relations

OK3 AIR's final claim is for tortious interference. Against Mr. Boyer, OK3 AIR claims that Mr. Boyer tortiously interfered with the McQuarrie hangar purchase, as discussed earlier. Mr. Godfrey tortiously interfered with OK3 AIR's

---

[7] OK3 AIR also claims to have written representations by the Mayor and City Manager to support its assertions. (Mem. in Opp'n to Mot. to Dismiss First Am. Compl. 45-46, ECF No. 42.)

economic relations when he issued Mr. Hancock's SASO, and when he failed to remove snow from the runway that the City had plowed for over a decade

The Supreme Court of Utah rearticulated the elements of tortious interference with economic relations as requiring: 1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, 2) by improper means,[8] and 3) causing injury to the plaintiff. Eldridge v. Johndrow, 345 P.3d 553, 556 (Utah 2015).

The court finds that OK3 AIR has articulated sufficient facts to survive the motions to dismiss. For Mr. Boyer, his failure to approve the hangar lease, especially in the light of such commonplace approval, could have interfered with OK3 AIR's ability to acquire Mr. McQuarrie's hangar. OK3 AIR alleges the delay damaged them in the amount of $65,000 a year for the next 25 years.

As for Mr. Godfrey, the failure to plow a runway, especially during peak season, would interfere with OK3 AIR's economic relations. OK3 AIR lost business from every airplane that was diverted. (First Am. Compl. ¶277, ECF No. 33.) The second element, refusal to plow snow after having done so for more than a decade, could tortuously interfere in this context. (Id.)

Issuing a new SASO to Mr. Hansen in violation of the Minimum Standards could tortuously interfere with OK3 AIR's economic relations because Mr. Hansen would no longer need to purchase fuel from OK3 AIR. (Id. ¶288.) Further, OK3

---

[8] Element two previously read "for an improper purpose or by improper means" (emphasis added). The Supreme Court of Utah abandoned the improper means doctrine in this case. (See id. at 557-565.)

AIR alleges that they already had an economic relationship with Mr. Hansen prior to the SASO. (Id. ¶¶278-9.) The damages are all the fuel not purchased by Mr. Hansen for his business.

## CONCLUSION

For the aforementioned reasons, Mr. Boyer's Motion to Dismiss (ECF No. 35) and Mr. Godfrey's and the City's Motion to Dismiss (ECF No. 34) are DENIED.

SO ORDERED this 6th June, 2018.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge