**Craig A. Hoggan (8202)**
**Joelle S. Kesler (11213)**
**DART ADAMSON & DONOVAN**
257 East 200 South, Suite 1050
Salt Lake City, Utah 84111
Telephone: (801) 521-6383
**Attorneys for Plaintiff**
choggan@dadlaw.net
jkesler@dadlaw.net

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AH Aero Service, LLC dba OK3 AIR, <br><br> Plaintiff, <br><br> v. <br><br> Heber City, a municipal corporation, Paul Boyer, an individual, in his individual and official capacity, and Denis Godfrey, an individual, in his individual and official capacity. <br><br> Defendants. | SECOND AMENDED COMPLAINT & JURY DEMAND <br><br> Civil No. 2:17-CV-01118-TC <br><br> Judge Tena Campbell <br><br> Tier 3 |

**Parties, Jurisdiction & Venue**

1.      AH Aero Services, LLC d/b/a OK3 AIR ("OK3 AIR"), is a limited liability company organized and existing under the laws of the State of Utah.

2.      Defendant Heber City ("the City") is a municipal corporation and political subdivision of the State of Utah.

3.      Defendant Paul Boyer is a former Acting Airport Manager for the City. He is a citizen of and resides in Summit County, State of Utah.

4.      Defendant Denis Godfrey is the current Airport Manager for the City. He is a citizen of and resides in Wasatch County, State of Utah.

5.     All of the defendants reside in the State of Utah, meaning personal jurisdiction and venue lie in the United States District Court in and for the District of Utah as provided in 28 U.S.C §1391.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case presents federal claims arising under federal law, including the Civil Rights Act, 42 U.S.C. § 1983, and for attorneys' fees under 42 U.S.C. § 1988.

7.     OK3 AIR also invokes supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims alleged herein in that such claims are so related to the claims within this Court's original jurisdiction that they form the same case or controversy under Article III of the United States Constitution.

8.     In addition, OK3 AIR seeks declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**Background**

9.     OK3 AIR is a full-service Fixed Base Operator ("FBO") located on the Heber City Municipal Airport ("Airport"), providing aircraft maintenance, ramp parking, fueling, de-icing, overnight hangar services, and other services.

10.     In 1999, OK3 AIR purchased certain assets of High Country Aviation, Inc., which at the time, operated the FBO at the Airport.

11.     As part of the purchase and sales transaction with High Country Aviation, OK3 AIR became a party to a long-term ground lease ("Ground Lease Agreement") with the City that was originally entered by the City with High Country Aviation, Inc. on January 8, 1995.

12.     The Ground Lease Agreement had an initial lease term of 30 years and provided OK3 AIR with a right of first refusal to extend the lease for an additional 20 years.

13.     The City and OK3 AIR subsequently amended the terms of the Ground Lease Agreement to extend the initial lease term through January 8, 2041.

14.     OK3 AIR is the only FBO at the Airport.  This is not unusual.  Most airports in the United States, if they offer services, have only one FBO.

15.     There is currently only one other operator at the Airport, Barry Hancock, who also leases space from the City and provides commercial services to the public through his various entities.  Dave's Custom Sheetmetal, owned by the late Dave Hansen, also used to provide services at the Airport prior to Mr. Hansen's death in the fall of 2017.

16.     In addition to the commercial operators, there are a number of individuals who lease land and/or aircraft hangars from the City so that they can store their aircraft.

17.     The City owns the Airport, which is a general aviation airport, and the City is considered the Airport "sponsor" within the meaning of federal law.

18.     Management of the Airport is under the direction and control of the Heber City Council.

19.     The City Council has created an Airport Advisory Board ("AAB"), which acts as advisory board to the City Council on issues relating the Airport.

20.     The day-to-day management of the Airport is conducted by the City's Airport Manager.  There have been three airport managers during the time period that is relevant to this case: Terry Loboschefsky, Paul Boyer, and Denis Godfrey.

21.     While prior Airport Managers reported to the City Manager, the defendant Airport Managers, Boyer and Godfrey, reported directly to the City Council.  Because the City Council meets only twice monthly to formally act on Airport matters, in between meetings, individual

members of the City Council supervised Boyer and Godfrey though informal, closed-door meetings and telephone and email correspondence.

22.     The Airport is funded in large part with money the City obtains on a periodic basis from the Federal Aviation Administration ("FAA").

23.     The City's conduct with respect to the Airport is governed by, among other things, certain FAA regulations and contracts, including "Grant Assurances," which are contractual obligations the City assumed in order to qualify for FAA funding.

24.     Over the years, the City has developed Airport governing documents, including the Minimum Standards and Requirements of the Conduct of Commercial Aeronautical Services and Activities at the Heber City Municipal Airport ("Minimum Standards"), the Rules and Regulations, and the Lease/Rates and Charges Policy.

25.     The Minimum Standards were first adopted by the City in 1987. They were amended in 2005 and again in 2010, both with OK3 AIR's consent. In 2016, the City again approved certain minor administrative amendments to the Minimum Standards. The 2005 Minimum Standards (as modified in 2010 and 2016) were in effect during all relevant times and are the Minimum Standards to which this Complaint is referring when it references the "Minimum Standards" or "2005 Minimum Standards."

26.     The Minimum Standards contain the minimum requirements that commercial operators must meet in order to have the privilege of operating a business at the Airport and address, among other things, requirements for leased space, employees, public access, insurance, and certifications.

27.     In order to operate any commercial operation at the Airport, all commercial operators must comply with the Minimum Standards.

28.     As part of its Grant Assurances with the FAA, the City has agreed that it must apply its Minimum Standards fairly and equally to all commercial operators.

29.     The Minimum Standards are an important component of OK3 AIR's contractual relationship with the City.

30.     Section 3 of the Ground Lease Agreement provides that the City has leased the leasehold property to OK3 AIR as lessee "for the purpose of conducting a general aviation business as a Fixed Based Operator and as a Special Services Operator as per 'Minimum Standards and Requirements of the Conduct of Commercial Aeronautical Services and Activities at the Heber City Municipal Airport…"

31.     Section 3 of the Ground Lease Agreement further provides that the Minimum Standards can only be "amended or changed by mutual consent between Heber City and Lessee or as amended when deemed reasonable and necessary by the City Council for safety reasons or in order to comply with State and Federal rules and regulations or in order to assure reasonable and competent service at said airport, and to do all things necessary to carry out said purpose."

32.     When the City proposed to amend the Minimum Standards in 2009, OK3 AIR explained that it had the right under its Ground Lease Agreement to participate in the revision process, and ultimately, that the City could not amend the Minimum Standards without its consent.

33.     Subsequently, the City acknowledged and agreed with OK3 AIR's interpretation of Section 3 of the Ground Lease Agreement in 2009 and 2010.  As a result, it agreed that it would not revise the Minimum Standards without OK3 AIR's participation and consent.

34.     In fact, the City revised the Minimum Standards in 2005 and 2010 only after OK3 AIR consented to the revisions.

35.     Until recently, the City had never questioned the fact that it must obtain OK3 AIR's consent prior to amending the Minimum Standards, subject to the exceptions outlined in Section 3.

36.     In reliance upon the City's promises and conduct over the years, and in particular the City's promises and conduct in 2005, 2009 and 2010, OK3 AIR invested substantial capital into the Airport, its leasehold interest, and its business in general.

37.     The City knew that OK3 AIR had relied on the promises it made in 2009 and 2010, and the City should reasonably have expected that these promises would induce OK3 AIR's to make these financial investments.

**OK3 AIR's History at the Airport and Long-Term Relationship with the City.**

38.     OK3 AIR has operated as the FBO at the Airport for the last 18 years.

39.     During that time, it has complied with the terms of its Ground Lease Agreement with the City and has complied with all FAA, state and local requirements.

40.     Over the years, OK3 AIR has made a substantial financial investment in its business in reliance on its long-term lease rights with the City, and has done everything necessary to ensure that it is compliant with the City's Minimum Standards.

41.     OK3 AIR also made this financial investment in direct reliance on the fact that all competing commercial businesses at the Airport would also have to comply with the City's Minimum Standards.

42.     Over the majority of the last 18 years, OK3 AIR and the City have cooperated to develop and maintain a safe, well-funded Airport. This was made possible in large part because of a good working relationship between OK3 AIR and the City, the City Manager, and the Airport Manager.

43.     This cooperation was in the best interest of OK3 AIR and the City, and was required by the terms of the Ground Lease Agreement. Specifically, Section 3 of OK3 AIR's Ground Lease Agreement with the City permits changes to the Minimum Standards only by "mutual consent between Heber City and Lessee" or as required for safety reasons, to comply with law, or to provide "reasonable and competent service."  Additionally, Section 15 of OK3 AIR's Ground Lease Agreement requires the City to consult with OK3 AIR about "the formulation of rules, regulations and policies to be implemented for the future operation of said airport."  This includes the Minimum Standards and the Rules and Regulations.

