W. Eric Pilsk (Pro Hac Vice)
Peter J. Kirsch (Pro Hac Vice)
Steven L. Osit (Pro Hac Vice)
KAPLAN KIRSCH & ROCKWELL, LLP
1634 I Street N.W., Suite 300
Washington, D.C. 20006
Telephone: (202) 955-5600
epilsk@kaplankirsch.com
pkirsch@kaplankirsch.com
sosit@kaplankirsch.com

J. Mark Smedley (Utah Bar #06442)
Heber City Attorney
75 North Main
Heber City, UT 84032
Telephone: (435) 654-4600
msmedley@heberut.gov

**Attorneys for Defendants**
**Heber City and Denis Godfrey**

---

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| AH AERO SERVICE, LLC dba OK3 AIR,<br><br>Plaintiff,<br><br>v.<br><br>HEBER CITY, a municipal corporation; PAUL BOYER, an individual, in his individual and official capacity; and DENIS GODFREY, an individual, in his individual and official capacity,<br><br>Defendant. | **DEFENDANT DENIS GODFREY'S MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED VERSION**<br><br>No. 2:17-CV-01118-HCN-DAO<br><br>District Judge Howard Nielsen, Jr.<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION AND RELIEF SOUGHT ............................................................................ 1

BACKGROUND ......................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 4

    A.   Godfrey's Snow Removal on Thanksgiving and Christmas, 2016 ................................. 4

    B.   Godfrey's Request to Remove Fuel Trucks from an Aircraft Hangar ........................... 6

    C.   Godfrey's Request that OK3 Relocate a Parked Aircraft .............................................. 7

    D.   Godfrey's Issuance of a Self-Fueling Permit to Barry Hancock .................................... 8

    E.   Godfrey's "Advocacy" for Revisions to the Minimum Standards ............................... 10

ARGUMENT ............................................................................................................................. 11

I.    SUMMARY JUDGMENT STANDARD ........................................................................ 11

II.   GODFREY IS ENTITLED TO QUALIFIED IMMUNITY ON EACH
      OF OK3'S FIRST AMENDMENT RETAILATION CLAIMS ........................................ 12

    A.   OK3 Must Satisfy a "Heavy Burden" to Defeat Qualified Immunity ......................... 12

    B.   Godfrey's Snow Removal Performance ...................................................................... 14

    C.   Godfrey's Request that OK3 Remove a Fuel Truck from an Aircraft Hangar ............. 16

    D.   Godfrey's Request that OK3 Relocate a Customer's Parked Aircraft ......................... 18

    E.   Godfrey's Issuance of a Temporary Self-Fueling Permit to Barry Hancock ............... 20

    F.   Godfrey's "Advocacy" for Revised Minimum Standards ............................................ 21

III.  OK3'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW ........... 23

    A.   Tortious Interference Standard .................................................................................... 23

    B.   The Failure to Remove Snow from the Airport Runway .............................................. 24

    C.   The Issuance of a Temporary Self-Fueling Permit to Barry Hancock ......................... 25

CONCLUSION ......................................................................................................................... 27

CERTIFICATE OF SERVICE ................................................................................................ 28

# TABLE OF AUTHORITIES

## Federal Cases

*AH Aero Services, LLC v. Ogden City*, No. 1:05-cv-66,
2007 U.S. Dist. LEXIS 65322 (D. Utah Aug. 30, 2007) ...............................................................3

*Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996) ..................................................................13

*Border Area Mental Health Inc. v. United Behavioral Health*,
311 F. Supp. 3d 1308 (D. N.M. 2018) ...........................................................................................28

*Carabajal v. City of Cheyenne*, 847 F.3d 1203 (10th Cir. 2017)............................................13, 14

*City of San Diego v. Roe*, 543 U.S. 77 (2004) .............................................................................13

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007)..............................................14, 17, 22, 23

*Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001) .........................................................................14

*Gehl Grp. v. Koby*, 63 F.3d 1528 (10th Cir. 1995) .........................................................14, 17, 19

*Heidt v. City of McMinnville*, No. 3:15-cv-00989-SI,
2016 U.S. Dist. LEXIS 163996 (D. Or. 2016)................................................................16, 21, 22

*Hinshaw v. Smith*, 436 F.3d 997 (8th Cir. 2006) .........................................................................23

*Johnson v. City of Bountiful,* 996 F. Supp. 1100 (D. Utah 1998).................................................12

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018).....................................................................................14

*Knopf v. Williams*, 884 F.3d 939 (10th Cir. 2018)...............................................14, 17, 19, 20, 22

*Lighton v. Univ. of Utah*, 209 F.3d 1213 (10th Cir. 2000) ...........................................................13

*Mullenix v. Luna*, 136 S. Ct. 305 (2015).......................................................................................14

*Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243 (10th Cir. 2000) .........................18

*Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814 (10th Cir. 2014) ....................23

*Shero v. City of Grove, Okla.*, 510 F.3d 1196 (10th Cir. 2007).....................................................20

*Trant v. Oklahoma*, 754 F.3d 1158 (10th Cir. 2014) ....................................................................18

*Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527 (10th Cir. 1994)....................12

*White v. Pauly*, 137 S. Ct. 548 (2017) .........................................................................14

*Wilkie v. Robbins*, 551 U.S. 537 (2007).......................................................................20

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000) ........................................13, 20, 22

*X-Men Security, Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) ........................................23

## State Cases

*C.R. England v. Swift Transp. Co.*, 437 P.3d 343 (Utah 2019) ..........................24, 25, 26

*Eldridge v. Johndrow*, 345 P.3d 553 (Utah 2015) .......................................................24

*USA Power, LLC v. PacifiCorp*, 372 P.3d 629 (Utah 2016) .......................................26

*Walker v. Anderson-Oliver Title Ins. Agency, Inc.*, 309 P.3d 267 (Utah Ct. App. 2013)..............27

## Federal Statutes

42 U.S.C. § 1983.............................................................................................................1

## State Statutes

Utah Code Ann. § 63G-7-102 .......................................................................................24

Utah Code Ann. § 63G-7-202 .......................................................................................24

## Other Authorities

Fed. R. Civ. P. 56..........................................................................................................12

Fed R. Evid. 802 ...........................................................................................................26

## INTRODUCTION AND RELIEF SOUGHT[1]

Defendant Denis Godfrey ("Godfrey"), through the undersigned counsel, moves this Court for summary judgment on the following claims and defenses:

1.      Godfrey is entitled to summary judgment on his Eighth Affirmative Defense, qualified immunity, with respect to all claims asserted by Plaintiff AH Aero Service, LLC ("OK3") in its First Cause of Action, First Amendment retaliation under 42 U.S.C. § 1983; and

2.      Godfrey is entitled to summary judgment on his First Affirmative Defense, failure to state a claim, and Fifth Affirmative Defense, immunity under the Governmental Immunity Act of Utah ("GIAU"), with respect to OK3's Fifth Cause of Action, tortious interference with existing and prospective economic relations, which fails as a matter of law.

Godfrey requests that the Court grant him summary judgment on the above-referenced claims and defenses, dismiss him as a defendant from this proceeding, and award any other and further relief that the Court deems just and equitable.