44.     Over the years, OK3 AIR has invested substantial resources to grow its business at the Airport.  It makes a substantial contribution to the local economy and currently employs over 20 people, many of whom live in Heber City and the surrounding area.

45.     OK3 AIR has consistently strived to be a good partner with the City and has been a proud member of the Heber City business community.   Over the years, OK3 AIR has provided financial support to help preserve the Airport's history, has participated in the local Chamber, and has supported countless local groups and causes.

46.     As the Airport has grown, OK3 AIR has been sensitive to noise complaints, and has proactively taken steps to address concerns raised by Heber City citizens.

47.     However, as Heber City and the surrounding area have continued to grow over the years, and as more and larger aircraft land at the Airport, the City's management of the Airport has come under increased public scrutiny.

48.     Many in the local community do not understand the management structure at the Airport, however, and assume that OK3 AIR is responsible for management of the Airport and

the increased traffic at the Airport. As such, OK3 AIR has become a target of public criticism aimed the Airport.

49. At the same time, tensions have developed between OK3 AIR and the City regarding the City's management of the Airport.

50. Most of these tensions stem from the fact that OK3 AIR has publicly raised concerns regarding the City's financial management of the Airport, the City's unequal application of the Minimum Standards, and the City's violations of its ongoing Grant Assurance obligations to the FAA.

51. Those Grant Assurance violations have caused the City to lose certain funding grants from the FAA and have jeopardized the City's ability to obtain millions of dollars in necessary future funding from the FAA.

52. Over the last few years, through appearances at public meetings and through written correspondence to the City, OK3 AIR has requested that the City require other operators to comply with the Minimum Standards and has requested that the City comply with the FAA's regulations and Grant Assurances.

53. When the City failed to adequately address OK3 AIR's concerns, OK3 AIR exercised its right to file an informal complaint with the FAA known as a Part 13 Complaint.

54. Over the course of the last two or more years, the City and key City employees, including Mr. Boyer and Mr. Godfrey, have retaliated against OK3 AIR for taking positions on matters of public concern that the City does not like, for speaking up on those matters though correspondence and at public meetings and/or for complaining to the FAA about the City's conduct.

55.     Among other things, the City and the City's Airport Managers have selectively enforced airport regulations against OK3 AIR, inappropriately favored other airport user groups over OK3 AIR, threatened OK3 AIR based on nonexistent violations of Airport rules, and attempted to undermine and damage OK3 AIR's business relationships and OK3 AIR's standing in the community.

56.     Those efforts have been effective; OK3 AIR's relationships with the City and the City Council, as well as OK3 AIR's relationships with its current and prospective customers, have been damaged.

57.     The City also amended the Minimum Standards in 2017 in violation of OK3 AIR's Ground Lease Agreement. The changes to the Minimum Standards lower the standards for competition against OK3 AIR, devalue OK3 AIR's prior investment at the Airport, and make the Airport less safe.

58.     This conduct has caused significant damage to the value of OK3 AIR's leasehold interest and OK3 Air's enterprise value in general.

**OK3 AIR's First Amendment Free Speech on Reversionary Leases**

59.     OK3 AIR can trace its current problems with the City back to 2014.

60.     In 2014, the AAB crafted a Lease/Rates and Charges Policy, with assistance from a professional aviation consultant. Among other things, the purpose of the Lease/Rates and Charges Policy was to establish the terms of standard hangar leases and the rates that the City could charge for hangar lessees.

61.     One of the recommendations made by the consultant was that all future Airport hangar leases should be "reversionary," meaning the hangars would revert back to the City at the expiration of the lease.

62.     While reversionary leases are usually in the best financial interest of the City and Airport, reversionary leases are not as desirable to individual hangar owners.

63.     OK3 AIR's President, Nadim AbuHaidar, was on the AAB at that time and believed that, financially, reversionary leases were in the best interest of the City in this instance.

64.     Another hangar owner, Paul Boyer (who later became the City's Acting Airport Manager) appeared before the AAB, and argued against the reversionary leases and in favor of non-reversionary and renewable leases, i.e., leases in perpetuity, presumably so that he could eventually sell his hangar for a profit and benefit financially.

65.     Mr. Boyer had the support of most of the hangar owners, including those who were members of the AAB.

66.     Even though OK3 AIR owned more hangars at the Airport than any other hangar owner, and stood to gain the most from Boyer's position, Mr. AbuHaidar realized that the position Boyer was lobbying for would likely cost the City hundreds of thousands, if not millions, of dollars over time.  Thus, he argued in favor of reversionary leases.

67.     During one AAB meeting, after Mr. Boyer argued in favor of non-reversionary, renewable leases, and took the position that such leases were in the best interest of the City, Mr. AbuHaidar characterized Mr. Boyer's position as "disingenuous."  This made Mr. Boyer very angry.

68.     Mr. AbuHaidar's lease position was not popular with several of the other members of the AAB, who were also hangar owners.

69.     Because Mr. AbuHaidar expressed an unpopular opinion at the AAB meetings regarding the leases, those AAB members and Hangar owners convinced the City Council to remove Mr. AbuHaidar from the AAB based on an alleged "conflict of interest" that did not

actually exist.  Ironically, although Mr. AbuHaidar had a substantial interest at the Airport, he was actually arguing against OK3 AIR's interest to protect the City.

70.     From that point forward, OK3 AIR's relationship with the AAB and the City began to noticeably deteriorate.

71.     Since that time, Mr. AbuHaidar and OK3 AIR have been largely marginalized by the City and its Airport management. OK3 AIR no longer has an effective voice on Airport matters, even though OK3 AIR is most impacted by Airport decision-making and even though the Ground Lease Agreement requires that OK3 AIR be allowed to participate in Airport decision-making.

72.     After attempting to silence OK3 AIR's dissenting opinion, the AAB and the City Council ultimately approved various amendments to existing and new leases so that such leases are now non-reversionary and essentially perpetual, even though this is not in the best long-term financial interest of the City.

73.     The late Dave Hansen operated Dave's Custom Sheetmetal, a commercial aircraft maintenance business at the Airport, through a Specialized Aircraft Service Operator ("SASO") agreement with the City.  Dave Hansen is not a hangar owner, however; he merely operates a business on property he sub-leases from another hangar owner.

74.     During all relevant times, including the present, Hansen was a member of the AAB, and at times, he was the Vice Chair of the AAB.

75.     While acting as Vice Chair of the AAB, and during public meetings, Hansen leveled several baseless accusations against OK3 AIR, including the accusation that OK3 AIR improperly parked its fuel trucks inside one of its hangars in violation of International Fire Code, that OK3 AIR operated an illegal paint booth, and that OK3 AIR engaged in predatory pricing.

76.     At Hansen's request, the City's then-Airport Manager, Terry Loboschefsky, investigated Hansen's groundless accusation regarding the fuel truck issue.

77.     At or around that same time, OK3 AIR asked Mr. Loboschefsky to investigate Hansen's two other groundless allegations regarding the paint booth and predatory pricing in order to confirm that OK3 AIR was not in violation.

78.     Mr. Loboschefsky investigated Hansen's paint booth and predatory pricing allegations and found them to be baseless.

79.     The City, through Mr. Loboschefsky and the fire marshal, did, at least temporarily, take the position that OK3 AIR's fuel trucks could not be parked inside a hangar unless OK3 AIR installed an expensive fire suppression system.

80.     The City's position was incorrect based on applicable fire codes, however, and through written correspondence, OK3 AIR explained that fact to Mr. Loboschefsky, the fire marshal, and the City attorney, Mark Smedley.

81.     OK3 AIR also explained that, if the City required OK3 AIR to install a fire suppression system based on the City's reading of the applicable fire code, then the City should also require Hansen and other hangar owners to install fire suppression systems for their operations.

82.     After a series of letters between OK3 AIR and the City, wherein OK3 AIR requested reconsideration and/or the chance to meet, the City ultimately decided to drop this issue in March of 2016.  The City never provided OK3 AIR with a final written resolution to this issue.

83.     The City was only interested in requiring OK3 AIR to install an expensive fire suppression system until it realized that other more favored operators were implicated in the position it had taken, and then let the matter drop at that time.

**The City's Unequal Application of the Minimum Standards**

84.     Over the years, the City has demanded that OK3 AIR strictly comply with its obligations under the Ground Lease Agreement and the Minimum Standards.

85.     At the same time, the City has not required other commercial operators to comply with their own lease obligations or the terms of the Minimum Standards.