## BACKGROUND

Heber City (the "City") hired Godfrey as its first full-time Airport Manager in October 2016, amidst an intense political debate regarding the City's management of the Heber Valley Airport (the "Airport"). As the *de facto* intermediary between the City and OK3, the Airport's sole Fixed Base Operator ("FBO"),[2] Godfrey was immediately thrust into the center of this roiling political debate. As he executed the City Council's directives and carried out his everyday duties,

---

[1] Defendants conferred in an effort to file a joint Motion for Summary Judgment. However, given the number of claims asserted, and the legally and factually distinct defenses to each claim, Defendants were not able to combine their motions without unduly prejudicing their ability to present their respective cases. Defendants have coordinated to minimize any overlap and to make their respective arguments as streamlined as possible.

[2] An FBO is an entity that provides certain aeronautical services to the public, including aircraft fueling, parking, hangaring, maintenance, and other services.

OK3 vociferously objected to any of Godfrey's actions that OK3 perceived as contrary to its business interests.  And when OK3 ultimately failed to convince the City not to adopt revised Minimum Standards[3] in 2017, OK3 changed its tactics to pursue this litigation.

Weaponizing the First Amendment, OK3 claims virtually every adverse action taken by the City or its Airport Managers, no matter how mundane, was retaliation for OK3's opposition to the City's Airport policies.[4]  Specifically (and incredibly) OK3 claims that all of the following actions taken by Godfrey were substantially motivated by his desire to punish OK3 for its speech:

1.    His alleged failure to adequately remove snow and ice from the Airport runway, when in fact he acted as any airport manager barely one month into his new position would;

2.    His request that OK3 staff remove a fuel truck from an aircraft hangar, when in fact the Fire Marshall had prohibited that practice because it was unsafe;

3.    His request that OK3 refrain from parking in a particular location that, in fact, was not part of OK3's leasehold and interfered with other Airport users' access to their hangars;

4.    His authorization of another Airport user to fuel their own aircraft, rather than buy fuel from OK3, when in fact such authorization was required by law; and

---

[3] Minimum standards are a comprehensive set of minimum requirements (*e.g.*, leasehold size and required facilities) that an entity must satisfy in order to establish a business at an airport. The City revised the Minimum Standards in part to attract additional competition to the Airport as a means of addressing OK3's high fuel prices and inattentiveness to the customer service needs of many local Airport users.  Affidavit of Hon. Kelleen Potter ("Potter Aff.") ¶ 19–20 (Heber City and Denis Godfrey's Joint Appendix of Evidence Exhibit ("App'x Ex.") 1).

[4] OK3 successfully tested this tactic at another airport that's policy choices did not align with OK3's business interests.  *See AH Aero Services, LLC v. Ogden City*, No. 1:05-cv-66, 2007 U.S. Dist. LEXIS 65322, at *26 (D. Utah Aug. 30, 2007) (denying motion for summary judgment on First Amendment retaliation claims).

5.      His recommendation that the City adopt revised Minimum Standards, when in fact he did so only at the conclusion of a robust public process designed to ensure the revised Minimum Standards would increase competition and address other concerns at the Airport.[5]

Godfrey is entitled to qualified immunity with respect to these claims.  OK3 cannot overcome the first prong of qualified immunity – that Godfrey's actions violated its constitutional rights – because OK3 cannot satisfy the elements of a First Amendment retaliation claim.  The undisputed material facts demonstrate that all of Godfrey's actions were objectively reasonable, and OK3 cannot meet its burden to show that Godfrey acted with a "culpable state of mind."  Most of the above events also did not result in *any* injury, much less one that would chill the protected activities of a person of ordinary firmness.  And OK3 cannot establish that its speech involved a "matter of public concern," much less that Godfrey was substantially motivated thereby, because in most cases OK3 cannot even *identify* the speech that Godfrey was allegedly reacting *to*.

OK3 also cannot overcome the second prong of qualified immunity, which requires OK3 to demonstrate that it should have been clear to Godfrey that his actions violated OK3's constitutional rights.  There is simply no precedent for transforming the sort of routine operational disagreements and minor consequences that OK3 alleges into a constitutional cause of action.

_____

[5] In its supplements to the City and Godfrey's Interrogatories, OK3 also claims that "the City/Godfrey" retaliated by (1) refusing to indemnify OK3 for not collecting landing fees from aircraft, as it is contractually obligated to do; (2) permitting and/or encouraging aircraft to park in City-owned areas of the Airport, other than at OK3; (3) refusing to grant OK3 authorization to construct a new aircraft storage hangar on its preferred terms and location; (4) requiring OK3 to consent to future updates to the Minimum Standards as a condition of extending the terms of OK3's lease of two hangars, subject to a reservation of rights that would protect OK3's litigation position; (5) issuing a Request for Proposals for a second FBO at the Airport; (6) encouraging another user to establish a competing business at the Airport; and (7) allowing that user to resume fueling their own aircraft.  But OK3 has not sought to amend its complaint (for a third time) to add these additional claims and, as Defendants will demonstrate in a forthcoming motion, OK3 may not seek to do so at this late stage of the litigation.

3

OK3 also claims that two of the incidents above – Godfrey's alleged failure to adequately remove snow and ice from the runway and authorizing another user to fuel its own aircraft – constitute tortious interference. But Godfrey did not intend to interfere (and is therefore immune from OK3's claim) and, even if he had, he did not use "improper means" to do so. Accordingly, OK3's tortious interference claims also fail as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Godfrey was employed by the City as the Airport Manager from October 2016 to April 2019. Affidavit of D. Godfrey ("Godfrey Aff.") ¶ 2 (App'x Ex. 2).[6] Godfrey held a number of prior positions within the airport industry, including as a Line Service Supervisor at OK3 at the Airport from May 2013 until his termination in January 2014 (Godfrey Aff. ¶ 3). When Godfrey was first approached about the Airport Manager position at the Airport, he made clear that any personal feelings toward OK3 would not affect the performance of his duties. *Id.*

A.   Godfrey's Snow Removal on Thanksgiving and Christmas, 2016

On Thanksgiving Day, November 24, 2016, barely one month after he was hired, Godfrey arrived at the Airport and observed that the runway was covered with a thin layer of snow and ice. *Id.* ¶ 21. There are no federal standards[7] that require an airport of the Airport's size to remove snow or ice from a runway, or to do so within a certain time period. *Id.* ¶¶ 22, 31; Report of Matthew Cavanaugh at 8–9 (App'x Ex. 92). Rather, the City is required to "notify[] airmen of any condition affecting aeronautical use of the airport." AIP Grant Assurances ¶ 19.a. Such notifications are provided through Notices to Airmen ("NOTAMs"), a coded message

---

[6] Godfrey voluntarily resigned from the City. *Id.* ¶ 2.

[7] Airports such as the Heber Valley Airport are regulated by the Federal Aviation Administration ("FAA") pursuant to various federal statutes, as well as through certain contractual commitments undertaken by the public sponsor of an airport in exchange for federal funding under the Airport Improvement Program ("AIP"), typically referred to as "grant assurances."

disseminated through an FAA system that apprises pilots of, among other things, runway conditions.  Godfrey Aff. ¶ 22 (App'x Ex. 2).