86.     For example, the City did not require Dave Hansen, owner of Dave's Custom Sheetmetal, to comply with the Minimum Standards.

87.     On May 5, 2016, Hansen submitted a SASO Application on behalf of Dave's Custom Sheetmetal/Aircraft to the City.  That SASO application was submitted to the AAB at the May 18, 2016 meeting.

88.     At the time of his application, Mr. Hansen's prior SASO had expired and he had been operating a business for two years without paying any rent to the City.  This included the time he served as Vice Chair of the AAB and leveled false accusations against OK3 AIR.

89.     During that same time, Hansen also had failed to maintain the insurance required by his prior SASO agreement with the City and the Minimum Standards.

90.     In addition to the problems with Hansen's past performance, Hansen's new application did not and could not comply with the multiple SASO requirements outlined in the Minimum Standards.

91.     OK3 AIR explained these facts to the City Council through written correspondence and through comments made at public meetings.

92.     Specifically, OK3 AIR explained that the Minimum Standards are in place to protect the public, the City, and existing commercial operators at the Airport.  OK3 AIR also explained the importance that the City should place on the Minimum Standards, as one of the guiding documents necessary to maintain a well-managed, safe airport.

93.     OK3 AIR further explained the need to fairly and consistently apply the Minimum Standards to all operators at the Airport, as required by the FAA Grant Assurances.

94.     Despite being aware of the facts, the City ignored the requirements of the Minimum Standards and approved a new lease for Hansen.

95.     The City actually held a special, early morning City Council meeting, for the sole purpose of approving Hansen's new lease.

96.     During that public meeting, members of the City Council took the opportunity to publicly praise Hansen (despite his past conduct) and to chastise OK3 AIR for raising concerns with Hansen's SASO application.

97.     The City has also failed to apply the Minimum Standards to the other commercial operator at the Airport, Barry Hancock, and his businesses, Worldwide Warbirds and Pilot Makers. (Mr. Hancock and his businesses are sometimes collectively referred to as "Hancock").

98.     Mr. Hancock has operated a commercial operation at the Airport for years, despite the fact that he does not have sufficient ramp space to comply with the Minimum Standards.

99.     This City is aware of this fact, and has done nothing to address this issue or force Mr. Hancock to comply with the Minimum Standards.

100.    In fact, while Mr. Hancock's businesses were not in compliance with the Minimum Standards in the Spring of 2017, the City's Airport Manager, Mr. Godfrey, granted Hancock an illegal self-fueling permit, which was a clear violation of the Minimum Standards.

101.    Prior to receiving a self-fueling permit, Hancock purchased fuel from OK3 AIR.

102.    In response to Hancock's complaints about OK3 AIR's fuel prices, Mr. Godfrey decided to grant Hancock a self-fueling permit.

103.    At the time Mr. Godfrey granted Hancock a self-fueling permit, Mr. Godfrey knew it was violation of the Minimum Standards to do so.

104.    The self-fueling permit allowed Hancock to self-fuel from May 2017 through October 2017.

105.    During the time that Hancock was allowed to illegally self-fuel, OK3 AIR lost the revenue that it would have received selling fuel to Mr. Hancock and his businesses.

106.    The City was aware of Mr. Godfrey's actions and approved and/or ratified those actions by allowing Hancock to self-fuel, even though it was a violation of the Minimum Standards to do so.

**OK3 AIR's Wind Safety Complaint and the City and Boyer's Retaliatory Response**

107.    Several months after publicly chastising OK3 AIR for raising legitimate concerns regarding Hansen's SASO application, the City and Mr. Boyer further retaliated against OK3 AIR when OK3 AIR raised legitimate safety issues caused by a neighboring commercial operator.

108.    In mid-2016, during a closed meeting that likely violated Utah's Open and Public Meetings Act, the City Council appointed Paul Boyer to be Acting Airport Manager. Mr. Boyer is the hangar owner who Mr. AbuHaidar of OK3 AIR criticized during the above-described discussions before the AAB regarding reversionary leases. The City then formally voted to hire Mr. Boyer as Airport Manager on July 6, 2016.

109.    Section 5 of OK3 AIR's Ground Lease Agreement requires that OK3 AIR "shall .

. . make a complete inspection at least once a week of all facilities at the airport and report

immediately any hazardous or dangerous condition to the City."

110.    Pursuant to Section 5, OK3 AIR has routinely reported safety concerns to the City

Manager, the Airport Manager, or the AAB, depending on who was in charge.

111.    In September 2016, OK3 AIR brought a safety issue to Mr. Boyer's attention.

112.    Wind in the Heber Valley can cause safety concerns at the Airport because, if a

lightweight aircraft is left outside and not properly tied down, the wind can catch the wings and

cause the aircraft to move, which could damage the aircraft or nearby property or cause personal

injury.

113.    Several years ago, during a windstorm, a glider that was not properly tied down

had blown into an Airport boundary fence.

114.    On September 22, 2016, OK3 AIR's Chief Financial Officer, Alan Robertson,

emailed Mr. Boyer and stated that OK3 AIR had a safety concern regarding aircraft that were left

outside of a neighboring commercial operator's hangar and not properly tied down as required by

the Airport Rules and Regulations and the FAA's guidance.

115.    Mr. Robertson explained in his email that he witnessed individuals attempting to

physically hold down an aircraft during a windstorm next door to OK3 AIR's building.  "After

apparently tiring of this exercise they tied the plane out to a picnic table. Thanks in advance for

addressing this."

116.    This violation of the Rules and Regulations was of particular concern to OK3

AIR, because if the wind had picked up the aircraft, it could have blown the aircraft into OK3

AIR's building, customer aircraft that were tied down on OK3 AIR's ramp, or the fuel farm, and caused substantial damage.

117.   OK3 AIR's complaint regarding this safety concern was required by Section 5 of OK3 AIR's Ground Lease Agreement and was also a Constitutionally-protected petition for redress.

118.   Mr. Boyer, in his capacity as Airport Manager for the City, did not address OK3 AIR's valid safety concern.  Instead, Mr. Boyer retaliated against OK3 AIR.

119.   This is consistent with a plan that was devised by Mr. Boyer, and communicated to Mr. Hancock via email just days before OK3 AIR's safety complaint.

120.   In that email, dated September 20, 2016, Mr. Boyer explained his plan to retaliate against OK3 AIR's involvement in the public process, and to ultimately cause a lawsuit between OK3 AIR and the City.  Specifically, he explained his intent to target OK3 AIR's use of the apron space by issuing a "cease-and-desist letter" and to "make a single big-item change to the M/S (something like reducing the FBO required 8 acres to just 2 acres…and then wait for the lawsuit to come."   The acronym "M/S" stands for Minimum Standards.

121.   When OK3 AIR raised the wind safety issue on September 22nd, it provided Mr. Boyer the opportunity he was looking for to retaliate and raise the apron issue identified in his September 20th email.

122.   Consistent with his plan, Mr. Boyer replied to Mr. Robertson via email stating: "Curiously, Alan, **despite your 'safety concern . . .' by one of your neighbors, one can view OK3 Air's apron any night of the week and see that very few of your parked aircraft are tied down**. This seems to be a double standard from your complaint about one of your neighbors. . . ."  (Emphasis in original).

123.     Mr. Boyer's allegation that OK3 AIR was similarly failing to tie down light aircraft was false.  OK3 AIR was properly tying down lightweight aircraft.  Meanwhile, heavy aircraft, like jets, do not need to be tied down.

124.     Mr. Boyer then leveled a series of additional, unrelated accusations against OK3 AIR regarding its use of the apron and demanded that OK3 AIR refrain from various activities that he stated were violations of Airport Rules and Regulations.

125.     This apron issue is the very same issue Mr. Boyer's September 20th email stated he would raise in retaliation for OK3 AIR's next complaint (along with his larger plan of revising the Minimum Standards to damage OK3 AIR and force a lawsuit).

126.     Again, all of Boyer's allegations were either untrue, without factual basis, or were not grounded in applicable Airport Rules and Regulations.

127.     Mr. Boyer went on to state: "I truly appreciate your email about safety concerns, but the discussion **you requested** demands it be widened to the full requirements above. The City expects OK3 AIR to comply with these provisions of the Airport Rules and Regulations without cherry picking only those that suit OK3 AIR's purpose."  (Emphasis in original).

128.     In other words, through Boyer, the City made it clear that valid safety complaints about other operators (even if those complaints were raised pursuant to OK3 AIR's obligations under the Ground Lease Agreement) would not be investigated or addressed, and would, instead, result in retaliatory complaints against OK3 AIR.

129.     The next day, on September 30, 2016, Mr. Boyer followed up on his retaliatory threats by making false allegations to the City's legal counsel that OK3 Air was parking aircraft on apron space allegedly owned by the City and requesting that the City take action against OK3 AIR.