The City did not have the type of equipment necessary to remove a thin layer of snow and ice from the runway, *id.* ¶ 21, so consistent with the City's federal obligations, Godfrey contacted the FAA to report the condition of the runway and generate a NOTAM, *id.* ¶ 23.  This was the first time Godfrey had issued a runway condition report using the FAA's new Takeoff and Landing Performance Assessment ("TALPA") system for reporting runway conditions, which had been in place for only one month and marked a substantial change in how runway conditions were to be observed and reported.  *Id.*  Godfrey did not realize his report necessarily caused the FAA to issue a NOTAM that closed the runway from 6:41 a.m. to 1:00 p.m.  *Id.*

Later that morning, conditions improved but the NOTAM was still in effect.  *Id.* ¶ 24.  A based-aircraft owner sought to depart the Airport but could not, due to the runway's closure.  *Id.*  He was not able to reach Godfrey at the Airport office, and therefore contacted OK3.  *Id.*  OK3 contacted Godfrey, who promptly cancelled the NOTAM, and personally apologized to the user for the inconvenience.  *Id.*  Godfrey and OK3 subsequently met to discuss the incident, review the TALPA reporting system, and implement a plan for future snow activity.  *Id.* ¶ 25.

The first major snowstorm of the 2016/2017 winter season (and therefore the first major snowstorm that Godfrey handled as Airport Manager) occurred on December 25-26, 2016.  *Id.* ¶ 26.  OK3 was not satisfied with Godfrey's snow removal performance during that storm because he did not plow an approximately 15-foot wide section of pavement that separates OK3's aircraft parking area (also referred to as an "apron" or "ramp") from the taxiway, did not clear the full width of the runway, and did not call for assistance from the City's Department of Public Works to remove snow.  *Id.* ¶ 27–30.  As a still relatively new Airport Manager, Godfrey did not

call Public Works for assistance in an effort to be fiscally conservative, and did not believe it was his responsibility to clear the 15-foot wide section.[8]  *Id.*

Five aircraft that were scheduled to land at the Airport on December 26, 2016, cancelled their reservations with OK3.  Email from J. Quilter dated Dec. 28, 2016 (App'x Ex. 88).  A number of other aircraft safely arrived or departed.  Godfrey Aff. ¶ 29.  ██████████████████

██████████████████  Deposition of N. Abuhaidar at 212:13-18 ("N. Abuhaidar Dep.") (App'x Ex. 103).

Following the December 25-26 snowstorm, Godfrey and OK3 again met to discuss snow removal.  Godfrey Aff. ¶ 30 (App'x Ex. 2).  Godfrey invited OK3 to review any of their concerns with the City Council if they were not satisfied with his response.  *Id.*

On January 6, 2017, OK3 filed a complaint with the FAA complaining about a number of items, most of which predated Godfrey's tenure as Airport Manager.  *Id.* ¶ 31.  Among these items, the complaint alleged that Godfrey's poor snow removal was actually part of the City's alleged efforts to restrict large aircraft from landing at the Airport.  OK3's Informal Complaint, at 6 (App'x Ex. 57).  The FAA ultimately concluded that the City had not violated any standards pertaining to snow removal.  FAA Determination of OK3's Informal Complaint, at 6–7 (App'x Ex. 59).

B.    Godfrey's Request to Remove Fuel Trucks from an Aircraft Hangar

On Sunday, January 8, 2017, Godfrey was at the Airport to perform snow removal, and happened to observe OK3's 5,000 gallon refueling truck parked in the hangar connected to OK3's main office and terminal spaces.  Godfrey Aff. ¶ 35 (App'x Ex. 2).  The Fire Marshall had previously determined that OK3 could not store its fuel trucks in hangars.  *Id.* ¶ 33.  OK3 did not agree with that position and often parked its refueler in its other aircraft hangars, away from the

_____

[8] OK3's FBO lease does not specify who is responsible for snow removal (App'x Ex. 4).

passenger terminal building.  *Id.* ¶ 34.  Godfrey did not raise the Fire Marshal's determination on those occasions to avoid inflaming older disputes while the parties tried to globally resolve several outstanding issues and disagreements.  *Id.*  But, in this instance, Godfrey considered the presence of the refueler in a hangar immediately adjacent to the occupied terminal to be an unacceptable safety risk and a clear violation of applicable Fire Codes.  *Id.* ¶ 35.

Having just reviewed OK3's complaint to the FAA, and believing that OK3's description of the snow-related events was inaccurate, Godfrey wanted to ensure that there was an official record of his actions.  *Id.* ¶ 36.  This being a snowy Sunday morning, he contacted the Heber City Police Department and asked an officer to accompany him to OK3 as a witness.  *Id.*  Godfrey requested that the fuel truck be removed from the hangar, and OK3 complied without further incident.  Police Report of Jan. 8, 2017 (App'x Ex. 64).

C.    Godfrey's Request that OK3 Relocate a Parked Aircraft

Later in January 2017, Godfrey observed that OK3 had parked an aircraft in an area that was not part of its leasehold.  Godfrey Aff. ¶ 37 (App'x Ex. 2); Deposition of OK3, Vol. 1 ("OK3 Dep. Vol. 1") at 163:25 (App'x Ex. 102).  Parking aircraft at this location interfered with an adjacent hangar owner's ability to safely access his leased premises.  Deposition of B. Hancock ("Hancock Dep.") at 140:17-142:4 and Ex. 166 thereto (App'x Ex. 105); Godfrey Aff. ¶ 37 (App'x Ex. 2).  Section 6.8.1 of the Airport's Rules and Regulations (App'x Ex. 89) expressly prohibits parking in a location that would obstruct access to aircraft hangars.[9]

Godfrey verbally requested that an OK3 employee move the aircraft.  Godfrey Aff. ¶ 38 (App'x Ex. 2).  The employee informed Godfrey that he would check with his supervisors.  *Id.* Several hours later, Godfrey again contacted OK3 about the parked aircraft and was ultimately

---

[9] OK3's lease is subject to the Rules and Regulations.  FBO Lease ¶ 2 (App'x Ex. 4).

7

referred to OK3's general counsel, Maggie Abuhaidar. *Id.* Godfrey sent an email to Ms. Abuhaidar requesting that the aircraft be moved, instructed OK3 to refrain from parking in that area in the future, and warned OK3 that he would be forced to contact OK3's customer if it refused to move the aircraft. Email from D. Godfrey dated Jan. 30, 2017 (App'x Ex. 65).

The aircraft was eventually moved by OK3 to another parking area and Godfrey did not contact the customer. Godfrey Aff. ¶ 38 (App'x Ex. 2).