130. The City had previously delegated authority to Mr. Boyer to engage in the conduct described above, was aware of Mr. Boyer's conduct, and went on to ratify it.

131. Specifically, in a ratification of Mr. Boyer's retaliatory plan, the City ultimately pursued Mr. Boyer's baseless complaint against OK3 AIR regarding its use of the apron, and continued to exert pressure on OK3 AIR over the next year though Mr. Boyer's replacement, Mr. Godfrey, even though there was no probable cause for doing so.

132. OK3 AIR responded to Boyer's allegations, challenging each of them. However, except as described below, the City was ultimately forced to abandon its pursuit of the violations raised by Boyer, as they all turned out to be baseless threats.

## OK3 Air's First Amendment Speech Against the City Through a Part 13 Complaint and the City's Retaliatory Response

133. Throughout 2016, OK3 AIR consistently raised issues with the City's unequal application of the Minimum Standards.

134. During that same time, the City violated its Grant Assurances with the FAA by passing resolutions designed to delegate City decision-making to the public, by refusing to update its Airport Layout Plan in violation of Grant Assurances, by passing an ordinance discriminating against airport users who do not have hangars at the Airport, by failing to apply its existing Minimum Standards fairly and equally to all operators, and by repeatedly failing to enforce the Minimum Standards against certain, more favored operators who have not criticized the City.

135. OK3 AIR raised issues, both in writing and at public meetings, with these decisions made by the City.

136. For instance, on July 18, 2016, OK3 AIR sent correspondence to the City in which its legal counsel explained:

I recognize the current relationship between the City Council and OK3 Air is strained. That does not mean we should not have the same goals—a safe, well-regulated and well-funded airport. With that common goal in mind, I think a reasonable resolution is possible. I have made repeated efforts to schedule meetings with you, the Mayor and various members of the City Council and the Airport Advisory Board. The City has not only ignored those requests, but has continued to take actions that appear to be targeted at damaging the airport and OK3 Air's business. The City also seems intent on doing things that it knows, or should know, will invariably jeopardize the millions of dollars of funding it receives from the FAA.

My previous conversations with you have been clear. To avoid any possibility for confusion, however, I am sending this letter to inform you and the City that we are dangerously close to a situation where OK3 Air will have no choice but to pursue a Part 16 Complaint with FAA and to file a civil suit against the City (and possibly certain Council Members). Please be advised that OK3 Air will take such action if any of the following should occur: (1) the City issues a Notam order restricting traffic at the airport; (2) the City amends its Minimum Standards without OK3 Air's consent, as is required by the City's lease agreement with OK3 Air; (3) the City enters a lease with Dave's Custom Sheetmetal/Aircraft, which would be a clear violation of the Minimum Standards; or (4) the City fails to repeal Heber City Resolution 2016-9. We have explained in prior correspondence why each of these events would be grounds for an FAA complaint and/or a civil suit against the City. Based on the City's actions over the last several months, OK3 Air is very confident that it will prevail if it is forced to bring such claims against the City.

137.    Mr. Boyer, who was newly appointed as Airport Manager at the time, was aware of this letter. However, the City and its Airport Managers ignored OK3 AIR's concerns, and instead, the City continued to violate the Grant Assurances and jeopardize its own funding.

138.    OK3 AIR's concerns regarding the City's compliance with FAA regulations and Grant Assurances culminated on Friday, January 6, 2017, when it filed a complaint with the FAA known as an Informal Part 13 Complaint.

139.    Denis Godfrey had taken over as Airport Manager by the time OK3 Air filed its Part 13 Complaint with the FAA, and, in fact, Godfrey's conduct was mentioned in the Part 13 Complaint.

140. Just two days after OK3 AIR filed its Informal Part 13 Complaint, on Sunday, January 8, 2017, Mr. Godfrey, showed up at OK3 AIR's premises at the Airport unannounced. He brought two Heber City Police officers with him.

141. In retaliation for OK3 AIR's Part 13 Complaint, Mr. Godfrey proceeded to order OK3 AIR's employees to remove OK3 AIR's large fuel truck from inside one of OK3 AIR's hangars. This is the same issue that the City had seemingly decided to drop nine months earlier when challenged by OK3 AIR.

142. There was no valid reason for Mr. Godfrey to have police officers show up on OK3 AIR's premises to address a small, petty compliance issue, and certainly not without a final decision from the fire marshal.

143. Prior to this time, all other previous Airport Managers simply contacted OK3 AIR's employees about minor concerns such as the location of a fuel truck.

144. However, Mr. Godfrey wanted to send the message that OK3 AIR's Informal Part 13 Complaint – which OK3 AIR had a First Amendment right to make – was not acceptable. This message was consistent with the City's unstated, but well-established policy of retaliating against OK3 AIR.

145. The City had previously delegated authority to Mr. Godfrey to engage in the conduct described above and was aware of Mr. Godfrey's conduct, which was supervised by the City Council.

146. Mr. Godfrey's tactics were effective, and OK3 AIR's employees, both those who were at work that day and those who learned about the police incident later, are afraid that they will face repercussions from Mr. Godfrey, the City and the City's police force, including arrest,

if they or OK3 AIR exercise their First Amendment right to speak out against the City's management of the Airport and/or treatment of OK3 AIR.

147. Again, OK3 AIR challenged the City's conduct and its position regarding the location of the fuel truck during a follow-up meeting with legal counsel for the City.

148. The City further ratified Mr. Godfrey's actions by failing to correct or address his actions.

149. In fact, to this day, the City has failed to issue a final determination on any of the fire safety issues it raised. The alleged fire safety issue was nothing more than a retaliatory action intended by Godfrey and the City to harass and intimidate OK3 AIR and its employees.

**OK3 Air's Access to Public Ramp**

150. Later in that same month, Mr. Godfrey, acting in his capacity as the Airport Manager, accused OK3 AIR of allowing a customer to park an aircraft on a "public ramp" owned by the City.

151. The aircraft was parked on OK3 AIR's leasehold, in a location that OK3 AIR had parked aircraft for 18 years without any issues or complaint from the City.

152. Now, because OK3 AIR had filed a complaint with the FAA and because OK3 Air had raised its September 22, 2016 safety complaint, Mr. Godfrey was raising a complaint about this process.

153. In his email, Mr. Godfrey mischaracterized the ramp as a "taxi lane," asked OK3 AIR to move the aircraft, and then threatened to be "heavy handed" if OK3 AIR did not comply:

> Frankly, my first impulse was to contact the chief pilot, Matt Mogel at 660 281-8334 and have him direct it moved. I would rather not be heavy handed and involve your customer. Rather, I hope you get this message and direct FBO staff to move the aircraft by tomorrow morning.

154.    This was the very same baseless issue that Mr. Boyer raised in retaliation to OK3 AIR's October 22, 2106 safety complaint, and the same issue that Mr. Boyer had asked the City's attorney to raise with OK3 AIR.

155.    The fact that two separate airport managers had leveled the same incorrect allegations in retaliation against OK3 AIR is evidence that that they were pursuing a City policy that had been approved and/or ratified by the City.

156.    In response to this threat, OK3 AIR explained that the plane was safely parked and that the area was not a taxi lane.

157.    The FAA later confirmed that the area was not a taxi lane and was, in fact, part of OK3 AIR's ramp.

158.    Although Mr. Godfrey and/or the City have taken no further, official steps to prevent OK3 AIR from parking aircraft on its ramp, the City, through the Airport Manager and other City officials, continues to mischaracterize OK3 AIR's ramp as a "taxi lane" and OK3 AIR's practice of safely parking aircraft on its ramp as improper during public meetings.

**The City's Failure to Adequately Plow the Runway**

159.    The City receives substantial snow in the wintertime, which can cause dangerous runway conditions if not cleared.

160.    In addition to obvious safety concerns, OK3 AIR's business depends on the runway being cleared in the winter.  Without a clear runway, OK3 AIR's customers cannot land and OK3 AIR cannot sell those customers fuel or any of the other services provided by OK3 AIR at the Airport.

161.    Snow removal from the runway, taxiway, and connector is the City's responsibility, which the City has delegated to Godfrey as Airport Manager.

162. In fact, the City is required by FAA regulation and Grant Assurances, as well as contracts with Airport lessees and operators, to promptly remove snow from the Airport.

163. For the first 17 years that OK3 AIR operated the FBO, the City plowed the runway in a timely fashion and OK3 AIR has been able to provide services to its customers in winter months.