D.    Godfrey's Issuance of a Self-Fueling Permit to Barry Hancock

Just as Godfrey started working at the Airport, Barry Hancock informed him and others that he may seek permission to fuel his own aircraft rather than purchasing it from OK3 (a practice known in the airport industry as "self-fueling") because he was dissatisfied with OK3's fuel prices and the unavailability of OK3's self-service fueling pump. *Id.* ¶ 42. Hancock submitted an application to Godfrey for permission to self-fuel in January 2017. *Id.* ¶ 41. The City's federal obligations[10] require that it allow Airport users an opportunity to self-fuel their own aircraft, but permit the City to establish *reasonable* rules and regulations to ensure that self-fueling is conducted safely. Airport Compliance Manual, Chapter 11 (App'x Ex. 90). Establishing and enforcing *unreasonable* rules and regulations is a violation of the City's federal obligations. *Id.* At the time, the City required, among other things, that every self-fueling permittee have a 750-gallon refueler truck and a robust safety plan, no matter the anticipated volume of self-fueling. Airport Minimum Standards amended June 16, 2016 § 14 (App'x Ex. 91).

Godfrey responded to Hancock's request by encouraging him to utilize OK3 for his fueling needs, offering to try and negotiate a lower fuel price, but also acknowledging Hancock's right to self-fuel. Godfrey Aff. ¶ 41 (App'x Ex. 2). Because Hancock's request was the first self-fueling

---

[10] *See supra* note 7.

request the City had ever received, and because Godfrey expected opposition from OK3, Godfrey committed to reviewing his request with the City's Airport Advisory Board ("AAB"), and the City's outside aviation legal counsel.  *Id.* ¶ 42.

On March 7, 2017, Hancock revised his self-fueling application to request that he be exempted from some of the City's self-fueling requirements.  *Id.* ¶ 44.  Hancock's self-fueling request was discussed in detail at the next meeting of the AAB.  Minutes of the March 8, 2017, AAB Meeting (App'x Ex. 38).  Hancock explained that "the reason for his request for a Self-Serving Fuel Permit was a significant need to fuel aircraft with competitive prices and not being reliant on anyone else to fuel the aircraft," and discussed the safety of his proposed operation, notwithstanding that it would not comply with the City's self-fueling requirements.  *Id.*  The AAB recommended that Hancock be allowed to self-fuel, based on the information he presented, once details could be worked out regarding where and how fuel would be stored at the Airport.  *Id.*

As Godfrey was coordinating Hancock's revised request, Paul Boyer, no longer the Temporary Airport Manager, supplemented his then-pending complaint with the FAA against the City, arguing among other things that the City's self-fueling regulations were too onerous and unreasonable.  Godfrey Aff. ¶ 45 (App'x Ex. 2).  Hancock also threatened to file a complaint against the City if it did not issue him a self-fueling permit.  *Id.* ¶ 43.  Godfrey reviewed Boyer's arguments with legal counsel, and determined that the City's restrictions on self-fueling would likely be found unreasonable and therefore violative of the City's federal obligation.  *Id.* ¶ 45.[11]

Accordingly, on May 2, 2017, Godfrey issued Hancock a temporary self-fueling permit which waived compliance with several of the City's self-fueling requirements as unreasonable, as

---

[11] The FAA later found that the City's published self-fueling regulations were in fact unreasonable as applied to small fueling operations like Hancock's.  *Id.* ¶ 47.

applied.  *Id.* ¶ 46.  Hancock continued to self-fuel under this permit until reaching an agreement with OK3 to purchase fuel at a discounted price.  Hancock Dep. at 50:5–25 (App'x Ex. 105).

E.      Godfrey's "Advocacy" for Revisions to the Minimum Standards

One of the earliest directives the City Council gave Godfrey was to work with outside counsel to update the Airport's governing documents, including the Minimum Standards, to ensure that they satisfied the City's federal grant assurance obligations and provided an opportunity for businesses to compete with OK3.  Godfrey Aff. ¶ 8 (App'x Ex. 2); Potter Aff. ¶ 15 (App'x Ex. 1).

From March to October 2017, Godfrey worked closely with outside counsel to shepherd the City through an extensive public process to develop revised Minimum Standards.  Godfrey first discussed proposed changes with OK3.  Godfrey Aff. ¶ 11 (App'x Ex. 2).  He solicited and reviewed public comments submitted on an initial draft of revised Minimum Standards, including from OK3.[12]  *Id.* ¶ 13.  In some cases, Godfrey agreed with the comments submitted by OK3 and other users and, in other cases, he did not.  *Id.*  Godfrey presented all public comments and an updated draft of the Minimum Standards at the September 13, 2017, public meeting of the AAB.  *Id.* ¶ 14.  The AAB passed a resolution recommending to the City Council that the Minimum Standards be approved, with several modifications.  *Id.*  Godfrey also solicited comments from the FAA.  Staff Report dated Sept. 21, 2017 (App'x Ex. 51).

On September 21, 2017, Godfrey presented the final draft of the Minimum Standards in an open meeting of the City Council.  Godfrey Aff. ¶ 15 (App'x Ex. 2).  Godfrey and the City's outside counsel recommended that the draft be adopted by the City Council at the following meeting, allowing one last opportunity for public comment.  *Id.*  In response, OK3 submitted a

---

[12] Godfrey even extended the deadline for submitting comments in response to OK3's request that he do so.  *Id.* ¶ 13.

letter urging the City not to adopt the revised Minimum Standards and threatening to sue the City if it did. *Id.* ¶ 16. Other groups, such as the Aircraft Owners and Pilots Association ("AOPA"), a national organization representing the interests of general aviation pilots, strongly supported the proposed revisions to the Minimum Standards, stating among other things that the revisions would address their members' concern about high fuel prices at the Airport. *Id.*

The City Council adopted the revised Minimum Standards on October 5, 2017, finding that they would address safety issues at the Airport, ensure that the City was compliant with its federal obligations, and increase the quality of services at the Airport. *Id.* ¶ 17.

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party." *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 377 U.S. 235, 248 (1986)) (internal quotations omitted). Although the moving party must "bear . . . the burden of showing the absence of a genuine issue of material fact," it "need not negate [the responding party's] claims, but need only point out to the district court 'that there is an absence of evidence to support [the responding party's] case.'" *Universal Money Ctrs.* 22 F.3d at 1529 (quoting *Celotex Corp v. Catrett,* 477 U.S. 317, 325 (1986)). This burden may be met merely by identifying portions of the record that show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful,* 996 F. Supp. 1100, 1102 (D. Utah 1998). However, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to defeat a properly

supported motion for summary judgment." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 377 U.S. 235, 248 (1986)).

## II.   GODFREY IS ENTITLED TO QUALIFIED IMMUNITY ON EACH OF OK3'S FIRST AMENDMENT RETAILATION CLAIMS

In his individual capacity, Godfrey is entitled to qualified immunity with respect to each of the First Amendment retaliation claims asserted by OK3.