164. Suddenly, when OK3 AIR threatened to file and ultimately filed its Part 13 Complaint with the FAA, the City began to fail to timely plow the runway. For example, the City failed to adequately plow the runway during the arrival periods for Thanksgiving and Christmas of 2016, which are peak periods for OK3 AIR, forcing OK3 AIR to send customers elsewhere to land.

165. During Christmas of 2016, Mr. Godfrey intentionally did not plow a fifteen-foot-wide swath of ramp/taxi-way. This was on property that the City claimed was on OK3 AIR's leasehold, but which had been traditionally plowed by the City.

166. As a result of Mr. Godfrey actions, OK3 AIR's customers were forced to divert from Heber City to land in Salt Lake City.

167. Mr. Godfrey has made excuses for why it had failed to remove snow in a timely manner or left large patches of snow. None of these excuses were valid.

168. In reality, Mr. Godfrey was deliberately providing poor snow removal in order to punish OK3 AIR for speaking out in public about airport related matters and the positions it has taken on various issues, despite the safety risks to Airport users.

169. This action was consistent with the City's pattern and plan of retaliating against OK3 AIR for exercising its right to speak out about the City's actions.

170. By failing to address or rectify Mr. Godfrey's actions, despite formal requests that the City address it, the City has ratified Godfrey's actions.

171. OK3 AIR has requested that the City invest in more or better equipment and/or the manpower needed to ensure timely snow removal. The City has not complied, despite the safety risks posed by poor snow removal.

**The City's Refusal to Approve the McQuarrie Hangar Lease**

172. The City and its Airport Manager also interfered in a pending business transaction between OK3 AIR and Mel McQuarrie. In the summer of 2016, OK3 AIR entered a contract to purchase Daniel Hangar #2 from Mr. McQuarrie.

173. This was during a time period when OK3 AIR was regularly providing written comments to the City on Airport related issues, attending AAB and City Council meetings, and otherwise exercising its right to participate in the public decision-making process.

174. As a condition to completing that transaction, Mr. McQuarrie was required to obtain a new lease from the City.

175. Mr. McQuarrie's existing lease with the City gave him the right to obtain a new hangar lease and assign it to OK3 AIR.

176. Under McQuarrie's lease and the Lease/Rates and Charges Policy, the Airport Manager has the right to approve a new lease as an administrative function without seeking City Council approval.

177. At the time, Mr. Boyer was the Acting Airport Manager.

178. On August 9, 2016, McQuarrie notified the City that he intended to sell his hangar to OK3 AIR and assign his lease rights to OK3 AIR, pursuant to a Real Estate Purchase Contract, a copy of which was provided to the City.

179.    Mr. Boyer initially indicated to Mr. McQuarrie that he would happily provide such approval.  He later refused to process the application when he learned that OK3 AIR was the prospective purchaser.

180.    Mr. Boyer's alleged reasons for refusing to renew McQuarrie's lease were illegitimate.  Had OK3 AIR not been the buyer, Mr. Boyer would have administratively approved McQuarrie's new lease and the hangar sale would have closed.

181.    For illegitimate reasons, i.e., bias against OK3 AIR, the AAB and then the City Council also proceeded to refuse to enter a new lease with Mr. McQuarrie in accordance with the clear terms and understanding of his original lease.

182.    Had OK3 AIR not been the buyer, the AAB and City Council would have approved McQuarrie's new lease and the hangar sale would have closed.

183.    Councilman Ronald Crittenden and Councilwoman Heidi Franco acknowledged on the record that their personal views regarding OK3 AIR were the motivating factor for voting not to grant McQuarrie a new lease under the terms of his original lease.

184.    Over the course of several months, the City engaged in delay tactics by proposing unreasonable lease terms to McQuarrie that did not conform to McQuarrie's original lease and did not give McQuarrie the leasehold interest he had agreed to renew and assign to OK3 Air under its Real Estate Purchase Contract.

185.    As such, the contract between OK3 AIR and McQuarrie expired by its terms, OK3 AIR was unable to buy the hangar under the terms it had bargained for, and OK3 AIR will suffer approximately $65,000 a year in damages for the next 25 years.

186.    OK3 AIR has exhausted its administrative remedies regarding its tort claims against the City, Mr. Godfrey, and Mr. Boyer, including serving a Notice of Claim in

conformance with the Utah Governmental Immunity Act, Utah Code Ann. § 63G-7-101 et seq. on June 15, 2017. The sixty-day, statutory waiting period for filing this Complaint has ended, less than a year has passed since OK3 AIR's claim was deemed to be denied, and therefore, OK3 AIR properly brings its tort claims pursuant to Utah Code Ann. §63G-7-403.

**The City's Adoption of Revised Minimum Standards**

187. Section 3 of OK3 AIR's Ground Lease Agreement with the City permits changes to the Minimum Standards only by "mutual consent between Heber City and Lessee" or as required for safety reasons, to comply with law, or to provide "reasonable and competent service."

188. Section 15 of OK3 AIR's Ground Lease Agreement also requires the City to consult with OK3 AIR about "the formulation of rules, regulations and policies to be implemented for the future operation of said airport." This includes the Minimum Standards and the Rules and Regulations.

189. In other words, changing the Minimum Standards constitutes a rule or regulation for the future operation of the Airport.

190. In reliance on these protections in its Ground Lease Agreement, OK3 AIR has made a substantial financial investment in the Airport in order to build up its facilities and comply with the Minimum Standards.

191. Despite the foregoing, the City insisted on amending the Minimum Standards and the Rules and Regulations without any meaningful consultation with OK3 AIR under Section 15 of the Ground Lease Agreement and without obtaining OK3 AIR's consent under Section 3 of the Ground Lease Agreement.

192.    When OK3 AIR learned that the City was considering amending the Minimum Standards in 2016, it hired an expert in airport rules and regulations and, with his assistance, provided comments to the proposed revised minimum standards during the public comment period.  These comments were ignored.

193.    OK3 AIR also wrote the City and explicitly stated that it did not consent to the revised Minimum Standards.  Again, OK3 AIR's objection was ignored.

194.    Despite the foregoing, on October 5, 2017, the City voted to adopt revised Minimum Standards and revised Rules and Regulations, knowing that it would harm OK3 AIR and knowing that it was a violation of OK3 AIR's Ground Lease Agreement to do so.

195.    With respect to the Rules and Regulations, the City moved the provision governing self-fueling from the Minimum Standards to the Rules and Regulations.

196.    In other words, the City eliminated the provision regarding self-fueling from the Minimum Standards without OK3 AIR's consent and without satisfying any of the three exceptions set forth in Section 3 of the Ground Lease Agreement. This is a serious detriment to OK3 AIR because, once moved to the Rules and Regulations, the City can claim, and has claimed, that it can reduce the self-fueling requirements without OK3 AIR's consent.

197.    As Airport Manager, Godfrey was heavily involved in the process of revising the Minimum Standards and advocated in favor of revisions that would harm OK3 AIR.

198.    Mr. Boyer was also involved as a member of the City's Technical Advisory Committee.

199.    On numerous occasions, including his September 20, 2016 email to Mr. Hancock, Mr. Boyer stated his hope that the City would make substantial revisions to the Minimum Standards to damage OK3 AIR and force a lawsuit between the City and OK3 Air.

200.    Mr. Boyer used his role as Airport Manager, and then as a member of the City's Technical Advisory Committee, to push for changes to the Minimum Standards that would damage OK3 AIR.

201.    In the months leading up to its adoption of the revised Minimum Standards, the City never indicated that it was revising the Minimum Standards for safety reasons, in order to comply with state and federal rules, or in order to assure reasonable and competent service at the Airport.

202.    On the day it passed Resolution No. 2017-14 revising the Minimum Standards, the City stated, for the first time, that it was revising the Minimum Standards for safety reasons, in order to comply with state and federal rules, and in order to assure reasonable and competent service at the Airport.  In other words, at the last minute, the City attempted to bring the reasons for amending the Minimum Standards within the allowable bases set forth in Ground Lease Agreement.

203.    However, the City's newly stated reasons were merely a pretext for its true reasons for revising the Minimum Standards.

204.    The 2005 Minimum Standards were already in compliance with state and federal rules and regulations, and the FAA has repeatedly confirmed that it did not have any issues with 2005 Minimum Standards.

205.    The revised Minimum Standards also do not address any legitimate safety issues. In reality, the record shows that the City is deliberately lowering the requirements to operate and making the Airport less safe by lowering safety standards.

206.    The record also shows that services at the Airport were already reasonable and competent.

207.    Indeed, the true purpose for the City's decision to revise the Minimum Standards, and for Mr. Boyer and Mr. Godfrey to advocate for these changes, was to undermine OK3 AIR through unfair competition, which is not an exception to the "mutual consent" requirement in Section 3 of OK3 AIR's Ground Lease Agreement.