### A.   OK3 Must Satisfy a "Heavy Burden" to Defeat Qualified Immunity

When qualified immunity is raised by a defendant, the plaintiff must satisfy the "heavy burden" of demonstrating (i) that the defendant's actions violated a constitutional right, and (ii) that the constitutional right was clearly established at the time. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

#### 1.   *OK3 must demonstrate that Godfrey violated a constitutional right.*

OK3 claims that various actions taken by Godfrey were in retaliation for OK3's exercise of its First Amendment rights.  To satisfy the first prong of the qualified immunity inquiry, OK3 must demonstrate, in each instance, that (i) it was "engaged in constitutionally protected activity," (ii) Godfrey's actions caused OK3 to suffer "an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (iii) that Godfrey's "adverse action was substantially motivated as a response to [OK3's] exercise of constitutionally protected conduct . . . ." *Worrell v. Henry*, 219 F.3d 1197, 1213 (10th Cir. 2000).  To be constitutionally protected, OK3's speech must involve a "matter of public concern." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 685, (1996).  A matter of public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication," *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004), as opposed to

speech which "merely deals with personal disputes and grievances unrelated to the public's interest," *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000).

Additionally, because Godfrey's "state of mind is an essential element of [OK3's] substantive claim," the Court must also adopt a "modified approach" to considering his qualified immunity defense with respect to that element:

> First, [Godfrey] must make a prima facie showing of the objective reasonableness of the challenged conduct. If [Godfrey] carr[ies] [his] burden of showing objective reasonableness, the burden then shifts to [OK3] to establish that [Godfrey] acted on the basis of a culpable subjective state of mind.

*Gehl Grp. v. Koby*, 63 F.3d 1528, 1535 (10th Cir. 1995), *overruled on other grounds by Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001) (internal quotation marks and citations omitted).

2.     *OK3 must demonstrate that the right was clearly established.*

To satisfy the second prong of the qualified immunity inquiry, OK3 must establish that the constitutional right was "clearly established." *Carabajal*, 847 F.3d at 1208. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Id. See also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established").

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *accord Knopf v. Williams*, 884 F.3d 939, 946–47 (10th Cir. 2018). Although there need not be "a case

directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152.

OK3 cannot meet its "heavy two-part burden" to defeat Godfrey's entitlement to qualified immunity with respect to each of its First Amendment claims.

B.    Godfrey's Snow Removal Performance

First, OK3 cannot establish that Godfrey "violated a constitutional right" because his conduct related to snow removal on November 24, 2016 and December 25-26, 2016, was objectively reasonable and there is no evidence that he acted with a retaliatory intent. *Gehl Grp.*, 63 F.3d at 1535.  On November 24, 2016, Godfrey merely reported observed runway conditions to the FAA, which in turn issued a NOTAM closing the runway based on mandatory federal standards. Godfrey Aff. ¶ 23 (App'x Ex. 2).  When he reported runway conditions, he was unaware that his report would cause the runway to be closed.  *Id.*  As soon as Godfrey became aware that conditions had improved, but the runway remained closed, he cancelled the NOTAM.  *Id.* ¶ 24. This conduct was objectively reasonable, as evidenced by the FAA's finding that the City had not violated any federal standards.  FAA Determination of OK3's Informal Complaint, at 6–7 (App'x Ex. 59).  Moreover, any allegation that Godfrey acted with retaliatory intent is clearly belied by his response to the incident: he personally apologized to the affected aircraft operator so that the incident would *not* reflect poorly on OK3 and met with OK3 to ensure that their concerns were both heard and addressed.  Email from D. Godfrey dated Nov. 25, 2016 (App'x Ex. 54).

Godfrey's performance on December 25-26, 2016, was also objectively reasonable. Godfrey had been hired only two months prior and was instructed that the Airport must reimburse the Department of Public Works for all snow removal assistance.  Godfrey Aff. ¶ 27 (App'x Ex. 2).  The Airport did not then have a budget for such reimbursement, so Godfrey did not call Public

14

Works for their assistance.  *Id.*  While this resulted in a longer time to clear snow from the Airport, Godfrey's decision was clearly made in an effort to be fiscally conservative.  *See* Email from D. Godfrey dated Dec. 30, 2016 (App'x Ex. 56).   And, as confirmed by the FAA, there was no prescribed time period in which the Airport *must* have been cleared of snow.  FAA Determination of OK3's Informal Complaint, at 6–7 (App'x Ex. 59).  Moreover, OK3's principal complaint is that Godfrey did not plow a 15-foot swatch of *OK3's* leasehold, which Godfrey did not believe it was his responsibility to plow.  Email from D. Godfrey dated Dec. 30, 2016 (App'x Ex. 56). Godfrey explained all of this to OK3 and invited OK3 to bring its concerns regarding snow removal procedures to the next City Council meeting, again belying any allegation that Godfrey's actions were intended to silence OK3 or, indeed, had anything to do with OK3's speech at all.  *Id.*

OK3's inability to show that Godfrey's performance was "substantially motivated as a response to [OK3's] exercise of constitutionally protected conduct" is underscored by OK3's failure to even *identify* speech that Godfrey could plausibly have been retaliating for.  *Worrell*, 219 F.3d at 1212.  OK3 claims only ███████████████████████████████████ ███████████ N. Abuhaidar Dep. at 208:19-209:6 (App'x Ex. 103), ███████████████████████ ██████████████████████████████████████████████████████████████████████████, OK3 Dep. Vol. 1 at 175:9-177:1 (App'x Ex. 102).  The Court therefore cannot evaluate, much less can OK3 establish, whether OK3's speech was on a matter of public concern, as opposed to matters within its own commercial interest, that there was any nexus between the speech and Godfrey's actions, or that Godfrey even *knew* of the alleged speech.  *See Heidt v. City of McMinnville*, No. 3:15-cv-00989-SI, 2016 U.S. Dist. LEXIS 163996 at *17 (D. Or. 2016) (unpublished) (dismissing complaint that failed to identify specific speech because the court could not therefore evaluate whether speech was on a matter of public concern).  Moreover, OK3's complaint to the FAA

claimed that Godfrey's performance was substantially motivated by a desire to limit large aircraft from landing at the Airport, *not* OK3's speech.  OK3's Informal Complaint, at 6 (App'x Ex. 57).

Godfrey is also entitled to qualified immunity because it would not have been clear "to a reasonable officer that his conduct was unlawful in the situation."  *Cortez*, 478 F.3d at 1114.  OK3 must establish not only that Godfrey's actions were motivated by speech that related to a public concern, but that "a preexisting Supreme Court or Tenth Circuit decision, or the weight of authority from other circuits," placed that question "beyond debate."  *Knopf*, 884 F.3d at 949 (granting qualified immunity where the nature of specific speech was not clearly established).  Godfrey is unaware of a "preexisting Supreme Court or Tenth Circuit decision, or the weight of authority from other circuits," indicating that his discretionary determination *not* to deploy City resources to (unnecessarily) expedite snow removal is the type of injury that could chill a person of ordinary firmness from speaking out.  Email from D. Godfrey dated Dec. 30, 2016 (App'x Ex. 56).