208.    Encouraging competition is not the same as guaranteeing "reasonable and competent service."  Nor do the revisions to the Minimum Standards guarantee "reasonable and competent service."  In fact, the changes guarantee the opposite:  Where the Airport is busier now than it has ever been before, an argument could be made that the 2005 Minimum Standards were insufficient to ensure "reasonable and competent service."  If anything, the standards should have been increased (rather than decreased) to reflect what current operators use to safely serve the flying public.

209.    Even if ensuring competition was a valid exception to Section 3 of OK3 AIR's Ground Lease Agreement, which it is not, the 2005 Minimum Standards already allow competition at the Airport.   Another FBO is free to compete against OK3 AIR under the 2005 Minimum Standards, provided it meets the same requirements that OK3 AIR has been forced to meet.

210.    Nevertheless, the City elected to lower the standards for operating at the Airport so that a second FBO could unfairly undermine OK3 AIR, without complying with the same safety requirements applied to OK3 AIR and without making the same investment made by OK3 AIR.

211.    Through these revised Minimum Standards and revised Rules and Regulations, the City (including Godfrey) was trying to encourage another FBO to move into the Airport to damage OK3 AIR's business or drive out OK3 AIR entirely.

212.    Ironically, by lowering the Minimum Standards, the City was not only damaging existing, compliant operators like OK3 AIR, but also eroding safety protections for the public and the City.

213.    During the September 13, 2017 AAB meeting, Councilwoman Franco, other AAB members, and Airport Manager Denis Godfrey stated on the record that their purpose in revising the Minimum Standards was to lower the cost of beginning new operations at the Airport, specifically FBO operations.

214.    Thus, the City was expressly lowering the standards and investment required of such an FBO.  Rather than encourage competition on equal terms, the City is intentionally using the revised Minimum Standards to encourage competition on unequal terms to the detriment of existing, compliant operators, like OK3 AIR.

215.    Put another way, the City was lowering the cost of beginning new operations at the Airport and thereby diluting the value of OK3 AIR's substantial financial investment in the Airport.

216.    In particular, the revised Minimum Standards allowed the introduction of a self-service fueling SASO at the Airport with few regulations and unreasonably low standards.

217.    Selling fuel is primarily what an FBO like OK3 AIR does.  Although FBOs are required to provide other services to support general aviation, such as maintenance, hangaring and flight training, profits from fuel sales are what financially enable FBOs to provide these other services.

218.    Carving out a SASO for fuel sales only, i.e., allowing an operator to only sell fuel and not require them to provide other support services, puts that SASO at an unfair advantage and can irreparably harm an FBO business that is otherwise required to provide full services.

219. The City also lowered the standards and requirements for the amount of contiguous land an FBO needs, lowered the standards and requirements for an aircraft-maintenance SASO, and lowered the standards and requirements for a flight training SASO.

220. The City also revised the Minimum Standards to allow the City Council to give waivers and variances to operators the City likes better than OK3 AIR and to give the Airport Manager more authority and unfettered discretion to police the Airport.

221. For example, the revised Minimum Standards allow the City Council to give 6-month temporary variances upon a finding of a "special condition or unique circumstances" that makes the Minimum Standards "unduly burdensome." Even worse, the revised Minimum Standards allow the City Council to give a 6-month temporary waiver to an operator if "reasonably necessary to alleviate the financial burden of initiating a new Commercial Aeronautical Activity at the Airport."

222. It is proposed changes like these that make Section 3 of OK3 AIR's Ground Lease Agreement so important. That is, Section 3 exists to prevent the City from making unilateral changes that can damage an existing, compliant business like OK3 AIR that has already paid to enter the market.

223. Additionally, the revised Minimum Standards gave the Airport Manager the discretion to punish operators like OK3 AIR who do not conform to subjective, vague, ambiguous, and undefined standards of conduct.

224. For example, the revised Minimum Standards provided that operators "are to control the conduct and demeanor of their personnel, agents, subcontractors, and subtenants, as well as conduct their business operations in a safe, orderly, efficient, and proper manner so as not to unreasonably disturb or endanger City employees and representatives and/or Airport

customers, tenants or other Commercial Aeronautical Operators." None of these requirements or standards were defined anywhere in the revised Minimum Standards.

225. To make matters worse, the revised Minimum Standards provided that the Airport Manager "has the primary responsibility for the interpretation and application of the Minimum Standards and is authorized to issue citations, directives, adequacy determinations, and interpretive guidance in conformity with the [revised] Minimum Standards and the Rules and Regulations."

226. Where the revised Minimum Standards did not contain clear standards for determining violations, they invited arbitrary, subjective decision-making. This problem is compounded by the fact that much of the decision-making is to be done by a single individual (i.e., Godfrey and his predecessors as the Airport Manager) without notice to the affected parties or an opportunity for the affected parties to be heard.

227. The City also knew that its claim that it needs to bring the Minimum Standards within federal and state rules and regulations was false.

228. When it decided to revise the Minimum Standards, the City publicly stated that it needed to revise the Minimum Standards to comply with FAA requirements, which was communicated to the FAA.

229. However, before the revised Minimum Standards were adopted in 2017, the FAA informed the City that it has no issues with the 2005 Minimum Standards (as amended in 2010 and 2016) and that those Minimum Standards do not present concerns with the City's Grant Assurance obligations.

230. Again, FAA compliance was a false justification for revising the Minimum Standards designed to conceal its true intentions: bring new operators to the Airport to compete against OK3 AIR without requiring them to make the same financial investment as OK3 AIR.

231. On April 2, 2019 – eighteen months after OK3 AIR filed its original Complaint – the City voluntarily rescinded the Revised Minimum Standards and restored the Minimum Standards in effect prior to October 5, 2017.

232. The City stated in its resolution that it was doing so "to [among other things] eliminate or reduce recent disputes regarding proposed development and new commercial aeronautical activities at the Airport in order to ensure a meaningful, transparent, and robust Master Plan process."

233. While laudable, the City would not have made the decision to rescind the Revised Minimum Standards if not for the current lawsuit.

234. Further, the City's decision to rescind the Revised Minimum Standards was made 18 months after adopting them, meaning the City was in violation of the Ground Lease Agreement for a year and a half.

235. The City's breach of the Ground Lease Agreement during that time caused OK3 AIR to incur substantial damages and costs, including and especially attorneys' fees.

236. Incurring these attorneys' fees was reasonably necessary in order for OK3 AIR to protect its investment in its business at the Airport.

237. Accordingly, under the terms of the Ground Lease Agreement, as amended, OK3 AIR is entitled to an award of these attorneys' fees and costs due to the City's failure to perform its obligation to obtain OK3 AIR's consent prior to amending the Minimum Standards. January 2015 Amendment to Ground Lease Agreement, ¶5.

238.     Meanwhile, Heber City continues to repudiate its obligation under the Ground Lease Agreement to obtain OK3 AIR's participation and consent prior to revising the Minimum Standards in the future.

239.     During the April 2, 2019 City Council meeting, Councilmember Ron Crittenden insisted that the City could reinstate the Revised Minimum Standards at any time.

240.     Additionally, in the very resolution through which Heber City rescinded the revised Minimum Standards (Resolution No. 2019-08), the City stated that it "intends to review its Minimum Standards in connection with development of the Master Plan to assure that the City's Minimum Standards support and advance the goals set forth in the Master Plan."  In other words, the resolution said nothing about working with OK3 AIR to obtain its consent before adopting these new Minimum Standards in the future.

241.     Similarly, in justifying its actions in rescinding the revised Minimum Standards, Matt Brower, Heber City Manager, told AOPA, the pilot advocacy group, through a letter dated April 5, 2019 that the City remained open to making additional revisions to the Minimum Standards.

242.     He also explained that "[t]he City shares AOPA's concern about the fuel prices and other services offered by the incumbent FBO [OK3 AIR], as well as AOPA's belief that enhanced competition at the Airport is an effective means of addressing this concern."

243.     Again, neither the objective of increasing competition and/or forcing OK3 AIR to lower its fuel price are contractual bases under the Ground Lease Agreement for revising the Minimum Standards without OK3 AIR's participation and consent.

244.     As long as the City continues to take the position that it can revise the Minimum Standards without OK3 AIR's consent in violation of the Ground Lease Agreement, OK3 AIR

faces immediate harm, its enterprise value is immediately affected and its future profitability is in jeopardy.

## FIRST CAUSE OF ACTION
### First Amendment Retaliation under 42 U.S.C. § 1983

245.    Plaintiff incorporates all prior and subsequent allegations by this reference.

246.    OK3 AIR has rights to freedom of speech and to petition the Government for redress of grievances that are protected under the First Amendment to the United States Constitution.