C.      Godfrey's Request that OK3 Remove a Fuel Truck from an Aircraft Hangar

Godfrey's actions regarding his request that OK3 remove the fuel truck from its aircraft hangar were objectively reasonable and OK3 cannot establish that he acted with a retaliatory intent. *Gehl Grp.*, 63 F.3d at 1535.  As of January 2017, the Fire Marshall took the position that OK3 could not lawfully park its fuel trucks within its aircraft hangars.  Godfrey Aff. ¶ 33 (App'x Ex. 2); Deposition of Maggie Abuhaidar at 54:2–55-8 (App'x at Ex. 107).  Although Godfrey was willing to look the other way with respect to OK3's storage of its fuel trucks in more remote aircraft hangars, he reasonably believed that the storage of OK3's 5,000-gallon refueler truck immediately adjacent to the terminal building was an unacceptable safety threat.  Godfrey Aff. ¶ 34–35 (App'x Ex. 2).  His request to remove the truck was, accordingly, objectively reasonable.  Indeed, the only evidence of retaliatory intent OK3 asserts is that this incident occurred shortly after OK3 filed a

17-page complaint with the FAA, one *paragraph* of which concerned Godfrey's snow removal performance. OK3 cannot demonstrate that Godfrey's request that OK3 move a fuel truck was substantially motivated by such an insignificant complaint. OK3's Informal Complaint, at 6. And "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014).

OK3 appears to focus on Godfrey's decision to ask police officers to accompany him to act as a witness, rather than the order itself, as evidence of retaliatory intent. But this, too, was objectively reasonable. OK3 had just filed a complaint against the City in which Godfrey believed OK3 had not stated the facts accurately. Godfrey Aff. ¶ 36 (App'x Ex. 2). Knowing that OK3 had also objected to the Fire Marshall's conclusion before, it was reasonable for him to ensure that there was a neutral, official report of his request and OK3's response. *Id.* And both Godfrey and the officers made clear that they were there *only* to observe, and not to direct compliance. Heber City Police Report of January 8, 2017 (App'x Ex. 64).

But even if Godfrey did act unreasonably in calling police officers, this incident still would not rise to a constitutional violation because OK3 did not "suffer an injury that would chill a person of ordinary firmness from continuing to engage" in protected speech. *Worrell*, 219 F.3d at 1212. While the "chilling" element is objective, "[i]n order for governmental action to trigger First Amendment scrutiny, it must carry consequences that infringe protected speech." *Phelan*, 235 F.3d at 1247. OK3 has produced no evidence that moving the fuel truck led to any injury whatsoever. ███████████████████████████████████████████

███████████████. N. Abuhaidar Dep. 201:16-22 (App'x Ex. 103). Nor did Godfrey's conduct have an *actual* chilling effect. The OK3 employee on duty at that time, John Warmack, testified

that he was not intimidated by the incident, that it did not affect his subsequent behavior, and that it did not affect his willingness to speak in public on airport issues. Deposition of J. Warmack at 19:14–20:15 (App'x Ex. 108). OK3's outspoken objections to Airport policies also continued unabated.

Godfrey is also entitled to qualified immunity on the second prong of that analysis because it is not "clearly established" that the mere *presence* of police officers is the type of "injury that would chill a person of ordinary firmness from continuing to engage" in speech. Neither Godfrey nor the police officers threatened OK3 or its staff with any criminal or civil penalties, further investigation, or citations. Heber City Police Report of January 8, 2017 (App'x Ex. 64). The officers did not order OK3 to do anything; they merely observed and drafted a neutral report. *Id.* There is simply no support in existing precedent that a "reasonable person in [Godfrey's] position 'would understand that what he [was] doing [was] unlawful.'" *Knopf*, 884 F.3d at 949 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

D.    Godfrey's Request that OK3 Relocate a Customer's Parked Aircraft

OK3 argues Godfrey violated its First Amendment rights by requesting that it move a customer's aircraft and threatening to call the customer. But this trivial incident also did not violate any clearly established constitutional right.

Godfrey's conduct was objectively reasonable and OK3 cannot satisfy its burden to demonstrate that Godfrey acted with retaliatory intent. *Gehl Grp.*, 63 F.3d at 1535. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (OK3 Dep. Vol. 1 at 163:25 (App'x Ex. 102)), in a position that clearly interfered with other tenants' access to their hangars (B. Hancock Dep. at 139:18-143:1 and Exhibit 166 thereto (App'x Ex. 105). Godfrey attempted to resolve this issue first with OK3's line technician and then with its General Manager, but was ultimately referred to OK3's General

Counsel. Godfrey Aff. ¶ 38 (App'x Ex. 2). In his email to Mrs. Abuhaidar, out of frustration, Godfrey noted that his "first impulse was to contact the customer." *Id.* But he did *not* contact the customer, and OK3 moved the aircraft without further incident. *Id.* ¶ 39. Godfrey's request was not only objectively reasonable but routine.

Moreover, OK3 has been wholly unable to articulate a basis for its belief that Godfrey's action was "substantially motivated as a response to [OK3's] exercise of constitutionally protected conduct." *Worrell*, 219 F.3d at 1212. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ OK3 Dep. Vol. 1 at 164:7-19 (App'x Ex. 102). As discussed above, OK3 cannot meet its burden to show that its speech involved a matter of public concern (based on clearly established law), *Knopf*, 884 F.3d at 949, or that Godfrey was substantially motivated to retaliate for that speech, *Worrell*, 219 F.3d at 1212, without so much as even *identifying* it. And although Godfrey disputes that he was "lever[aging] OK3 into a different lease," it would not have been an unconstitutional motive if he was. *See Wilkie v. Robbins*, 551 U.S. 537, 558 n.10 (2007) (even if an action "may gratify malice in the heart of the official who takes it . . . an instance of hard bargaining intended to induce the plaintiff to come to legitimate terms" is not retaliation).

Godfrey is also entitled to qualified immunity because it would not have been clear to a reasonable officer that a mere request to move an aircraft (that was *admittedly* parked improperly) is the type of injury that would "chill a person of ordinary firmness from continuing to engage" in protected activities. *Worrell*, 219 F.3d at 1213. A "trivial or de minimis injury" cannot support a First Amendment retaliation claim. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203–04 (10th Cir. 2007). OK3 cannot identify "a preexisting Supreme Court or Tenth Circuit decision, or the

weight of authority from other circuits," which places the constitutional implications of Godfrey's mere (and legitimate) request "beyond debate." *Knopf*, 884 F.3d at 949.

E. <u>Godfrey's Issuance of a Temporary Self-Fueling Permit to Barry Hancock</u>

Godfrey's issuance of a self-fueling permit to Hancock in May 2017 was also objectively reasonable and OK3 cannot establish that he acted with a retaliatory intent. *Hancock* came to *Godfrey* with a request to self-fuel his own aircraft. Godfrey Aff. ¶ 41 (App'x Ex. 2). Hancock had a federal *right* to self-fuel. Airport Compliance Manual, Chapter 11 (App'x Ex. 90). Godfrey's initial response encouraged Hancock to continue purchasing his fuel directly from OK3.[13] Godfrey Aff. ¶ 41 (App'x Ex. 2). Godfrey only authorized Hancock to self-fuel after months of deliberation and review by the AAB, and under the threat of FAA enforcement action due to Boyer's then-pending Part 13 complaint and Hancock's threat to file his own complaint. *Id.* ¶ 43, 45–46. Indeed, the FAA later found the very requirements that OK3 complains the City did not enforce were, in fact, unenforceable. FAA Determination of Boyer's Informal Complaint, at 39–45 (App'x Ex. 73). Godfrey's actions were reasonable.