247.    OK3 AIR was engaged in constitutionally-protected activity when it took a position on reversionary leases, complained to the City, Boyer, and Godfrey about its failure to require compliance with the Minimum Standards and Rules and Regulations by other operators through written correspondence and public meeting appearances, filed an informal Part 13 Complaint with the FAA, and otherwise criticized the City's, Boyer's, and Godfrey's management and oversight of the Airport.

248.    The City and its Airport Managers, Boyer and Godfrey, responded to OK3 Air by falsely accusing OK3 AIR of violating various Airport rules—including through police force, unequally applying the existing Minimum Standards and Rules and Regulations, refusing Mr. McQuarrie's lease extension for no legitimate reason, deliberately failing to timely remove snow, illegally allowing Hancock to self-fuel, and revising the Minimum Standards to invite unfair competition against OK3 AIR.  All of these responses were retaliatory and have all caused OK3 AIR financial injury.

249.    Mr. Boyer responded to OK3 AIR by falsely accusing OK3 AIR of violating various Airport rules, unequally applying the existing Minimum Standards and Rules and Regulations, refusing Mr. McQuarrie's lease extension for no legitimate reason, lobbying for

36

revisions the Minimum Standards to harm OK3 AIR and attempting to engineer a lawsuit between OK3 AIR and the City.  All of these responses were retaliatory and have all caused OK3 AIR financial injury.

250.    Mr. Godfrey responded to OK3 AIR by falsely accusing OK3 AIR of violating various Airport rules, unequally applying the existing Minimum Standards and Rules and Regulations, using police force, refusing Mr. McQuarrie's lease extension for no legitimate reason, deliberately failing to timely remove snow, illegally allowing Hancock to self-fuel, and lobbying for revisions the Minimum Standards to harm OK3 AIR.  All of these responses were retaliatory and have all caused OK3 AIR financial injury.

251.    The City, Mr. Boyer, and Mr. Godfrey also brought many retaliatory complaints against OK3 AIR, regarding fuel truck fire safety, aircraft tie-downs, and taxi lane parking, among other things.  The City and its Airport Manager, Mr. Godfrey, even used local police to enforce a recommendation from the fire marshal (which was not yet a final decision because the City had already dropped the issue), in order to intimidate, harass, and silence OK3 AIR and its employees.

252.    All of Mr. Boyer, Mr. Godfrey, and the City's complaints and accusations were baseless and, once OK3 AIR responded to them, they declined to pursue them.  They constituted false threats, harassment and official retaliation.

253.    These retaliatory complaints and accusations by the City, Mr. Boyer, and Mr. Godfrey would chill a person of ordinary firmness from continuing to exercise his or her First Amendment rights to complain to the City and to the FAA about the City's management and oversight of the Airport.

254. The City supervised, was aware of, participated in, gave authority for, and/or ratified the conduct by Mr. Boyer and Mr. Godfrey described above.

255. The City's actions, through its Airport Managers, City Council, and other City actors, were substantially motivated as a response to OK3 AIR's exercise of its First Amendment rights. They constituted a widespread practice of retaliation against OK3 AIR that rose to the level of a City custom and/or policy.

256. Additionally, many of the City's retaliatory actions against OK3 AIR were made by its Airport Managers and other City actors who had final decision-making authority; other of the City's employees' retaliatory actions were ratified by the City Council. As a result, the City is liable for the retaliatory actions against OK3 AIR that were taken by its employees.

257. OK3 AIR has suffered financial injury, excessive stress, emotional distress, and inconvenience, as a result of this conduct in an amount to be determined at trial, including lost revenue, the loss of the McQuarrie hangar and McQuarrie leasehold assignment, diminution in the value of OK3 AIR's leasehold interest in the Ground Lease Agreement, a diminution in OK3 AIR's enterprise value, and other economic damages. The damages are expected to exceed a total of $3,000,000.00.

258. Pursuant to 42 U.S.C. § 1988, OK3 AIR is entitled to its reasonable attorneys' fees and costs for prosecution of this action.

259. OK3 also is entitled to a preliminary and permanent injunction prohibiting the City, through its Airport Managers, City Council, and other City actors, from continuing or devising any further custom, policy or practice that will deprive OK3 AIR of its First Amendment rights and otherwise have a chilling effect on OK3 AIR's speech.

**SECOND CAUSE OF ACTION**
**Breach of Contract (Heber City)**

260.     Plaintiff incorporates all prior and subsequent allegations by this reference.

261.     OK3 AIR's Ground Lease Agreement with the City is a valid and enforceable contract.

262.     OK3 AIR has, at all material times, complied with its obligations to the City under the Ground Lease Agreement.

263.     When it learned that the City was considering amending the Minimum Standards, OK3 AIR took many steps to object to the City's consideration of revised Minimum Standards on numerous occasions.

264.     Nevertheless, on October 5, 2017, the City passed Resolution 2017-14 adopting the Minimum Standards, which went into effect thirty (30) days later.

265.     The City's adoption of this Resolution over OK3 AIR's objection was a violation of the clear terms of the Ground Lease Agreement.

266.     The City's adoption of Resolution 2017-15, amending the Rules and Regulations without consultation with OK3 AIR also violated Section 15 of OK3 AIR's Ground Lease Agreement.

267.     The City's violation of the Ground Lease Agreement by adopting the Revised Minimum Standards for a year and a half damaged OK3 AIR in an amount to be determined at trial.

268.     For example, OK3 AIR has lost revenue due to the City's failure to manage and maintain the Airport in conformance with the terms of the Ground Lease Agreement and the prior Minimum Standards.

269. Among other things, OK3 AIR has lost value in its investment because, if the City were to reinstate the revised Minimum Standards, another FBO could compete against OK3 AIR without having to make the same financial investment.

270. OK3 AIR has also been damaged because its leasehold interest in the Ground Lease Agreement is not as valuable now that the City has demonstrated that it will make changes to Minimum Standards without OK3 AIR's consent based on the argument that Section 3 of the Ground Lease Agreement does not require OK3 AIR's participation and consent to amend the Minimum Standards.

271. Finally, OK3 AIR has incurred substantial attorneys' fees as a result of Heber City's conduct, which are compensable under the terms of the Ground Lease Agreement as set forth above.

272. Under Utah law, OK3 AIR is entitled to damages and preliminary and permanent injunctive relief, including an order enjoining the reinstitution of the revised Minimum Standards and Rules and Regulations and prohibiting the City, through its Airport Managers, City Council, and other City actors, from further revising the Minimum Standards without conforming to the requirements of the Ground Lease Agreement.

### THIRD CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith & Fair Dealing (Heber City)**

273. Plaintiff incorporates all prior and subsequent allegations by this reference.

274. As a party to OK3 AIR's Ground Lease Agreement, the City impliedly promised not to intentionally or purposely do anything that would destroy or injure OK3 AIR's right to receive the fruits of the Ground Lease Agreement, including the fruits of Section 3 of the Ground Lease Agreement and the investment OK3 AIR would make in reliance upon this protection.

40

275.     By unevenly enforcing the 2010 Minimum Standards, falsely accusing OK3 AIR of numerous violations of the Rules and Regulations governing the Airport, retaliating against OK3 AIR for expressing its opinions, making misrepresentations to the public about OK3 AIR, and adopting the revised Minimum Standards in 2017, all of which were done with the intent and purpose to injure OK3 AIR's right to benefit from the substantial investment in the Airport that OK3 AIR made in its business and OK3 Air's peaceful and profitable operation of its FBO business at the Airport, the City has breached the implied covenant of good faith and fair dealing.

276.     Moreover, by attempting to frustrate OK3 AIR's right to participate and consent to changes to the Minimum Standards by removing the standards governing self fueling from the Minimum Standards and putting them into the Rules and Regulations, so that they could be freely amended without OK3 AIR's consent, the City injured OK3 AIR's right to receive the fruits of the Ground Lease Agreement.

277.     The City's violations of the Ground Lease Agreement's implied covenant have damaged OK3 AIR in an amount to be determined at trial.

278.     For example, OK3 AIR has lost revenue due to the City's failure to manage and maintain the Airport in conformance with the terms of the Ground Lease Agreement and the prior Minimum Standards.

279.     Among other things, OK3 AIR has lost value in its investment because, if the City were to reinstate the revised Minimum Standards, another FBO could compete against OK3 AIR without having to make the same financial investment.

280.     OK3 AIR has also been damaged because its leasehold interest in the Ground Lease Agreement is not as valuable now that the City has demonstrated that it will make changes to Minimum Standards without OK3 AIR's consent based on the argument that Section 3 of the

Ground Lease Agreement does not require OK3 AIR's participation and consent to amend the Minimum Standards.