Like the rest of OK3's First Amendment claims, OK3 does not even *try* to connect Hancock's self-fueling permit to any of OK3's specific activities:



---

[13] Godfrey's January 11, 2017, response also undercuts OK3's argument that the snow removal, fuel truck, or aircraft parking incidents (all of which *also* occurred around January 2017) discussed above had anything to do with OK3's speech. If Godfrey had then been motivated by a desire to retaliate against OK3, he certainly could have responded by immediately granting Hancock's request, and would not have encouraged Hancock to continue buying fuel from OK3.

OK3 Dep. Vol. 2 at 51:16-52:4 (App'x Ex. 104) (emphasis added). Accordingly, OK3 cannot establish that it spoke on a manner of public concern. *Heidt*, 2016 U.S. Dist. LEXIS 163996 at *10. OK3 cannot establish that existing caselaw put the status of such speech "beyond debate." *Knopf*, 884 F.3d at 949. And OK3 cannot establish that Godfrey was "substantially motivated" as a response to it. *Worrell*, 219 F.3d at 1212. Accordingly, Godfrey is entitled to qualified immunity.

Godfrey is also entitled to qualified immunity because it would not have been clear "to a reasonable officer that his conduct was unlawful in the situation." *Cortez*, 478 F.3d at 1114. Godfrey is unaware of a "preexisting Supreme Court or Tenth Circuit decision, or the weight of authority from other circuits," which calls into question the constitutionality of granting a request *that could not lawfully be denied*, let alone places it "beyond debate." *Knopf*, 884 F.3d at 944.

F.    Godfrey's "Advocacy" for Revised Minimum Standards

OK3's claim that Godfrey's "advocacy" for revised Minimum Standards was retaliatory is so absurd that it borders on frivolity. Godfrey was doing his *job*, and the objective reasonableness of his actions is evidenced by every Airport stakeholder's reaction *other than* OK3's.

At the express direction of the City Council, Godfrey shepherded the City through an extensive public process to develop revised Minimum Standards, with extraordinary transparency and opportunities for input by OK3 and other stakeholders. Godfrey Aff. ¶ 11–15 (App'x Ex. 2); Potter Aff. ¶ 17 (App'x Ex. 1). His recommendation that the Council adopt revised Minimum Standards was supported by other airport users, the AAB, and AOPA, a national organization deeply concerned about the potential for competition at the Airport. Godfrey Aff. ¶ 15–16 (App'x Ex. 2). And all six members of the City Council voted to adopt the revised Minimum Standards. Resolution 2017-14 (App'x Ex. 13). Clearly, Godfrey's "advocacy" was objectively reasonable

because his views were mirrored by almost everyone *other than* OK3. 

N. AbuHaidar Dep. at 78:15-82:6 (App'x Ex. 103).  There is simply no evidence that Godfrey's recommendation that the Minimum Standards be revised, at the conclusion of a months-long, public process in which OK3 actively participated, was "substantially motivated" by OK3's speech.

OK3 Dep. Vol. 1 at 192:25-193:6 (App'x Ex. 102), are simply inadequate.

Moreover, OK3 also cannot satisfy its burden to demonstrate that "it would be clear to a reasonable officer that [such] conduct was unlawful in the situation." *Cortez*, 478 F.3d at 1114. To the contrary, the law clearly *protects* a public official's own advocacy.  *See*, *e.g.*, *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999); *Hinshaw v. Smith*, 436 F.3d 997, 1009 (8th Cir. 2006).  OK3 cannot identify a case, as it must, where a public official's mere recommendation that his supervisors adopt a particular position violated a plaintiff's First Amendment rights. Indeed, if that were the law, public officials would be subject to virtually unlimited liability for taking a position that was publicly opposed by anyone, a position the Tenth Circuit has rejected. *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 842 (10th Cir. 2014) (rejecting a similar theory because it "raise[d] the prospect of every loser in a political battle claiming that enactment of legislation it opposed was motivated by hostility toward the loser's speech").

## III.    OK3'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW

OK3 also alleges that Godfrey interfered with OK3's existing and prospective economic

relations by (1) failing to adequately remove snow and ice from the airport runway and (2) granting

Barry Hancock a self-fueling permit.  Both claims fail as a matter of law.

### A.    Tortious Interference Standard

To succeed on its tortious interference claims, OK3 must demonstrate that (1) Godfrey

intentionally[14] interfered with OK3's existing or potential economic relations, (2) by improper

means, and (3) causing injury to OK3.  *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015).

The Utah Supreme Court has long held that the "improper means" element limits tortious

interference claims to those actions which are *independently* tortious or wrongful, *i.e.*, those that

"are contrary to law, such as violations of statutes, regulations, or recognized common-law

rules,"[15] or actions that violate "an established standard of a trade or profession."  *C.R. England v.*

*Swift Transp. Co.*, 437 P.3d 343, 344 (Utah 2019) (quoting *Leigh Furniture & Carpet Co. v. Isom*,

657 P.2d 293, 308 (Utah 1982)).  The Utah Supreme Court recently clarified that such an

"established standard of a trade or profession" must be "an external and objective one, rather than

the individual judgment, good or bad, of the particular actor."  *Id.*  at 354-55 (quoting *Walker v.*

*Anderson-Oliver Title Ins. Agency, Inc.*, 309 P.3d 267, 274 (2013)).  Thus, OK3 *must* prove "the

existence of an objective, industry-wide standard . . . through expert testimony regarding industry-

wide customs or practices, uniform codes, [or] industry-specific regulations . . . ."  *Id.* at 355.

---

[14] Under the Governmental Immunity Act of Utah, OK3 may not pursue an action against Godfrey unless OK3 demonstrates that he acted or failed to act "without just cause or excuse . . . [and] was aware that [his] conduct will probably result in injury."  Utah Code Ann. § 63G-7-202(3)(c)(i) & 63G-7-102(11).

[15] For example, "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods."  *C.R. England*, 437 P.3d at 353 (quoting *Isom*, 657 P.2d at 308).

B.    The Failure to Remove Snow from the Airport Runway

OK3 claims that Godfrey failed to adequately remove snow and ice from the airfield on November 24, 2016 and December 26, 2016, causing several of OK3's potential customers not to land at the airport. *See*, *supra*, at 14–16.  This claim fails because (i) Godfrey's performance was not independently tortious or contrary to an objective, industry-wide standard; and (ii) OK3 cannot establish that Godfrey's performance was the proximate cause of OK3's alleged injury.

First, OK3's claim rests on its assertion that Godfrey "deliberately fail[ed] to timely remove snow."  Second Amended Complaint ¶ 250 [ECF No. 100].  Even if this were allegation were true, it would not constitute an "improper means," because there *is no* "external and objective" standard for the timely removal of snow at a general aviation airport such as the Airport.  *See C.R. England*, 437 P.3d at 344.  Indeed, the FAA specifically found, in response to OK3's complaint, that Godfrey had not violated any standard because "there is no mandated timeframe for snow removal operations at general aviation airports."  FAA Determination of OK3's Informal Complaint, at 6–7 (App'x Ex. 59).  Moreover, the City's retained expert witness noted that many general aviation airports do not remove snow at all and that there is no industry standard that would govern the removal of snow from the Airport's runways.  Report of M. Cavanaugh, at 8–9 (App'x Ex. 92).  OK3 has offered no expert rebuttal testimony that allows the Court to conclude otherwise.