281.     Finally, OK3 AIR has incurred substantial attorneys' fees as a result of Heber City's conduct, which are compensable under the terms of the Ground Lease Agreement as set forth above.

**FOURTH CAUSE OF ACTION**
**Promissory Estoppel (Heber City)**

282.     Plaintiff incorporates all prior and subsequent allegations by this reference.

283.     The City promised in 2005, 2009 and 2010 that it would not revise the Minimum Standards without OK3 AIR's participation and consent.

284.     In fact, the City only revised the Minimum Standards in 2005 and 2010 after OK3 AIR consented to the revisions.

285.     In reliance upon the City's promises, OK3 AIR invested substantial capital into the Airport, its leasehold interest, and its business in general.

286.     The City knew that OK3 AIR had relied on the promises it made in 2005, 2009 and 2010, and the City reasonably should have expected that these promises would induce OK3 AIR's to make these financial investments.

287.     Based on the foregoing, the City should be estopped from arguing that Section 3 of the Ground Lease Agreement does not require OK3 AIR's participation and consent to amend the Minimum Standards.

288.     OK3 AIR's reliance on the promises, which the City broke when it adopted the revised Minimum Standards, has damaged OK3 AIR in an amount to be determined at trial.

289.     Among other things, OK3 AIR has lost value in its investment because, if the City were to reinstate the revised Minimum Standards, another FBO could compete against OK3 AIR without having to make the same financial investment.

290.     OK3 AIR has also been damaged because its leasehold interest in the Ground Lease Agreement is not as valuable now that the City is arguing that Section 3 of the Ground Lease Agreement does not require OK3 AIR's participation and consent to amend the Minimum Standards.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Existing and Prospective Economic Relations (Boyer and Godfrey)**

291.     Plaintiff incorporates all prior and subsequent allegations by this reference.

292.     OK3 AIR had an existing and/or potential economic relationship with Mel McQuarrie as the purchaser of McQuarrie's hangar and as the assignee of McQuarrie's leasehold interest.

293.     The City's Airport Manager, Mr. Paul Boyer, intentionally interfered with that economic relationship by reversing his initial approval to enter a new lease with McQuarrie when they learned that OK3 AIR was the purchaser.

294.     Mr. Boyer initially indicated to Mr. McQuarrie that he would happily provide such approval, but later refused to process the application when he learned that OK3 AIR was the prospective purchaser.

295.     Further, Mr. Boyer used improper means to interfere with OK3 Air's economic relations, i.e., Boyer  (a) misrepresented the reason for denying McQuarrie's lease renewal, (b) engaged in intentional delay tactics to cause OK3 AIR to lose its right to buy the McQuarrie hanger, and (c) engaged in unconstitutional and ultra vires acts by actively working to prevent

the renewal of McQuarrie's lease, including: (i) breaching McQuarrie's hangar lease agreement, (ii) taking McQuarrie and OK3 AIR's property without just compensation in violation of state and federal law, and (iii) retaliating against OK3 AIR in violation of the First Amendment.

296.     Mr. Boyer's tortious interference with OK3 AIR's economic relationship with McQuarrie has damaged OK3 AIR in an amount to be determined a trial, but not less than $65,000 per year for 25 years.

297.     OK3 AIR had an existing and/or potential economic relationship with its customers who could not land at the Airport due to Mr. Godfrey's intentional failure to remove snow.

298.     OK3 AIR also had an existing and/or potential economic relationship with its customers, including Hancock, who purchased fuel from OK3 AIR.

299.     Mr. Godfrey intentionally interfered with OK3 AIR's business relationship with OK3 AIR's customers, including Hancock, when he improperly issued a self-fueling permit to Mr. Hancock.

300.     Mr. Godfrey's intentional interference with OK3 AIR's actual or prospective customers was done with improper means, i.e., Godfrey intentionally delayed removing snow and intentionally gave Hancock a self-fueling permit in violation of OK3 AIR's legal rights, in violation of the then-effective Minimum Standards, and in retaliation for OK3 AIR's First Amendment activities.

301.     OK3 AIR will suffer damages as a result of Mr. Godfrey's conduct in an amount to be determined at trial.

302.     Boyer and Godfrey's conduct was willful. They intentionally acted, and/or wrongfully failed to act, without just cause or excuse, while knowing that their conduct would probably result in injury to OK3 AIR.

303.     Accordingly, Boyer and Godfrey may be held personally liable under applicable law for their tortious acts against OK3 AIR.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment (against Heber City)

304.     Plaintiff incorporates all prior and subsequent allegations by this reference.

305.     As set forth above, a real and substantial controversy has arisen between the parties regarding the meaning to Section 3 of the Ground Lease Agreement.

306.     The City has demonstrated that it will make changes to Minimum Standards without OK3 AIR's consent and continues to assert that it can revise the Minimum Standards without OK3 AIR's consent in violation of the Ground Lease Agreement, which is causing immediate harm to OK3 AIR.

307.     Among other things, the City contends that its desire to have another fuel source at the Airport allows it to revise the Minimum Standards, even though having a second fuel source at the Airport is not necessary in order to comply with State and Federal rules and regulations and even though OK3 AIR is already providing reasonable and competent service at said airport.

308.     Making changes to the Master Plan is not a reason under the Ground Lease Agreement for the City to revise the Minimum Standards without OK3 AIR's consent. However, the City has indicated that it may adopt revised Minimum Standards through the Master Planning process without obtaining OK3 AIR's consent.

309. Should the City reinstate the Revised Minimum Standards (or similar ones), the City would violate the implied covenant of good faith and fair dealing because the Revised Minimum Standards deprive OK3 AIR of the value of the substantial investment in the Airport it made and of OK3 AIR's right to peacefully and profitably operate its FBO business at the Airport.

310. A declaratory judgment from this Court is necessary to resolve the current controversy between the parties regarding the parties' rights, duties and obligations with respect to Section 3 of the Ground Lease Agreement and to prevent the City from further damaging OK3 AIR by amending the Minimum Standards without OK3 AIR's consent in the future.

311. Accordingly, pursuant to 28 U.S.C. § 2201 and 2202, OK3 AIR seeks a declaratory ruling from the Court that:

 a. Section 3 of the Ground Lease Agreement prevents the City from amending the Minimum Standards without OK3 AIR's consent, subject to the exceptions outlined in Section 3 of the Ground Lease;

 b. Increasing competition at the Airport in order to force OK3 AIR to reduce its prices is not a legitimate basis for revising the Minimum Standards without OK3 AIR's consent under Section 3 of the Ground Lease Agreement;

 c. The 2005 Minimum Standards (as revised in 2010 and 2016), do not need to be revised again in order to bring them into compliance with State and Federal rules and regulations, as they do not violate any State or Federal rules or regulations;

 d. The 2005 Minimum Standards (as revised in 2010 and 2016) do not need to be revised again in order to ensure safe, reasonable and competent services, as OK3 AIR is currently providing safe, reasonable and competent service at the Airport;

46

e. The City may not remove provisions from the Minimum Standards, such as the provision governing self fueling, without first complying with Section 3 of the Ground Lease Agreement; and,

f. The City's conduct in adopting the revised Minimum Standards in 2017, if only for eighteen months, has caused OK3 AIR to reasonably incur substantial attorneys' fees, and OK3 AIR is entitled to award of those fees under the Ground Lease Agreement, as Amended in 2015.

312. OK3 AIR also seeks any further relief the Court deems just, necessary, or proper pursuant to 28 U.S.C. §§ 2201 and 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a trial by jury, compensatory damages, preliminary injunction, permanent injunction, declaratory relief, costs, attorneys' fees, any and all other remedies available at law under the causes of action alleged above, and any such other relief as the Court deems just and proper under the circumstances.

**DATED** this 6th day of May, 2019.

DART ADAMSON & DONOVAN

/s/ Craig A. Hoggan
Craig A. Hoggan
Joelle S. Kesler
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document was served on May 6, 2019 via the Court's electronic filing system on the following:

J. Mark Smedley
90 W 200 S STE 4
HEBER CITY, UT 84032
(801)654-4600
Email: msmedley@ci.heber.ut.us

Peter J. Kirsch
W. Eric Pilsk
Steven L. Osit
KAPLAN KIRSCH & ROCKWELL LLP
1675 BROADWAY STE 2300
DENVER, CO 80202
(303)825-7000
Email: pkirsch@kaplankirsch.com
       epilsk@kaplankirsch.com
       sosit@kaplankirsch.com

Joseph E. Wrona
Jared Bowman
WRONA DUBOIS PLLC
1745 SIDEWINDER DR
PARK CITY, UT 84060
(435) 649-2525
Email: wrona@wdlawfirm.com
       bowman@wdlawfirm.com


/s/ Robyn Van Shaar