OK3 also cannot establish that Godfrey's conduct was the *cause* of any aircraft diversions.  Whether or not to land at the originally intended airport or divert to an alternate airport is solely in the discretion of the pilot in command.  *Id.* ███████████████████████ N. Abuhaidar Dep. at 212:13–18 (App'x Ex. 103).  OK3's customer service representative testified that it is common for upwards of twenty-five percent of aircraft with reservations at OK3 to cancel, especially during the wintertime.  Deposition of J. Quilter at 22:18-23:13 (App'x Ex. 109).  OK3

has not produced any statements from the operators of aircraft that did not land at the Airport on

November 24, 2016 or December 26, 2016, ████████████████████████ █ ████████

████████████████████████████████████████████████████████████

████████  *See* OK3 Dep. Vol. 2 at 67:8-68:16 (App'x Ex. 104).  This claim should be dismissed

as a matter of law.  *See USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 674 (Utah 2016) ("[W]hen

the question is one of causation, we take the question from the jury . . . if the proximate cause of

an injury is left to speculation.") (internal quotation marks omitted).

C.     The Issuance of a Temporary Self-Fueling Permit to Barry Hancock

OK3 also claims that Godfrey tortiously interfered with OK3's economic relationship with

Hancock by granting Hancock permission to self-fuel his aircraft (in lieu of purchasing fuel from

OK3).  This claim fails because (i) Godfrey's authorization for Hancock to self-fuel was not

independently tortious or contrary to an objective, industry-wide standard, but was rather *required*

thereby; and (ii) Godfrey did not "interfere" with this relationship, but rather enabled Hancock to

carry out *Hancock's own* decision to end that relationship.

First, OK3 cannot demonstrate that issuing a self-fueling permit is an "improper means" of

interference because it is not "contrary to law" or violative of "an established standard of a trade

or profession."  *C.R. England*, 437 P.3d at 353.  Here, the law *required* Godfrey to comply with

Hancock's request.  The City's federal obligations require that it provide all airport users with a

reasonable opportunity to self-fuel.  Airport Compliance Manual, Chapter 11 (App'x Ex. 90).  The

FAA has repeatedly found airport operators which impose unreasonable restrictions on the right

---

[16] OK3 produced only an internal email wherein one of its employees claims to have been
told by the pilot of one aircraft that they diverted due to runway conditions.  *See* Email from J.
Quilter dated Dec. 28, 2016 (App'x Ex. 88).  That is hearsay that may not be offered for the truth
of the matter asserted.  FED. R. EVID. 802.

to self-fuel to be in violation of their grant agreements, and therefore at risk of losing federal financial assistance to maintain the airport. *See generally* Nat'l Acads. Of Sci., Eng., and Med., *The Right to Self Fuel* (2009) (App'x Ex. 93). And, indeed, the FAA later found that the very restrictions OK3 claims should have precluded the issuance of a self-fueling permit to Hancock were, in fact, unreasonable. Godfrey Aff. ¶ 47 (App'x Ex. 2).

Furthermore, granting Hancock waivers from certain requirements of the Minimum Standards does not render Godfrey's authorization "contrary to law" or an industry standard. Minimum standards are not law, but are a set of standards reflecting the City's internal policy as to the commercial use of Airport property. Minimum standards are enforced only through contract and vary significantly from one airport to another. FAA Advisory Circular 150/5190-7, *Minimum Standards for Commercial Aeronautical Activities* ¶¶ 1.1, 1.2.c. Moreover, a violation of one airport's Minimum Standards does not violate an "industry standard" because internal policies at one airport are, by definition, *not* an industry standard. *Walker v. Anderson-Oliver Title Ins. Agency, Inc.*, 309 P.3d 267, 274 (Utah Ct. App. 2013) ("Establishing an industry standard requires more than evidence of a particular company's rules and policies.").

Second, tortious interference requires that a defendant take some overt act to "induce[] or otherwise cause[]" interference with an existing economic relationship. Restatement (Second) of Torts § 766. "The word 'inducing' refers to the situations in which A causes B to choose one course of conduct rather than another. . . . The phrase 'otherwise causing' refers to the situations in which A leaves B no choice." *Id.* § 766, cmt. h. In other words, Godfrey must have "played an *active* and substantial part" in causing Hancock to pursue self-fueling, or committed "some overt

act which influenced" Hancock's decision. *Border Area Mental Health Inc. v. United Behavioral Health*, 311 F. Supp. 3d 1308, 1316 (D. N.M. 2018)).[17]

The record in this case clearly belies any such interference. *Hancock* approached *Godfrey* about permission to self-fuel, based on *Hancock's* concerns about OK3's fueling prices and policies; not the other way around. Godfrey Aff. ¶ 41–42 (App'x Ex. 2). Godfrey responded to Hancock's request by encouraging him to *continue* using OK3 for his fueling needs and offering to help him get a lower price. Email from D. Godfrey dated Jan. 11, 2017 (App'x Ex. 67). Godfrey did not induce Hancock to self-fuel his aircraft. Rather, Hancock sought the permit for his own purposes, apparently to avoid OK3's high fuel prices. Godfrey Aff. ¶ 41–42 (App'x Ex. 2). Indeed, when OK3 and Hancock reached an agreement for discounted fuel, Hancock discontinued self-fueling and resumed purchasing fuel from OK3. Hancock Dep. at 50:5–25 (App'x Ex. 105).

OK3's tortious interference claims against Godfrey must be dismissed.

## CONCLUSION

For the foregoing reasons, Denis Godfrey respectfully requests that the Court enter summary judgment in his favor an all claims.

**DATED** this 10th day of September, 2020.

**KAPLAN KIRSCH & ROCKWELL LLP**

*/s/ Steven L. Osit*
Peter J. Kirsch
W. Eric Pilsk
Steven L. Osit
Attorneys for Heber City & Denis Godfrey

---

[17] Godfrey is not aware of a similar holding by a Utah court, but believes the Utah court would adopt the same approach. In the absence of such a rule, competing enterprises would be regularly subject to liability to each other merely because a customer chose one over the other for reasons that had nothing to do with any conduct of any particular enterprise.

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2020, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following email addresses:

> Craig A. Hoggan
> Joelle S. Kesler
> DART ADAMSON & DONOVAN
> 257 East 200 South, Suite 1050
> Salt Lake City, Utah 84111
> choggan@dadlaw.net
> jkesler@dadlaw.net
>
> Joseph E. Wrona
> Jared Bowman
> Cade Whitney
> WRONA DUBOIS PLLC
> 1745 Sidewinder Dr
> Park City, UT 84060
> wrona@wdlawfirm.com
> bowman@wdlawfirm.com

*/s/ Steven L. Osit*
Steven L. Osit

*Attorney for Defendant Heber City
And Denis Godfrey*

28