# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AH AERO SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HEBER CITY, *et al*.,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER<br>(UNSEALED AND AMENDED)**<br><br>Case No. 2:17-cv-1118<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff AH Aero Services, LLC, the Fixed Based Operator at Heber City Municipal Airport, brings this action against Defendants Heber City and two of its former Airport Managers, Paul Boyer and Denis Godfrey. Aero asserts a claim for retaliation in violation of the First Amendment as well as various state-law claims. Mr. Boyer and Mr. Godfrey assert state-law counterclaims against Aero. All three Defendants move for summary judgment on all of Aero's claims against them and Aero moves for summary judgment on some of its state-law claims against the City and on Mr. Boyer and Mr. Godfrey's counterclaims.

For the reasons that follow, the court grants Heber City's and Mr. Boyer's motions for summary judgment on Aero's First Amendment claim and grants in part and denies in part Mr. Godfrey's motion for summary judgment on this claim. And in light of its disposition of Aero's sole federal claim, the court declines to exercise supplemental jurisdiction over the various state law claims and counterclaims.[1]

---

[1] The court issued this memorandum decision and order under seal on March 31, 2022. *See* Dkt. No. 407. The parties have agreed that this opinion may be unsealed without redactions. In addition to unsealing the opinion, the court has amended a footnote in response to the City's motion for clarification. *See* Dkt. No. 408. The court has also made a small number of technical corrections and minor changes throughout the opinion.

## I.

As a full-service, Fixed Based Operator ("FBO"), Aero provides aircraft maintenance, ramp parking, fueling, de-icing, overnight hangar rentals, and other services at the Heber City Municipal Airport, which is owned by the City. Since 1999, Aero has leased space at the Airport and provided services pursuant to a long-term Ground Lease Agreement. This agreement remains in force until at least 2041. Among other things, Aero is required to "undertake the maintenance of the leased grounds, buildings, and utilities" and to "make a complete inspection at least once a week of all facilities at the airport and report immediately any hazardous or dangerous condition to the City." Dkt. No. 18-1 at 4. "The maintenance of the runway, taxiway, beacon lights, etc.," however, "remain the responsibility of Heber City." *Id.* The agreement also requires Aero to comply with all federal, state, county, and local laws and ordinances that pertain to the flying and operation of aircraft and the conduct and operation of airports, except for "those minimum requirements of the existing Aviation Ordinance that specifically conflict with the provisions of this Agreement." *Id.* at 3.

The Airport is governed by FAA regulations and contracts—compliance with at least some of which is essential to maintain federal funding—as well as by documents adopted by the City. Those municipal documents include the Minimum Standards and Requirements of the Conduct of Commercial Aeronautical Services and Activities at the Heber City Municipal Airport, the Airport Rules and Regulations, and the Lease/Rates and Charges Policy.

The Minimum Standards establish requirements that apply to all commercial operators at the Airport, and they are incorporated into Aero's Ground Lease Agreement with the City. Aero's lease provides that the Minimum Standards may be "amended or changed by mutual consent between Heber City and [Aero] or . . . amended when deemed reasonable and necessary

by the City Council for safety reasons or in order to comply with State and Federal rules and regulations or in order to assure reasonable and competent service at said airport." *Id.* at 3–4.

The Airport is operated under the general direction of the Heber City Council, with its day-to-day operations conducted by the City's Airport Manager, who reports directly to the City Council. Because the Council meets only bimonthly to act on Airport-related matters, much of the Council's supervision over the Airport Manager is done through informal correspondence between the Airport Manager and individual members of the Council. The Council has also created an Airport Advisory Board to advise it on issues related to the Airport.

For many years, Aero and the City maintained a cooperative relationship. More recently, however, Aero and the City have repeatedly found themselves on opposite sides of various policy disputes relating to the Airport, and their relationship has grown increasingly strained.

At an Airport Advisory Board meeting in March 2014, Aero's President, Nadim AbuHaidar, then a member of the Board, argued in favor of reversionary hangar leases (as opposed to renewable, nonreversionary leases). During the meeting, Mr. AbuHaidar referred to a contrary argument made by Mr. Boyer, then a hangar owner at the Airport, as "disingenuous." Dkt. No. 195-7 at 74. Four months later, the City amended the Board's bylaws in a way that disqualified Mr. AbuHaidar from continuing to serve on the Board. *See* Dkt. No. 164-1 at 229. Aero's relationship with the City continued to deteriorate from that point on.

In April 2015, the Wasatch County Fire Marshall determined that Aero would need to install a Group I or II fire suppression system in one of its hangars. *See* Dkt. No. 164-3 at 14–15. He sent a letter to Aero explaining the basis for his determination and stating that, "if an agreement cannot be reached, the next step would be to organize a meeting with the Fire District along with [Aero], Heber City Building Department, and any other parties that are involved in

decision making and operation of the Russ McDonald Airfield." *Id.* at 26. That June, Aero's General Counsel sent a letter to the Fire Marshall disagreeing with his decision on both legal and factual grounds and requesting a meeting as the Fire Marshall had suggested. *See id.* at 21. The Fire Marshall did not respond either to Aero's objections or to its request for a meeting. *See* Dkt. No. 164-5 at 254.

Around the same time, at least some members of the City Council began questioning aspects of the Minimum Standards and the City's contractual relationship with Aero. In August 2015, the Council received a letter from the FAA stating that Aero's contractual right to veto revisions of the Minimum Standards came "dangerously close to potentially being in conflict" with one of the grant assurances necessary to maintain the Airport's federal funding. Dkt. No. 164 at 74. The following day, Councilwoman Heidi Franco sent a letter to the City Attorney expressing "concern . . . that the current Minimum Standards potentially create an artificial barrier to FBO competition at the Airport and could lead to FAA complaints against the city because of (1) the veto authority of the current FBO and (2) the artificial requirements of a high level of operations for any new competing FBOs." *Id.* at 73.

Later that year, the City began to receive complaints from Airport users that Aero's fuel prices were too high and that its maintenance services were too expensive and difficult to schedule. *See* Dkt. No. 164 ¶ 4 at 9. The City also grew concerned that Airport revenues did not always cover Airport expenses and that subsidies from the City's general fund were necessary to make up the shortfall. *See id.*

In response to those concerns, the City sought to renegotiate its contract with Aero to increase Aero's lease rate. The City also began to consider the possibility of allowing another

FBO to operate at the Airport in competition with Aero as a means of lowering the prices and improving the quality of services provided to Airport users.

In November 2015, Aero made its disagreement with the latter possibility clear in a letter to the City Council. Among other things, Aero stated that the City's consideration of a second FBO at the Airport would "jeopardize" the lease-rate renegotiations. Dkt. No. 164 at 59.

Just over four months later, on March 8, 2016, then-Airport Manager Terry Loboschefsky wrote an email to Aero explaining that, based on the Fire Marshall's April 2015 determination, Aero would no longer be allowed to park its fuel trucks inside its hangars. *See* Dkt. No. 164-3 at 17. Later that month, Aero responded with a letter from its General Counsel to the City Attorney disagreeing with the Fire Marshall's "interpretation" but stating that it was "still willing to meet and try to reach an agreement, as [the Fire Marshall] suggested." *Id.* at 20. The letter also asserted Aero's belief that, "[i]n the absence of such an agreement or a final appealable decision," "Mr. Loboschefsky's notice [was] premature." *Id.* The record does not reveal any further correspondence or action relating to this issue at this time.

A little over two months later, Councilwoman Franco raised concerns to the other Councilmembers that the Minimum Standards "were preventing competition at the airport," and requested approval from the City Council to begin working on amendments to the Minimum Standards. Dkt. No. 164-1 at 78. The Council approved her request. *See id* at 79.

Against this increasingly contentious backdrop, the City Council approved hiring Defendant Paul Boyer as part-time Airport Manager while the City sought a full-time Manager. *See* Dkt. No. 164-1 at 87–89. This decision was made in a closed special session on July 6, 2016. On July 19, 2016, Aero sent the City Attorney a letter arguing that this meeting had violated Utah's Open and Public Meetings Act, and that Mr. Boyer should not have been hired because,

as head of a group representing the interests of hangar owners, he had "a clear conflict of interest." Dkt. No. 209-15 at 1–2.

Two weeks later, Aero entered into a contract with Mel McQuarrie, who was leasing a large hangar at the Airport, to purchase that lease. Mr. McQuarrie's lease had taken effect on January 1, 2016, and ran through September 27, 2020, with a right to renew for five more years and the possibility of future renewals after that. *See* Dkt. No. 164-4 at 40–41. Although the lease required the City to approve any assignment of the lease, it also provided that this approval "shall not be unreasonably withheld." *Id.* at 50. The contract between Aero and Mr. McQuarrie required Mr. McQuarrie to obtain a new lease from the City for Aero prior to September 30, 2016. *See* Dkt. No. 209-19 at 2–3.

Shortly thereafter, Mr. McQuarrie notified Mr. Boyer of the intended sale, and the two scheduled a meeting with Aero to discuss the transaction. Mr. Boyer, however, subsequently canceled the meeting and informed Mr. McQuarrie and Aero that he would recuse himself from the City's consideration of the transaction because he had "been personally targeted in three letters from two of [Aero's] law firms" and Aero's "attorneys and their accusations ha[d] left [him] no other choice" but to recuse himself from "anything" Aero requested regarding the sale of the hangar. Dkt. No. 209-21 at 1–2. One of the three letters repeated the charge that Mr. Boyer "should not have been hired as Airport Manager" because "[he] ha[d] a conflict of interest." *Id.* at 1.

On September 1, 2016, the City Council held a meeting to consider whether to approve the assignment of the lease from Mr. McQuarrie to Aero and whether to offer a new lease. *See* Dkt. No. 209-27 at 2. At the meeting, Councilwoman Franco expressed frustration that the Council had previously "missed many opportunities to renegotiate the lease with [Aero]," and

6

that the McQuarrie transaction was "another opportunity to put conditions on [Aero] . . . to take things out of [its] lease that are clearly against FAA standards, [its] veto authority, and yet that [was] not even being discussed." Dkt. No. 209-75 at 21:8–22:13. The City Attorney, however, instructed her to "stop discussion with regard to those things immediately." *Id.* at 22:21–25. The City Council ultimately voted unanimously to approve the assignment of Mr. McQuarrie's lease to Aero and the majority also voted to offer Aero a new lease "when it was available." Dkt. No. 164-1 at 118. Councilwoman Franco and Councilman Ron Crittenden voted against the latter decision. Because a new lease was not offered before the contractual deadline, and because Aero apparently elected not to waive or seek to renegotiate the requirement of a new lease despite the City's approval of the assignment, Aero's contract with Mr. McQuarrie failed to close.

On September 16, 2016, Aero sent a letter to the City Attorney objecting to Councilwoman Franco's comments at the September 1st meeting. Aero asserted that she had "made several incorrect and misleading statements on the record about [Aero] and its owner, Nadim AbuHaidar." Dkt. No. 209-33 at 1. Aero also stated that "if Ms. Franco is to be believed, the denial [of the McQuarrie lease] was not based on a problem with Mr. McQuarrie's request, but rather, on her bias against [Aero] and her unrelated attempts to gain leverage in lease negotiations with [Aero]." *Id.* at 3–4.

A few days later, Mr. Boyer forwarded Aero's letter to an Airport operator named Barry Hancock and stated that he "would like to discuss" the letter with him. Dkt. No. 216-38 at 3. In subsequent email correspondence with Mr. Hancock, Mr. Boyer outlined what he considered to be "the areas [of Aero's lease] that can and beg to be negotiated," including Aero's Minimum Standards veto, its lease rates and fees, and revenue sharing. *Id.* at 1–2.

On September 22, 2016, Aero sent a safety alert to Mr. Boyer pursuant to Section 5 of the Ground Lease Agreement, informing him that Mr. Hancock was not tying down his aircraft as required by FAA regulations. *See* Dkt. No. 169-27 at 2–3. Mr. Boyer forwarded this email to Mr. Hancock. *See* Dkt. No. 209-34 at 1–2. Mr. Hancock responded that "he would start tying down [his] aircraft when [Aero] stops using public taxi lanes to park their aircraft on [the] city['s] ramp and starts tying down the light twin aircraft they are parking on city property, which is not only in violation of their lease, but also creates its own safety hazard and they do this every day!" *Id.* at 1. He also suggested that Aero's safety alert was "a perfect entrée into getting them to comply, actually." *Id.*

On September 29, 2016, Mr. Boyer responded to Aero's safety alert. He began by opining that the FAA regulations at issue were not mandatory. *See* Dkt. No. 209-38 at 1. He then wrote, "**despite your 'safety concern with regard to aircraft that are being left outside and not tied down' by one of your neighbors, one can view [your] apron any night of the week and see that very few of your parked aircraft are tied down.**" *Id.* at 2 (emphasis in original). He went on to allege five safety violations by Aero and to request that Aero "promptly correct" the violations. *Id.* at 2–3. Three of the alleged violations were among the matters discussed by Mr. Boyer and Mr. Hancock in their recent email exchange, namely, that Aero was not properly tying down its own aircraft and was parking some of its aircraft on approved taxi lanes as well as on city property that was not part of Aero's leasehold. *See id.* at 2. Mr. Boyer concluded his response to Aero's CFO, Alan Robertson, by stating, "Alan, I am not attacking you or anyone else at [Aero]. I truly appreciate your email about safety concerns, but the discussion **you requested** demands it be widened to the fuller requirements above. The City expects [Aero] to comply with these provisions of the Airport's Rules and Regulations without cherry picking only

those that suit [Aero]'s purpose." *Id.* at 3. (emphasis in original). It does not appear that Mr. Boyer or Aero took any further action relating to Aero's safety alert or the matters raised by Mr. Boyer in his email.

Early the next month, the City hired Denis Godfrey as the full-time Airport Manager. Mr. Godfrey had worked for Aero as a Line Service Supervisor for several months until he was terminated by Aero about two years before he became Airport Manager. *See* Dkt. No. 164 ¶ 3 at 15.[2]

Around the time that Mr. Godfrey became Airport Manager, Mr. Hancock informally told the City Council that he would like permission to fuel his own aircraft instead of purchasing fuel from Aero. *See* Dkt. No. 164-3 at 79. Shortly after Mr. Hancock broached this issue, Aero wrote a letter to Mr. Godfrey contending that Mr. Hancock could not satisfy the requirements for self-fueling established by the Minimum Standards. *See* Dkt. No. 164-3 at 81–82.

Still another dispute arose in November 2016 when the Airport Advisory Board considered a proposal to increase the airport landing fees charged by the City. Aero believed the increase would apply disproportionately to larger planes—a "major source" of its revenue. Dkt. No. 209-2 ¶ 25. On November 21, 2016, Aero sent the City Attorney a letter outlining its objections to the proposed landing fee increase. *See* Dkt. No. 209-45. Among other things, Aero argued that the proposal would "require the exercise of discretion for which [Aero] can and

---

[2] Mr. Hancock had recruited Mr. Godfrey for the Airport Manager position, explaining that the "City Council is getting more aggressive with Nadim [AbuHaidar] and it's creating more conflict," and suggesting the position would be "a good opportunity for someone with your skill set." Dkt. No. 209-43 at 3–4. And in passing along Mr. Godfrey's application to Councilmembers Franco and Crittenden, Mr. Boyer had opined that Mr. Godfrey's past experience working for Aero would "serve both him and Heber City well." *Id.* at 7.

should not be held responsible." *Id.* at 2. In its letter, Aero mentioned both Mr. Godfrey and Councilwoman Franco by name. *See id.*

Later that week, on Thanksgiving Day, Mr. Godfrey noticed a layer of snow and ice on the runway and issued a "Notice to Airman" informing pilots of the runway conditions. *See* Dkt. No. 164-1 ¶¶ 22–23 at 19. Under the FAA's then-newly implemented reporting system, Mr. Godfrey's report triggered a separate, runway-closing notice, which was in effect until the early afternoon. *See id.* In the seventeen years prior to the Thanksgiving Day incident, neither the City nor any previous Airport Manager had issued a notice requiring runway closure. *See* Dkt. No. 216-81 ¶ 5.

Mr. Godfrey later apologized to the aircraft operator who was affected by the runway closure in an attempt to ensure the closure "[w]ould not reflect upon [Aero] whatsoever since [it] was an airport matter." Dkt. No. 164-2 at 148. He also met with Aero's CFO to create a "snow removal plan for the cold weather season." *Id.* at 152; *see also* Dkt. No. 164 ¶ 25 at 20.

Around the same time, the City Council retained outside counsel and directed Mr. Godfrey to work with the outside counsel "to explore whether and to what extent the City could and should revise the . . . Minimum Standards . . . to comport with best practices, comply with federal law, and create additional opportunities for competition." *Id.* ¶ 15.

Weather conditions inflamed tensions yet again the following month. After a Christmas Day snowstorm, the City did not remove snow from a fifteen-foot-wide swath of Aero's leasehold that the City had traditionally plowed. Four days later, Mr. Godfrey sent Aero an email to "serve as further clarification of protocol and policy with respect to snow removal at the airport." Dkt. 164-2 at 155. Mr. Godfrey acknowledged that "there was some confusion or assumption about who plows t[hat] section," but explained that he had "reviewed relevant airport

10

documents and the FBO agreement" and could "find no language that compels the airport to plow any portion of [Aero's] leasehold." *Id.* Mr. Godfrey further explained that "in light of the new paradigm and . . . the limited resources of the airport," the City would no longer plow any portion of Aero's leasehold. *Id.*

On January 5, 2017, Mr. Robertson, sent a letter to Mr. Boyer, the Mayor, and the City Council disagreeing with Mr. Godfrey's conclusions. *See* Dkt. 209-50 at 1–3. After explaining his disagreement, Mr. Robertson stated that "Mr. Godfrey's behavior indicates either incompetence or an intention to create problems for [Aero] and the City. In either case, the net result is a serious safety issue as well as an access restriction issue at the Airport, which have only been compounded by the latest round of snowstorms. Both issues should be of serious concern to the City, as they could result in legal liability as well as FAA concerns. [Aero] respectfully requests that the City address Mr. Godfrey's performance so that aircraft operations are not unreasonably interrupted and Heber City is not exposed to undue risk." *Id.* at 2. The following day, Aero filed a complaint with the FAA, alleging that the City was violating one of the grant assurances required to receive federal funding as well as various statutes and regulations. *See generally* Dkt. No. 164-2 at 158–74.

Two days later, Mr. Godfrey arrived on Aero's leasehold accompanied by two City police officers and ordered an Aero employee to remove a fuel truck from inside one of Aero's hangars. He maintains that this order was based on the earlier determination by the Wasatch County Fire Marshall as well as on National Fire Protection Association Code 407 § 5.18, which provides that parking areas for "unattended aircraft fuel servicing tank vehicles" must be "[a] minimum of 15m (50 ft) from any parked aircraft and buildings other than maintenance facilities

and garages for fuel servicing tank vehicles." Dkt. No. 164-3 at 52; *see also id.* at 14–15, 22–26; Dkt. No. 164 at 21.

Around the same time, Mr. Hancock officially sought a self-fueling permit. *See* Dkt. No. 164-3 at 77. Mr. Godfrey responded by encouraging Mr. Hancock to "work out a deal with [Aero]," and offering him assistance in doing so. *Id*. Mr. Godfrey also explained that because Mr. Hancock's request was the first of its kind the City had received, the process might be lengthy and might require review by the Airport Advisory Board and the City's lawyers before reaching the City Council for final decision. *See id.*; Dkt. No. 164 ¶ 42 at 23.

Later that month, on January 30, 2017, Mr. Godfrey noticed one of Aero's customer's aircraft parked outside of Aero's leasehold. In an email he sent to Aero's General Counsel the same day, Mr. Godfrey wrote, "Frankly, my first impulse was to contact the chief pilot . . . and have him direct it moved. I would rather not be heavy handed and involve your customer. Rather, I hope you get this message and direct FBO staff to move the aircraft by tomorrow morning." Dkt. No. 209-95 at 1.

Just over a month later, Mr. Hancock submitted a revised request for a self-fueling permit. *See* Dkt. No. 164-3 at 87–89. He sought an exemption from a Minimum Standards requirement that he have a 750-gallon "fuel vehicle" so that he could self-fuel his aircraft using his 240-gallon fuel trailer. *Id.* at 88.

The Airport Advisory Board considered Mr. Hancock's request the following day and unanimously voted to recommend that the City Council amend the Minimum Standards to remove the 750-gallon fuel vehicle requirement. *See* Dkt. No. 164-1 at 137. The Board also unanimously voted to recommend that the City Council revise the Minimum Standards "to

alleviate the requirement for bottom loading fueling trailers and/or trucks" and that the City

Council approve Mr. Hancock's request for a self-fueling permit *Id.* at 138.

A few weeks later, at a City Council meeting in March 2017, the City's outside counsel

presented the City's plan to conduct a comprehensive review and revision of the Minimum

Standards. *See* Dkt. No. 164 at 76–92. The presentation outlined a six-part public process

intended to obtain input from stakeholders. *See id.* at 88. As part of that process, Mr. Godfrey

worked with outside counsel to prepare a draft of the Minimum Standards with proposed

revisions to be presented for discussion at a public City Council meeting that July. *See* Dkt. No.

164 ¶¶ 11–12 at 17.

In April 2017, while Mr. Hancock's application was awaiting consideration by the City

Council, Mr. Boyer—who no longer worked for the City—filed a complaint with the FAA

challenging the requirement, set forth in the Minimum Standards, that operators have a 750-

gallon, bottom-loading fuel vehicle as a condition of being permitted to self-fuel their aircraft.

*See* Dkt. No. 164-3 at 92–94.

Later that month, Aero met with Mr. Godfrey and the City's outside legal counsel to

discuss proposed changes to the Minimum Standards. *See* Dkt. No. 164-1 at 248; Dkt. No. 209-

68 at 1. Besides objecting to various specific changes and the pace of the revision process, Aero

reiterated its position that, pursuant to the Ground Lease Agreement, the Minimum Standards

could be amended only with its consent. *See* Dkt. No. 209-68 at 2.

After consulting with counsel regarding Mr. Boyer's complaint, Mr. Godfrey determined

that the requirement of a 750-gallon, bottom-loading fuel vehicle set forth in the Minimum

Standards "violat[ed] the City's federal obligations." Dkt. No. 164 ¶ 45 at 24. He then issued Mr.

Hancock a 90-day self-fueling permit that exempted Mr. Hancock from this requirement on May

3, 2017. *See* Dkt. No. 164-3 at 98. Nearly two years later, in February 2019, the FAA likewise determined that this requirement violated the City's grant assurances. *See* Dkt. No. 164-3 at 139–44.

Later in May 2017, the City, through outside counsel, "firmly reject[ed] [Aero]'s assertion that the Minimum Standards may only be revised through mutual consent between [Aero] and the City" as "based on a flawed interpretation of the [Ground Lease Agreement] . . . that should no longer persist." Dkt. No. 164-1 at 250. Instead, the City took the position that Section 3 of the Ground Lease Agreement allowed the City to revise the Minimum Standards under "at least one of four distinct scenarios . . . (1) upon mutual consent; or (2) when deemed reasonable and necessary for safety reasons; or (3) in order to comply with state and federal rules and regulations; or (4) in order to assure reasonable and competent services at said airport." *Id.* at 251.

Mr. Godfrey and outside Counsel submitted a discussion draft proposing revisions to the Minimum Standards to the City Council in June 2017. *See id.* at 176–80. A 30-day public comment period then took place. Aero submitted six of the eighty-eight public comments that the City received. *See generally* Dkt. No. 164-2 at 6–26.

Mr. Godfrey provided the public comments to the Airport Advisory Board in September 2017, along with proposed revisions to the Minimum Standards. *See* Dkt. No. 164-1 at 10–12. The Board voted to submit those revisions, along with some additional revisions of its own, to the City Council with a recommendation that they be adopted. *See id.* at 12.

Aero then sent a letter to the Mayor and the City Council reiterating that it would consider the proposed revision of the Minimum Standards to be a breach of the Ground Lease

Agreement. Aero also threatened to sue the City and to file a second complaint with the FAA. *See* Dkt. No. 164-2 at 33–34.

At a City Council meeting shortly thereafter, Mr. Godfrey presented the proposed revisions to the Minimum Standards to the Council with his own report recommending that the revised Minimum Standards be adopted. *See* Dkt. No. 164-2 at 28. The City Council unanimously adopted the revised Minimum Standards on October 5, 2017. *See* Dkt. No. 164 at 97.

Aero filed this lawsuit the next day. Aero asserts a First Amendment claim under 42 U.S.C. § 1983, alleging that the City Council and Airport Managers Paul Boyer and Denis Godfrey each took various adverse actions against Aero in retaliation for its protected speech. Aero also asserts a state law claim for tortious interference with existing and prospective economic relations against Mr. Boyer and Mr. Godfrey based on some of the same allegedly retaliatory actions. Finally, Aero seeks a declaratory judgment and asserts state law claims for breach of contract, breach of implied covenant of good faith and fair dealing, and promissory estoppel against the City based on its adoption of the revised Minimum Standards. *See* Dkt. No. 100. Mr. Boyer and Mr. Godfrey, in turn, assert anti-SLAAP counterclaims against Aero. *See* Dkt. Nos. 103, 104.

Aero moves for summary judgment on its request for a declaratory judgment, its claims for breach of contract and promissory estoppel, and on Mr. Boyer and Mr. Godfrey's counterclaims. *See* Dkt. No. 172. The City, Mr. Boyer, and Mr. Godfrey each move for summary judgment on all of Aero's claims. *See* Dkt. Nos. 162, 163, and 169. The parties have also filed nine motions to strike or exclude expert testimony. *See* Dkt. Nos. 264, 267, 270, 273, 274, 277, 278, 279, and 284.

The court heard argument on all of these motions and subsequently provided the parties

an opportunity to submit supplemental briefs addressing the following question:

> [A]ssuming that the test set forth in *Pickering v. Board of Education*, 391 U.S.
> 563 (1968), *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518
> U.S. 668 (1996) and their progeny applies here, can some or all of the alleged acts
> of retaliation be justified by the government's interest, as a contractor, in
> addressing an increasingly acrimonious relationship with its contractual partner
> by attempting to adjust the parties' relationship to strictly comport with their
> respective rights and obligations under the contract?

Dkt. No. 397. All of the parties submitted supplemental briefing. *See* Dkt. Nos. 401–404.

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Material facts are those which "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). A "dispute about a material fact is 'genuine'. . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether

genuine disputes of material fact exist, "[t]he evidence of the non-movant is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III.

The court first addresses Aero's Section 1983 claim for retaliation in violation of the First

Amendment. The court grants the Defendants' motions for summary judgment with respect to all

but one of the asserted acts of retaliation.

## A.

The parties dispute whether Aero's claim for retaliation should be analyzed under the

standards that apply to claims brought by ordinary citizens or under the standards that apply to

claims brought by government employees and at least some government contractors.

Aero argues that it should be treated as an ordinary citizen, and that the court should evaluate its claim using the test set forth in *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000). Under this test, a plaintiff need prove only that (1) it was engaged in "'constitutionally protected activity,'" (2) "the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity,'" and (3) "the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Id.* at 1212 (citation omitted).

The Defendants, by contrast, argue that because Aero and the City were in a contractual relationship, their relationship was not simply that of sovereign and citizen. It follows, Defendants argue, that Aero's claims must be evaluated using the test set forth in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968), and its progeny, including *Board of Commissioners v. Umbehr*, 518 U.S. 668, 676 (1996), and *Garcetti v. Ceballos*, 547 U.S. 410, 418–20 (2006).

Under this test, the court first "asks whether the government employee or contractor spoke pursuant to his or her official duties. If so, the government prevails." *Law Office of Samuel P. Newton v. Weber Cty.*, 491 F. Supp. 3d 1047, 1062 (D. Utah 2020) (citing *Garcetti*, 547 U.S. at 421, 423). "Otherwise, the court asks whether the employee or contractor spoke at least in part on a matter of public concern. 'If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" *Id*. (quoting *Garcetti*, 547 U.S. at 418 and citing *Connick v. Myers*, 461 U.S. 139, 147 (1983)). "[I]f the government has not prevailed at an earlier stage of the inquiry, the court balances the government's interests against

those of the . . . employee or contractor." *Id.* at 1063 (citing *Pickering*, 391 U.S. at 568 and *Umbehr*, 518 U.S. at 673).[3]

Even if the employee or contractor's speech would otherwise be protected, moreover, the court must consider whether the speech was a motivating factor in the alleged retaliatory action and whether the defendant would have taken the same action in the absence of the protected speech. *See Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977); *Newton*, 491 F. Supp. 3d at 1063 n.5. Unlike the first three inquiries, which "concern whether the speech is protected and are issues of law for the court to decide," these last two inquiries "concern whether an adverse action was taken because of the protected speech and are factual issues typically decided by the jury." *Duda v. Elder*, 7 F.4th 899, 911 (10th Cir. 2021) (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)).

Aero does not dispute that the Ground Lease Agreement creates a contractual relationship between Aero and the City or that Aero has significant obligations under that contract. But it argues that the *Pickering* test does not apply in this case because Aero is a lessee of the City and not an "independent contractor." Dkt. No. 202 at 33–36. Aero maintains that when the Supreme Court extended the *Pickering* test to "independent contractors" in *Umbehr*, the Court meant only "independent contractors performing tasks that would otherwise be performed by public employees." *Id.* at 34. Aero argues that it is "a merchant selling goods and services to the public," that it "provides no services on behalf of the City or which the City is required to provide," and that "the City has not contracted away its management of the Airport by allowing

---

[3] In some cases, it may also be necessary to ask whether "the employee or contractor's speech . . . was knowingly or recklessly false." *Newton*, 491 F. Supp. 3d at 1062. In this case, the Defendants do not seek to justify their alleged retaliatory actions on the ground that Aero's allegedly protected speech was knowingly or recklessly false. The court accordingly need not address this issue further in this case.

[it] to operate an FBO." *Id.* at 34–35 n.10. It follows, Aero argues, that the *Pickering* test does not apply to its First Amendment claims.

This court disagrees.

In extending the *Pickering* test to government contractors, the Court in *Umbehr* rejected both the argument that it should not "'extend' the First Amendment rights of government employees to independent contractors," and also the argument that "on proof of viewpoint-based retaliation for political speech, the government should be required to justify its actions as narrowly tailored to serve a compelling state interest." 518 U.S. at 676. The Court acknowledged that the arguments supporting each position had "some force." *Id*. at 677. But it concluded that "all of them can be accommodated by applying our existing framework for government employee cases to independent contractors." *Id.*

On the one hand, the Court explained that "[t]he dangers of burdensome litigation and the *de facto* imposition of rigid contracting rules necessitate attentive application of the . . . requirement of proof of causation and substantial deference, as mandated by *Pickering* [and its progeny], to the government's reasonable view of its legitimate interests, but not a *per se* denial of liability." *Id*. at 678. The Court further explained that it did "not believe that a deferentially administered requirement that the government not unreasonably terminate its commercial relationships on the basis of speech or political affiliation poses a greater threat to legitimate government interests than the complex and detailed array of modern statutory and regulatory government contracting rules." *Id*. at 684

On the other hand, the Court acknowledged that "Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling government

interest." *Id*. at 678. "But in this case," the Court explained, "as in government employment cases, the Board exercised contractual power, and its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. Deference is therefore due to the government's reasonable assessments of its interests *as contractor*." *Id*. (emphasis in original)

The Court thus saw "no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors." *Id*. And it found "ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees." *Id*.

Even accepting Aero's assertion that it performs no "tasks that would otherwise be performed by salaried Government employees," Dkt. No. 202 at 34—an assertion that rests on a debatable and perhaps dubious characterization of at least some of Aero's obligations under the Ground Lease Agreement—this court sees little in the foregoing analysis from *Umbehr* that would not apply with equal force here.

In addition, the Court in *Umbehr* described the question it was addressing as "whether, and to what extent, the First Amendment protects independent contractors" from government retaliation, *id*. at 670; *accord id*. at 673, and its specific holding was that "independent contractors are protected, and that the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of their protection," *id*. at 673; *see also id*. at 686 ("Subject to these limitations and caveats, however, we recognize the right of independent contractors not to be terminated for exercising their First Amendment rights."). In none of these key passages did the Supreme Court explicitly qualify the

phrase "independent contractors" in any way that would support Aero's proposed narrow reading of this phrase.

The references to "government contractors" and the government's "commercial relationships" that are sprinkled throughout the Court's analysis, *see id*. at 674, 684–85, as well as the importance placed by the Court on the Government's exercise of "contractual power," *id*. at 678, also suggest that the Court's ruling applies to government contractors generally and is not limited to contractors performing tasks that would otherwise be performed by salaried Government employees. Indeed, the Court's embrace of "a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases," *id*., likely reflects the Court's understanding that its holding would apply to a wide variety of government contractual relationships.

It is true that the opinion in *Umbehr* contains the statement "that independent contractors are often employed to perform 'tasks that would . . . otherwise be performed by salaried Government employees.'" *Id*. at 679 (citation omitted). But leaving aside the obvious negative implication of this language—that not all independent contractors are so employed—this language appears in a parenthetical describing an observation made in the Court's previous decision in *Logue v. United States*, 412 U.S. 521 (1973). The *Umbehr* Court cites that case in support of rejecting "a bright line distinguishing independent contractors from employees." *Umbehr*, 518 U.S. at 678. As the Court explains, "[t]he bright-line rule proposed by the Board . . . would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Id*. at 679. The Court further observes that "such formal distinctions . . . can be manipulated largely at the will of the

21

government agencies concerned." *Id*. It is in support of *this* proposition that the Court cites *Logue* and provides the parenthetical description containing the language on which Aero relies. This court has little difficulty dismissing Aero's reliance on this oblique parenthetical. Had the Court intended to limit its holding in so significant a way, it surely would have said so expressly—not in the cryptic manner Aero suggests.

Nor does Tenth Circuit precedent support Aero's narrow reading of *Umbehr*. *Worrell* itself, which Aero would have this court apply here, reflects the Tenth Circuit's assessment that "an alternative to the *Pickering* balancing is warranted when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer *and when there is no contractual relationship between them*." 219 F.3d at 1212 (emphasis added). It thus establishes "the appropriate framework for assessing First Amendment claims against a defendant who is neither an employer *nor a party to a contract with the plaintiff*." *Id*. at 1213 (emphasis added). By its own terms, then, this framework does not apply where, as here, a plaintiff has "some kind of contractual relationship" with the government defendant. *Id*. at 1210. *Leverington v. City of Colorado Springs*, which Aero also cites in support of its position, likewise indicated that it is "clear" that "the *Worrell* test applies to retaliation claims in which the defendant 'is not the plaintiff's employer and *when there is no contractual relationship between them*.'" 643 F.3d 719, 729 (10th Cir. 2011) (quoting *Worrell*, 219 F.3d at 1212) (emphasis added).

To be sure, in *Van Deelen v. Johnson*, the Tenth Circuit stated that the "public concern" requirement "properly applies to claims brought by government employees—but its scope reaches no further." 497 F.3d 1151, 1156 (10th Cir. 2007)). And in *Klen v. City of Loveland,* the Tenth Circuit similarly said that because the Plaintiffs were "private citizens, not public employees" the "'matter of public concern' requirement therefore did not apply to them." 661

F.3d 498, 508 (10th Cir. 2011) (quoting *Van Deelen*, 497 F.3d at 1156). But these cases addressed speech by private citizens—not government contractors—and the Tenth Circuit's language was directed toward resolving the cases before it. And although, taken out of context, the language used by the court may be imprecise, it surely was not intended—and cannot plausibly be understood—to disregard the Supreme Court's clear holding in *Umbehr* that the *Pickering* test applies not only to public employees but to government contractors as well.

Perhaps more important still, in *Planned Parenthood Association of Utah v. Herbert*, the Tenth Circuit applied the *Pickering-Umbehr* test to evaluate a First Amendment retaliation claim brought by an entity that provided "reproductive health services to women, men, and teenagers in the state of Utah" pursuant to various contracts with the Utah Department of Health. 828 F.3d 1245, 1248–50 (10th Cir. 2016). As the Tenth Circuit explained, "PPAU's unconstitutional conditions claims appear to us to fit comfortably within the context exemplified by *Umbehr*." *Id.* at 1259. In so concluding, the Tenth Circuit did not even discuss whether the Association performed tasks that would otherwise be performed by salaried government employees—let alone make the improbable conclusion that the Association did perform such tasks.

To whatever extent these controlling decisions leave the question open, this court concludes that the test set forth in *Pickering* and its progeny, as adapted by *Umbehr*, applies to *all* government contractors—not only those who perform tasks that would otherwise be performed by government employees.

*Pickering* itself rested largely on the Court's recognition that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568. But when it acts as a contractor, the government likewise has a distinct and legitimate

"interest in retaining freedom to decide how, with whom, and for whose benefit to deal." *Reeves,*

*Inc. v. Stake*, 447 U.S. 429, 438 n.10 (1980).

Indeed, the Court has stated that "[t]here is no indication of a constitutional plan to limit

the ability of the States themselves to operate freely in the free market," *id.* at 437, and that

"'*[l]ike private individuals and businesses*, the Government enjoys the unrestricted power to

produce its own supplies, to determine those with whom it will deal, and to fix the terms and

conditions upon which it will make needed purchases,'" *id.* at 439 n.12 (quoting *Perkins v.*

*Lukens Steel Co*., 310 U.S. 113, 127 (1940)) (emphasis and alterations in *Reeves*). To be sure, the

Court acknowledged "that there may be limits on this sweepingly phrased principle," but it also

indicated that "we cannot ignore the similarities of private businesses and public entities when

they function in the marketplace." *Id.*

In both its relationships with those whom it employs and those with whom it contracts,

the Government thus has interests that differ from—or apply in different ways than—those it has

when it acts solely as sovereign with respect to its citizens. Significantly, in deciding the extent

of independent contractors' First Amendment rights in *Umbehr*, the Court observed that "[t]he

similarities between government employees and contractors with respect to this issue are

obvious. The government needs to be free to terminate both employees and contractors for poor

performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and

to prevent the appearance of corruption." 518 U.S. at 674; *see also id*. at 684–85 ("Independent

government contractors are similar in most relevant respects to government employees, although

both the speaker's and the government's interests are typically—though not always—somewhat

less strong in the independent contractor case. We therefore conclude that the same form of

balancing analysis should apply to each."). And, as noted, the Court in *Umbehr* reasoned that in

both cases involving independent contractors and in government employment cases the government exercises "contractual power" and that in both instances "[d]eference . . . to the government's reasonable assessments of its interests *as contractor*" is therefore appropriate. *Id.* at 678.

In *Planned Parenthood*, the Tenth Circuit similarly stated that "[g]enerally speaking, when the government deals with its contractors, it is not acting as sovereign, but rather in a role that is in many ways similar to that of an employer." 828 F.3d at 1256; *see also id.* ("Just as in the employee context, and in the absence of a restricting contract or statute, decisions involving government contractors require broad discretion that may rest 'on a wide array of factors that are difficult to articulate and quantify.'" (quoting *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 604 (2008))). Or, as the Tenth Circuit put it in *SECSYS, LLC v. Vigil*, "in both circumstances, the government acts in a more proprietorial and less regulatory capacity." 666 F.3d 678, 690 (10th Cir. 2012).

The court rejects Aero's reading of *Umbehr* for another reason as well. As discussed, the Court in *Umbehr* rejected "a bright-line rule distinguishing independent contractors from employees" because that distinction was "at best a very poor proxy for the interests at stake" and could "be manipulated largely at the will of the government agencies concerned." 518 U.S. at 678–79. Although the *Umbehr* Court expressly rejected *that* bright line, Aero would read the Court's decision to implicitly embrace a *different* bright line—a line between those government contractors who perform tasks that would otherwise be performed by government employees and those that do not.

Leaving aside the implausibility of Aero's suggestion that this implicit bright line is part of the "nuanced approach" that the Court found "superior" to the bright line it explicitly rejected,

the line proposed by Aero—like that rejected by the *Umbehr* Court—is "unsound in principle and unworkable in practice." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985).

As a matter of theory, there is an overwhelming variety of views regarding what tasks should be performed by salaried government employees and what tasks should not. And this variety of views is to a considerable extent reflected in the differing practices among States and localities throughout this Country. This variety is even greater, of course, when viewed through the lens of history.

For just these reasons, the Supreme Court famously abandoned the attempt to distinguish traditional from nontraditional government functions in another constitutional context in *Garcia v. San Antonio Metropolitan Transit Authority*. *See id.* at 546–47. The Court rejected a "historical approach" to this inquiry because it would prevent courts "from accommodating changes in the historical functions of States, changes that have resulted in a number of once-private functions like education being assumed by the States and their subdivisions." *Id.* at 543–44; *see also id.* at 544 n.9 ("Indeed, the 'traditional' nature of a particular governmental function can be a matter of historical nearsightedness; today's self-evidently 'traditional' function is often yesterday's suspect innovation.").

The Court likewise rejected any "nonhistorical standard" as "likely to be just as unworkable as is a historical standard." *Id.* at 545. The court noted that "[t]he goal of identifying 'uniquely' governmental functions" had been rejected as "unmanageable" in other contexts. *Id.* And it opined that "[t]he set of services that fits into [the] category" of "'necessary' governmental services . . . that would be provided inadequately or not at all unless the government provided them" "may well be negligible." *Id.* As the Court explained, "[t]he fact that

an unregulated market produces less of some service than a State deems desirable does not mean

that the State itself must provide the service; in most if not all cases, the State can 'contract out'

by hiring private firms to provide the service or simply by providing subsidies to existing

suppliers." *Id*. The court also "question[ed] how well equipped courts are to make this kind of

determination about the workings of economic markets." *Id*.

      Ultimately, however, the Court abandoned the attempt to distinguish traditional from

nontraditional government functions for a more "fundamental" reason:

> The essence of our federal system is that within the realm of authority left open to
> them under the Constitution, the States must be equally free to engage in any
> activity that their citizens choose for the common weal, no matter how
> unorthodox or unnecessary anyone else—including the judiciary—deems state
> involvement to be. Any rule . . . that looks to the "traditional," "integral," or
> "necessary" nature of governmental functions inevitably invites an unelected
> federal judiciary to make decisions about which state policies it favors and which
> one it dislikes. "The science of government . . . is the science of experiment," and
> the States cannot serve as laboratories for social and economic experiment if they
> must pay an added price when they meet the changing needs of their citizenry by
> taking up functions that an earlier day and a different society left in private hands.

*Id*. at 546 (internal citations omitted); *see also id*. at 546 ("There is not, and there cannot be, any

unchanging line of demarcation between essential and non-essential governmental functions.

Many governmental functions of today have at some time in the past been non-governmental.

The genius of our government provides that, within the sphere of constitutional action, the

people—acting not through the courts but through their elected representatives—have the power

to determine as conditions demand, what services and functions the public welfare requires."

(citation omitted)).

      This case well illustrates the problem with the approach proposed by Aero. The court

simply cannot say whether, if it could not assign the tasks performed by Aero under the Ground

Lease Agreement, the City, as owner of the Airport, would perform these tasks through salaried

employees or whether it would abandon some or all of them. Regardless, the court does not

believe that *Umbehr* can plausibly be read to require it to undertake such an unmanageable inquiry.[4]

Having determined that the *Pickering-Umbehr* test applies, there is still an additional issue to address. In typical circumstances, public employees are not required to show explicitly

---

[4] Based on its characterization of the Ground Lease Agreement, Aero argues that this court should not balance the City's interests against Aero's First Amendment interests—either because the *Pickering-Umbehr* test does not apply at all or, even if it does technically apply, "this case is nearly indistinguishable from private-citizen cases where courts do not even consider the government's interest." Dkt. No. 404 at 9. Aero cites three cases in support of its argument: *Trant v. Oklahoma*, 754 F.3d 1158 (10th Cir. 2014), *Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2nd Cir. 2018), and *41 North 73 West, Inc. v. County of Westchester, New York*, 2009 WL 10740050 (S.D.N.Y. 2009). *See* Dkt. No. 404 at 9–11.

The court is unconvinced. *Trant* did not involve a government contractor at all, let alone a lessee. In *Wandering Dago*, the Second Circuit addressed the denial of a food vendor's application to participate in a lunch program ran by the City and operated on state-owned property. But the would-be vendor in *Wandering Dago* did not yet have "a pre-existing commercial relationship with the government" and thus fell outside the scope of *Umbehr*'s holding. 518 U.S. at 685; *see also id.* (declining to "address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship").

To be sure, the court in *Wandering Dago* did treat "the food vendors not as government contractors, but rather as private entities that pay to access public benefits and, in using those benefits to their economic advantage, secondarily satisfy a government purpose." 879 F.3d at 38. And it distinguished *Pickering* and *Umbehr* on the ground that "[i]n those cases, the government agreed to pay public moneys to private individuals for services to be rendered, and therefore had a stronger interest in restricting those individuals' speech than in restricting the speech of the public at large." *Id.* at 38. But Aero, unlike the plaintiff in *Wandering Dago*, does have "a pre-existing commercial relationship with the government." And given Aero's complex obligations under the Ground Lease Agreement, it bears no resemblance to a simple food vendor.

To whatever extent *Wandering Dago* can be read to suggest that in all cases the application of *Umbehr* (or at least the propriety of considering the Government's interests) turns on whether money flows from the government to the contractor or from the contractor to the government, the court believes that this sort of bright-line rule, based on a distinction that is easily manipulable in practice given the wide variety of ways in which parties can structure their contractual relationships, cannot be reconciled with the holding and analysis in *Umbehr*.

The unpublished district court decision in *41 North 73 West, Inc.*, does appear to support Aero's position. But this decision is directly contrary to the Eleventh Circuit's decision in *BMI Salvage Corporation v. Manion*, 366 F. App'x 140 (11th Cir. 2010), and the court finds it unpersuasive in all events.

that their speech was chilled by the defendants' conduct because they have usually suffered some obvious injury such as termination. The same is true in independent contractor cases brought by plaintiffs claiming their contracts were terminated or not renewed in retaliation for protected speech. *See, e.g., Umbehr*, 518 US at 672.

That said, "[i]mplicit in the *Pickering* test is a requirement that the public employer have taken some adverse employment action against the employee." *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003). The Tenth Circuit has thus made clear that, at a minimum, a public employee bringing a First Amendment retaliation claim must establish that he or she suffered a "detrimental employment decision," such as denial of "promotions [or] recalls after layoffs," "'substantial harassment and abuse,'" "remov[al of] job duties from an employee's portfolio," or "written reprimand or a poor performance rating," that would "deter a reasonable person from exercising his or her First Amendment rights." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203, 1207–08 (10th Cir. 2007) (citations omitted). No doubt government contractors suing for First Amendment retaliation must make a comparable showing.

Here, Aero's contract with the City remains in force, although the City has begun to enforce some of its terms in a stricter and more literal manner. The court thus concludes that it must consider whether each of the alleged acts of retaliation would "deter a reasonable person from exercising his or her First Amendment rights." *Id.* at 1208.

The requirement that a government employee or contractor bringing a *Pickering-Umbehr* claim must make such a showing seems somewhat analogous to the requirement that a citizen alleging retaliation under *Worrell* must demonstrate that "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in [constitutionally protected] activity." 219 F.3d at 1212 (cleaned up). In that context,

the Tenth Circuit has explained that this standard is an objective one, and that "although the . . .

standard permits a plaintiff who perseveres despite governmental interference to bring suit, 'a

trivial or de minimis injury will not support a retaliat[ion] . . . claim.'" *Eaton v. Meneley*, 379

F.3d 949, 954–55 (10th Cir. 2004) (citation omitted).

Whether a government contractor or employee has made the threshold showing of

adverse government action that would "deter a reasonable person from exercising his or her First

Amendment rights" required to support a claim under *Pickering* and *Umbehr* may well be a

question of fact. *Cf. Worrell*, 219 F.3d at 1213. But even if a reasonable finder of fact could

conclude that this threshold showing has been made, the court concludes that it may still consider

the nature of the challenged government action and the extent of the injury inflicted on the

government employee or contractor in balancing the government interests served by the action

against the First Amendment interests of the employee or contractor. *Cf. Weaver v. Chavez*, 458

F.3d 1096, 1100 (10th Cir. 2006) ("In conducting the required balancing of interests, the court

examines the manner, time, and place of the speech, as well as the context in which the dispute

arose." (citing *Connick*, 461 U.S. at 152–53)).

## B.

The court will now address the specific acts of alleged retaliation that Aero maintains

violated its First Amendment rights, starting with the acts taken by the individual Defendants,

Mr. Boyer and Mr. Godfrey. The individual Defendants argue that their actions did not violate

the Constitution and that they are protected by qualified immunity.

## 1.

Once persons sued under § 1983 in their individual capacity invoke this defense, the

court must grant them qualified immunity unless the plaintiff can show that "(1) they violated a

federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). A plaintiff bears the "heavy burden" of satisfying both parts of the test to overcome the defense and survive summary judgment. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). The court, however, has "discretion to decide the order in which these two prongs should be addressed, and, when appropriate, does not need to address both." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)).

The Tenth Circuit has long held that when a plaintiff's claim depends on the defendant's subjective intent, motive, or purpose—as it does here—"the qualified immunity analysis is modified slightly." *McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010) (quoting *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991)). In such cases, a defendant raising the defense of qualified immunity "must make a *prima facie* showing of objective reasonableness of the challenged conduct." *Id.* (cleaned up). If the defendant makes this showing, "the plaintiff must produce . . . specific evidence of the defendant's culpable mental state to survive summary judgment." *Id.* at 724–25 (cleaned up). To meet this "heightened" burden, the plaintiff must "establish subjective motivating animus" by producing "specific and concrete evidence rather than mere speculation." *Gehl Grp. v. Koby*, 63 F.3d 1528, 1535 (10th Cir. 1995), *implicitly overruled on other grounds by Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001); *see also McBeth*, 598 F.3d at 724–25.

## 2.

In response to Mr. Boyer's motion for summary judgment, Aero argues that Mr. Boyer engaged in three acts of retaliation. First, he sent an email to Aero's CFO accusing Aero of

violating Airport rules and regulations. Second, Mr. Boyer refused to enforce tie-down rules, depriving Aero of revenue that it otherwise would have received as the Airport's sole provider of tie-down services. Finally, he purported to recuse himself from the McQuarrie lease decision, instead referring the matter to the City Council. The court will address each of these assertedly retaliatory acts in turn.

### a.

After Aero's CFO sent a safety alert to Mr. Boyer on September 22, 2016, asserting that some aircraft at the Airport were not being tied down as required by FAA rules and regulations, Mr. Boyer responded a week later with an email accusing Aero itself of not complying with Airport rules and regulations and requesting that Aero correct the asserted noncompliance. Mr. Boyer did not, however, take further action with respect to the matters raised in his email. Aero argues that Mr. Boyer sent the September 29th email in retaliation for the speech contained in the safety alert. *See* Dkt. No. 202 at 21.

Mr. Boyer argues that Aero sent the safety alert pursuant to its contractual duty, under Section 5 the Ground Lease Agreement, to report safety concerns, and that the alert was therefore not protected speech under *Garcetti*. The court agrees.

To be sure, *Garcetti* addressed speech made by a public employee as part of his official duties, not speech made by a government contractor in performing its contractual obligations. *See* 547 U.S. at 422. But given that, under *Umbehr*, "public contractors are treated just like public employees with respect to the rule against hiring and firing to carry out political patronage," this court agrees with others that have addressed the issue that "[i]t is hard to see how there *could* be a difference" between them with respect to *Garcetti*. *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 471 (7th Cir. 2018) (Easterbrook, J.) (emphasis in original); *see also Culbertson v.*

*Lykos,* 790 F.3d 608, 618 (5th Cir. 2015); *Walden v. Centers for Disease Control & Prevention,* 669 F.3d 1277, 1285 (11th Cir. 2012); *Decotiis v. Whittemore,* 635 F.3d 22, 26 n.1 (1st Cir. 2011); *Marez v. Bassett,* 595 F.3d 1068, 1074 (9th Cir. 2010).

Indeed, just as a public employee does not "speak as a citizen" when he "speak[s] or write[s]" as part of "the tasks he [is] paid to perform," *Garcetti,* 547 U.S. at 422, a government contractor does not speak as a citizen when it speaks or writes in performing its contractual duties. With respect to their required duties, neither public employees nor government contractors have any First Amendment "right to perform . . . however they see fit." *Id.* To the contrary, the government is entitled to "evaluat[e] [their] performance" and "exercise . . . control over what" the government "itself has commissioned or created." *Id.*

Significantly, in support of the latter proposition, the Court in *Garcetti* cited the holding in *Rosenberger v. Rector and Visitors of University of Virginia* that "[w]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." 515 U.S. 819, 833 (1995) (quoted in *Garcetti,* 547 U.S. at 422). *Rosenberger,* in turn, drew this principle from *Rust v. Sullivan,* 500 U.S. 173, 194–200 (1991). *See Rosenberger,* 515 U.S. at 833. *Rust,* of course, held that the Government had the right to control the speech of a grantee with whom it had contracted to convey the Government's desired message. *See* 500 U.S. at 192–94, 199–200; *cf.* 42 U.S.C. § 300. The Court's indirect reliance on *Rust* thus provides substantial support for reading *Garcetti*'s holding to apply no less to independent contractors than to public employees.

Here, Section 5 of the Ground Lease Agreement required Aero to "report immediately *any* hazardous or dangerous condition [at the Airport] to the city." Dkt. No. 18-1 ¶ 5 (emphasis added). In issuing the September 16th safety alert, Aero was thus performing its required duties

under the contract; it was not speaking as a private citizen. And just as the government may evaluate its employees' performance and exercise control over what those employees say and write when performing tasks they are paid to perform, *see Garcetti*, 547 U.S. at 422, it may also evaluate and control speech that it has commissioned from a government contractor. The court accordingly concludes that Aero's safety alert was not protected speech and that the Mr. Boyer's response to this speech cannot constitute actionable First Amendment retaliation.

It may be possible, however, to construe Aero's opposition to Mr. Boyer's motion for summary judgment to also assert that Mr. Boyer's email was sent in retaliation for a letter Aero sent to the City Attorney on September 16, 2016, alleging that Councilwoman Franco "made several incorrect and misleading statements about [Aero] and its owner, Nadim AbuHaidar." Dkt. No. 209-33 at 1; *see also* Dkt. No 202 at 21. Although Aero does not actually say that Mr. Boyer's email was sent in retaliation for this letter, it does cite the letter as evidence of Mr. Boyer's "retaliatory motives." Dkt. No. 202 at 17. Aero points to an email thread from September 20, 2016, between Mr. Boyer and Mr. Hancock. In the thread, Mr. Boyer attached Aero's September 16th letter. He also referenced some of the issues he subsequently raised in his response to Aero's September 22nd safety alert—two days before the alert issued. Mr. Boyer noted his desire to make "a single big-item change to the [Minimum Standards] . . . and then wait for the lawsuit to come." Dkt. No. 216-38 at 3. Aero argues that the email thread demonstrates that Mr. Boyer used the safety alert as a pretext for raising issues he already intended to bring up.

The court concludes that even if Aero can be understood to argue that Mr. Boyer's September 29th email amounted to unconstitutional retaliation for Aero's September 16th letter, this argument fails as a matter of law.

The court is uncertain to what extent Mr. Boyer's somewhat sharply worded email, with no follow up or other tangible consequences, would actually "deter a reasonable person from exercising his or her First Amendment rights." *Brammer-Hoelter*, 492 F.3d at 1208. Certainly it does not appear to have deterred Aero, which persisted in its criticism of the City and its officials. *Cf. Eaton*, 379 F.3d at 956 ("Despite anything the sheriff had done, the plaintiffs were very much 'free to express [their] views publicly and to criticize' the sheriff's conduct, as we have found to be significant." (citation omitted)); *see also Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("[P]ersistence in maintaining [plaintiff's free speech rights] offers some evidence that [the defendant's] actions did not prevent such private speech."). The court is also doubtful that Aero's September 16th letter, which appears motivated primarily by Aero's own economic and reputational interests, actually addressed matters of public concern. For as the Tenth Circuit has explained, "[i]n analyzing whether speech constitutes a matter of public concern, we may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1225 (10th Cir. 2000).

The court does not reject Aero's argument on either of these grounds, however, though the nature of Mr. Boyer's action, the impact of that action on Aero, and the value of Aero's speech to the public all remain relevant to balancing the government interest served by Mr. Boyer's action against Aero's First Amendment interests. As the Supreme Court has explained, "*Pickering* unmistakably states . . . that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the court must reach the most appropriate balance of the competing interests." *Connick*, 461 U.S. at 150; *cf. Weaver*, 458 F.3d at 1100.

Rather, viewing the government interests served by Mr. Boyer's email, the nature of Mr. Boyer's action and its effect on Aero, and the relatively small value to the public of the speech contained in Aero's September 16th letter, the court concludes that the City's "legitimate interests as a contractor, deferentially viewed, outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685.[5]

It is well settled that "government has significantly greater leeway in its dealings with citizen employees"—or government contractors—"than it does when it brings its sovereign power to bear on citizens at large." *Engquist*, 553 U.S. at 599; *see also Planned Parenthood*, 828 F.3d at 1256–57. The court has no doubt that the City had a legitimate interest in Aero's compliance with the rules and regulations that Mr. Boyer asserted Aero was violating. Not only did these rules and regulations bind Aero, like all other Airport operators, by their own force, but Aero had agreed to comply with them as a term of the Ground Lease Agreement. *See* Dkt. No. 18-1 ¶ 2. The City no doubt also had a legitimate interest in ensuring Aero's thorough and even-handed performance of its reporting obligations under Section 5 of the Agreement.[6]

---

[5] Aero argues that the only government interest that may be balanced against its free speech interests is the City's interest in "avoiding direct disruption, by the speech itself, of the public contractor's contractual relationships." Dkt. No. 404 at 4 (cleaned up). Aero bases its argument on the Tenth Circuit's statement in *Duda v. Elder* that "[w]e have said the 'only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" 7 F.4th 899, 912 (10th Cir. 2021) (quoting *Trant*, 754 F.3d at 1166). But whatever force this statement may have in the public employment context, the Supreme Court in *Umbehr* expressly "accommodate[d] the differences between employees and independent contractors" by adopting "a nuanced approach" that "recognizes *the variety of interests* that may arise in independent contractor cases." 518 U.S. at 678 (emphasis added). The court concludes that the strict limitation Aero would place on the government interests that may be balanced against its First Amendment interests cannot be reconciled with the Court's analysis in *Umbehr*.

[6] To be sure, Aero maintains that it was not in fact violating any rules or regulations. Mr. Boyer obviously disagreed. While Aero was no doubt entitled to disagree with Mr. Boyer's assertions (and to voice that disagreement in response to Mr. Boyer's email), its disagreement does not negate the City's interest in raising perceived violations.

In addition, the law is clear that "[i]n performing the balancing" required by *Pickering* and *Umbehr*, the plaintiff's speech "will not be viewed in a vacuum; the manner, time, and place of the . . . expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citation omitted). The evidence in this case—including, but by no means limited to, Mr. Boyer's email correspondence with Mr. Hancock—makes clear that the City was not happy with its existing relationship with Aero and wished to alter that relationship in a manner that would better serve the City's perceived interests. Aero, in turn, was understandably resistant to changes that would hurt its interests. The City and Aero were thus engaged in a "continuing contest" in which "each side has a legitimate purpose in taking action contrary to the other's interest." *Wilkie v. Robbins*, 551 U.S. 537, 558 & n.10 (2007). Under these circumstances, the court has little difficulty concluding that the City had a significant interest in strictly enforcing its contractual rights and insisting on Aero's exact compliance with its obligations under the Ground Lease Agreement—both as a direct means of incrementally improving the City's position by ensuring that it actually obtained the benefits of its existing bargain, and also as an indirect means of more fundamentally improving the City's position by asserting pressure on Aero to agree to modifications of the existing bargain that the City believed would better serve its interests.

Indeed, the Supreme Court has made clear that "[j]ust as a private landowner, when frustrated at a neighbor's stubbornness" in opposing its interests, "may press charges of trespass every time a cow wanders across the property line or call the authorities to report every land-use violation, the Government too may stand firm on its rights and use its power to protect public property interests." *Id*. at 557. "It is true that the Government is no ordinary landowner, with its immense economic power, its role as trustee for the public, its right to cater to particular

segments of the public . . . , and its wide discretion to bring enforcement actions." *Id*. at 558. But it is nevertheless "entitled to drive a hard bargain," *id*., and "strictly enforcing rules" and contractual "conditions" may be used as "legitimate tactics designed to improve the Government's negotiating position," *id*. at 557.

While the email thread between Mr. Boyer and Mr. Hancock may suggest that Mr. Boyer already intended to bring up at least some of the issues he subsequently raised in his September 29th email to Aero, it *also* shows that Mr. Boyer considered the September 16th letter "an overture [from Aero] to negotiate in good faith." Dkt. No. 216-38 at 2. Under these circumstances, it does not matter that Mr. Boyer may have anticipated or even relished the opportunity to confront Aero. For the City had a "right to bargain hard in a continuing contest," and "an instance of hard bargaining intended to induce the plaintiff to come to legitimate terms" remains so, even though it "may gratify malice in the heart of the official who takes it." *Wilkie*, 551 U.S. at 558 n.10.

For all of these reasons, the court concludes that Mr. Boyer's email does not constitute actionable retaliation. And because there was no constitutional violation, Mr. Boyer is entitled to qualified immunity with respect to the September 29th email.

**b.**

Aero also argues that Mr. Boyer's failure to enforce tie-down rules at the Airport, either before or after the September 22nd safety alert, constituted unlawful retaliation for that alert.

The court has already explained that the September 22nd safety alert was not protected speech. And even if Aero can be understood to argue that Mr. Boyer's inaction was retaliation for the September 16th letter, the court concludes that Aero's argument fails to create a genuine dispute of material fact that could foreclose summary judgment for Mr. Boyer.

Even assuming that Mr. Boyer's mere failure to change his behavior to take action desired by Aero could constitute retaliation—and even assuming that this failure would "deter a reasonable person from exercising his or her First Amendment rights," *Brammer-Hoelter*, 492 F.3d at 1208[7]—Aero has failed to identify evidence that could support a reasonable jury's conclusion that Mr. Boyer's continued inaction was caused by Aero's protected speech.

Indeed, because Mr. Boyer's enforcement of tie down rules at the Airport did not change in any way following Aero's September 16th letter (or the September 22nd safety alert), there is simply no evidence that could support a reasonable finding that Mr. Boyer's continued inaction during the final days of his tenure was caused by the speech Aero asserts Mr. Boyer was retaliating against. Although causation is ordinarily a factual question in this context, "summary judgment is appropriate when 'there simply is no evidence in the record from which a trier of fact could reasonably conclude the protected speech was a motivating factor" in the challenged action. *Cypert v. Independent Sch. Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 484 (10th Cir. 2011) (cleaned up). The court concludes that this is the case here. And because the court concludes that Mr. Boyer's inaction cannot be attributed to protected speech, there was no constitutional violation and Mr. Boyer is entitled to qualified immunity.

### c.

Finally, Aero argues that Mr. Boyer retaliated against it by purporting to recuse himself from processing Mr. McQuarrie's request that the City assign his hangar lease to Aero and issue Aero a new lease and instead referring the matter to the City Council. Aero asserts that Mr. Boyer's actions were taken in retaliation for the letter Aero sent to the City Attorney on July 19,

---

[7] Again, Mr. Boyer's inaction does not in fact appear to have chilled Aero's speech—to the contrary, just as Mr. Boyer continued not to enforce the tie down rules, Aero continued to criticize the City and the Airport Managers.

2016, asserting that the closed special session in which the City Council decided to hire Mr. Boyer was unlawful and that Mr. Boyer should not have been hired because, as head of a group representing the interests of hangar owners, he had "a clear conflict of interest." Dkt. No. 209-15 at 2. Aero maintains that by refusing to process the transaction himself and referring the matter to the City Council rather than the Mayor or a subordinate, Mr. Boyer intentionally killed the deal. *See* Dkt. No 202 at 26–29.

While Aero's July 19th letter was not sent pursuant to its contractual duties and does appear to have addressed matters of public concern, the court nevertheless concludes that Aero's argument fails as a matter of law.

Given that the City Council approved the assignment and the issuance of a new lease to Aero (albeit not on Aero's desired terms and timeline), it is far from clear that Mr. Boyer's recusal would "deter a reasonable person from exercising his or her First Amendment rights." Certainly it does not appear to have deterred Aero from engaging in further protected speech.

Regardless, the government has a legitimate interest in "prevent[ing] the *appearance* of corruption." *Umbehr*, 518 U.S. at 674 (emphasis added); *see also McCutcheon v. Fed. Election Comm'n.*, 572 U.S. 185, 206–207 (2014) (plurality opinion). Under the circumstances here, in which Aero had accused Mr. Boyer of a conflict of interest arising, at least in part, out of his ownership of a hangar at the Airport and his involvement with a group representing the interest of hangar owners, *see* Dkt. No. 209-15 at 2, the court concludes that the government's interest in avoiding the appearance of corruption outweighs Aero's interest in speaking on matters of public concern.

Indeed, governmental decision making would grind to a halt if, when accused of conflicts of interest, potential decisionmakers could be sued for retaliation not only for a *failure* to recuse

40

but also for a decision *to* recuse, so long as the government ultimately reached a decision unfavorable to the party raising the accusation. The government must have a lawful means of addressing accusations of bias and avoiding the appearance of corruption, and recusal is a principal method by which that can be achieved. *Cf. Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 877 (2009).

To be sure, Aero argues that, by forwarding its request to the City Council instead of "ask[ing] a subordinate or the Mayor" to process it, Mr. Boyer acted with retaliatory intent. *See* Dkt. No. 202 at 28. But of course Mr. Boyer reported to the City Council. And in an email to the Mayor, he did suggest that "Mr. McQuarrie is likely to be correct in saying this matter should be moved to the mayor as head of the Council to which I report." Dkt. No. 169-16 at 2. It is also far from clear that the Mayor or any of Mr. Boyer's subordinates had authority to handle Aero's request without the approval of the City Council. In all events, Aero has failed to identify any evidence in the record supporting its suggestion that the Mayor or any of Mr. Boyer's subordinates would have promptly granted the new lease on Aero's desired terms even if they were authorized to do so.

Mr. Boyer's recusal thus did not violate the Constitution and he is entitled to prevail on his qualified immunity defense on this ground. In addition, Mr. Boyer's decision to recuse himself in response to Aero's accusations was at least objectively reasonable. And Aero has not offered "specific and concrete evidence"—or, indeed, anything beyond "mere conjecture"—to demonstrate that Mr. Boyer's decision to recuse was made with "subjective motivating animus."

*Gehl Grp.*, 63 F.3d at 1535.[8] Even if a constitutional violation had occurred, then, Mr. Boyer would still be entitled to qualified immunity.

\*     \*     \*

For all of the reasons, Mr. Boyer's Motion for Summary Judgment on Aero's First Amendment claim is GRANTED.

## 2.

In opposing Mr. Godfrey's motion for summary judgment, Aero argues that Mr. Godfrey took five actions against it in retaliation for its protected speech. First, he failed to remove snow and ice at the Airport on Thanksgiving Day, 2016, and instead issued a notice that caused the Airport to shut down. Second, on Christmas Day, 2016, Mr. Godfrey failed to clear snow from a fifteen-foot-wide section of pavement on Aero's leasehold that the City had traditionally plowed. Third, Mr. Godfrey ordered Aero to remove a fuel truck from one of its aircraft hangars. Fourth, Mr. Godfrey requested that Aero move a customer's aircraft from a location on city property

---

[8] To be sure, the record indicates that Mr. Boyer was not in fact entirely recused from the matter. But the nature of his involvement appears entirely directed toward getting the City Council to *approve* the assignment and issuance of a new lease in time for the hangar transaction to close. For example, in an Airport Manager Staff Report that he wrote for the City Council in connection with its consideration of the transaction, Mr. Boyer emphasized that "[t]he Council's required decisions in the transaction are **time sensitive** and should be resolved in a timely fashion to allow adequate time to draw up the appropriate documents without exceeding the contractual Sep 30, 2016 closing date." Dkt. No. 216-21 at 1 (emphasis in original). He also recommended that the City Council "write[] a new lease for the buyer as specified in the existing contract . . . using the 'terms and conditions, including rental rates and duration of the lease term and on the then-current lease form being offered by the City." *Id.* Even drawing all reasonable inferences in Aero's favor, Mr. Boyer's behind-the-scenes involvement in handling the matter can thus only be characterized as favorable to Aero.

In addition, although Aero disagrees, Mr. Boyer contends that he recused himself from at least some other matters involving hangar leases before the McQuarrie lease issue arose. *See* Dkt. No. 169-13 at 2–3; Dkt. No. 209-21 at 1–2; Dkt. No. 209-24 at 4.

42

outside its leasehold that Aero had historically used without issue. Finally, Mr. Godfrey failed to enforce the Minimum Standards by issuing a self-fueling permit to Mr. Hancock.[9]

**a.**

Aero contends that Mr. Godfrey issued the Notice to Airman (or "NOTAM") that resulted in the runway closure on Thanksgiving Day, 2016, in retaliation for both the September 22nd safety alert and a letter Aero sent the City attorney on November 21, 2016, regarding a proposed landing fee increase that specifically mentioned Mr. Godfrey by name. *See* Dkt. No. 216-47 at 2. Aero's arguments fail.

Because Aero issued the September 22nd safety alert pursuant to its contractual obligations under Section 5 of the Ground Lease Agreement, the alert was not protected speech, as already explained. In addition, Aero fails to identify any evidence in the record that Mr. Godfrey even saw the November 21st letter before he issued the Thanksgiving Day notice. Absent such evidence, a reasonable jury could not find that Mr. Godfrey's actions on Thanksgiving Day were taken in retaliation for this letter. For these reasons alone, Aero's arguments must be rejected.

Even if there were evidence that Mr. Godfrey actually had seen the November 21st letter and acted, at least in part, in retaliation for it, he was nonetheless required by FAA regulations to "collec[t] and disseminat[e] airport condition information to air carriers." 14 C.F.R. §

---

[9] Aero also argues that Mr. Godfrey, like Mr. Boyer before him, failed to enforce the Airport's aircraft tie-down requirements in retaliation for Aero's protected speech. But the only speech that Aero identifies is its September 22nd safety alert and Mr. Boyer's response, both of which Mr. Boyer forwarded to Mr. Godfrey when he replaced Mr. Boyer as Airport Manager. For the reasons already explained, the safety alert was not protected speech. And of course Mr. Boyer's response was not *Aero's* speech. Because Aero has identified no protected speech, its retaliation claim fails and Mr. Godfrey is entitled to summary judgment on his qualified immunity defense with respect to tie-down enforcement.

139.339(a). In particular, he was required to "provide information on . . . airport conditions that may affect the safe operations of air carriers" including the presence of "[s]now, ice, slush, or water on the movement area or loading ramps and parking areas." *Id.* at § 139.339(c), (c)(3). It was thus Mr. Godfrey's obligation to collect and disseminate "accurate airport condition information to all airport users when any pavement condition is worse than bare and dry." Dkt. No. 164-2 at 122. And when such conditions were present—as they were on Thanksgiving Day when Mr. Godfrey "observed that the runway was covered with a thin layer of snow and ice," Dkt. No. 164 ¶ 21 at 19—Mr. Godfrey was required to "use the NOTAM system, as appropriate, and other systems and procedures authorized by the Administrator," 14 C.F.R. § 139.339(b). The court concludes that the City's legitimate interest in complying with FAA regulations amply justifies Mr. Godfrey's actions, outweighing whatever deterrent effect this action may have had on Aero's First Amendment interests in opposing a landing fee increase. Mr. Godfrey's action thus did not violate the Constitution.

At a minimum, Mr. Godfrey's actions were objectively reasonable in light of the runway conditions and the FAA regulations. He is thus entitled to qualified immunity unless Aero can establish with "specific and concrete evidence rather than mere speculation" that Mr. Godfrey acted with "subjective motivating animus." *Gehl Grp.*, 63 F.3d at 1535.

Aero attempts to meet this burden by arguing that, as a former Aero employee, Mr. Godfrey "knew precisely what the Airport Manager was obligated to do on snowy days to keep the airport open for business." Dkt. No. 203 at 28. And it cites a declaration from Aero's Director of Maintenance stating that before Mr. Godfrey's tenure as Airport Manager, the City had always "plowed the runway in a timely fashion," Dkt. No. 216-81 ¶ 4, and "neither the City

nor the Airport Manager ever closed the runway due to snow conditions through . . . issuing a Notice to Airmen," *id.* ¶ 6.

The record makes clear, however, that Mr. Godfrey had the discretion to respond to snowstorms *either* by plowing the snow *or* by issuing a notice and waiting for conditions to clear. *See* Dkt. No. 208-1 ¶ 109; Dkt. No. 209-59 at 84:1–25. Indeed, the FAA ultimately rejected Aero's arguments that Mr. Godfrey had violated any standards relating to snow removal. *See* Dkt. No. 164-3 at 7–8.

It is also far from clear that Mr. Godfrey realized that issuing the notice reporting the presence of snow at the Airport would result in the issuance of separate notice closing the airport. At the time of the Thanksgiving Day incident, the FAA had recently changed its longstanding position leaving the determination whether a runway was safe for use solely to pilot discretion. Under the new guidance, which took effect on October 1, 2016—just before Mr. Godfrey became Airport Manager—reports of runway conditions involving wet ice, slush over ice, water over compacted snow, or dry snow or wet snow over ice automatically triggered runway closure until conditions improved. *See* Dkt. No. 164-2 at 124. Under the FAA's previous guidance, by contrast, reporting such conditions would have warned pilots of the runway conditions but not caused the runways to close. Aero has not identified any evidence that Mr. Godfrey was even aware of this recent change to the FAA's previous longstanding guidance.

Not only did the incident occur shortly after that change in guidance, it also occurred during the second month of Mr. Godfrey's tenure and resulted from his first use of the new NOTAM procedures. *See* Dkt. No. 164 ¶ 23 at 19. In addition, after the incident occurred, Mr. Godfrey apologized to the affected aircraft operator in an attempt to ensure that the runway closure "[w]ould not reflect upon [Aero] whatsoever since [it] was an airport matter." Dkt. No.

164-2 at 148. He also met with Aero's CFO to create a "snow removal plan for the cold weather season." *Id*. at 54.

For all of these reasons, Aero has failed to establish with "specific and concrete evidence rather than mere speculation" that Mr. Godfrey even knew that his action would result in the Airport's closure, let alone that he deliberately engineered this result to harm Aero because of "subjective motivating animus." *Gehl Grp.*, 63 F.3d at 1535. Mr. Godfrey would thus be entitled to qualified immunity, even if unconstitutional retaliation had occurred.[10]

### b.

After the Thanksgiving Day incident, Aero asserts that it "complained and demanded a meeting with City officials to address the issue." Dkt. No. 203 at 11. Aero argues that Mr. Godfrey retaliated against it for doing so by failing to plow a fifteen-foot-wide swath of snow from its leasehold on Christmas Day, 2016. Aero fails, however, to identify what it actually said either when it complained and demanded the meeting or at the meeting that apparently followed.[11]

Aero does cite an email that Aero's CFO sent to Aero's President, indicating that the purpose of the meeting "was to discuss winter snow removal operations planning for the upcoming season," and that Mr. Godfrey attended the meeting. Dkt. No. 209-47 at 1. The email also states that the topics discussed were the Thanksgiving Day incident and what would happen should a similar situation arise in the future. *See id.*

---

[10] For essentially the same reasons, the court believes that the record here would not support a reasonable jury's finding that Aero's speech was a motivating factor in Mr. Godfrey's decision to issue the notice reporting the runway conditions or that he would not have taken the same action in the absence of any protected speech.

[11] Aero offers a citation to the record as evidence that the requested meeting occurred. *See* Dkt. No. 203 at 11. But that citation appears to be incorrect: the cited document relates to a different matter entirely and makes no mention of a meeting. *See* Dkt. No. 209-56.

Aero also cites an email that Aero's CFO sent to Mr. Godfrey that purports to be "[b]ased on [their] discussions after Thanksgiving." Dkt. No. 209-47; *see also* Dkt. No. 209-48. This email asserts that Mr. Godfrey had previously "agreed that it was [his] office's responsibility to clear snow from the runways, taxi ways, and all other City-owned portions of the Airport," and then proceeds to argue that the City should have plowed the snow on Aero's leasehold on Christmas Day. Dkt. No. 209-48 at 1.

It is true that issues of public concern may be communicated privately. *See, e.g., Givan v. w. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979). But even crediting Aero's *post hoc* emails characterizing the topics discussed at the meeting and Mr. Godfrey's statement, the court cannot conclude that Aero's speech raised a matter of public concern.

To be sure, Aero asserts that "where it was at all times criticizing the City's/Godfrey's management of the Airport, [its] speech acts easily meet the public concern test." Dkt. No. 203 at 13.[12] But even assuming that Aero's complaints addressed a *topic* of public concern, "it is not

_____

[12] Aero cites *Lighton* for the proposition that "if speech focuses on disclosing a public official's malfeasance or wrongdoing, it is most likely a matter of public concern." Dkt. No. 203 at 13 (citing 209 F.3d at 1224–25). But as discussed, the record makes clear that Mr. Godfrey had discretion to respond to the Thanksgiving Day snowstorm either by plowing the snow or by issuing a notice and waiting for conditions to clear, and the FAA ultimately determined that Mr. Godfrey did not violate any standards relating to snow removal. The gravamen of Aero's complaint, then, appears not to have been that Mr. Godfrey acted outside of his authority or unlawfully, but rather that he acted differently from how City officials had acted in the past. *See* Dkt. No. 209-78. Aero's complaints thus do not appear to disclose "malfeasance or wrongdoing," but rather to raise complaints about Aero's deteriorating relationship with the City. And as *Lighton* makes clear, speech "is generally not considered protected . . . if its aim is simply to air grievances of a purely personal nature." 209 F.3d at 1225 (cleaned up). Indeed, in *Lighton*, a professor accused a subordinate of using university equipment without authorization. The professor had a bad relationship with his subordinate, and the subordinate had previously filed complaints about him with the university and the State. The Tenth Circuit held that the professor's accusations did not raise matters of public concern because they were not "for the principal aim or Good Samaritan purpose of disclosing 'government misconduct,' but for his own personal reasons for either getting even with, or using leverage against" the subordinate. *Id.* at 1225. The same appears true of Aero's speech here.

enough that the topic of the speech be of general interest to the public . . . what is *actually said* must meet the public concern threshold." *Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir. 1990) (emphasis in original). Because Aero fails to identify any evidence specifying what it actually said either when it "complained and demanded a meeting" or at the meeting itself, the court cannot conclude that the Christmas Day incident was retaliation for speech on a matter of public concern. This incident thus cannot support Aero's First Amendment claim.[13]

**c.**

On January 8, 2017, Mr. Godfrey arrived on Aero's leasehold accompanied by two City police officers and ordered an Aero employee to remove a 5,000-gallon fuel truck from inside one of Aero's hangars. Almost two years earlier, in April 2015, the Wasatch County Fire Marshall had determined that Aero would need to install a fire suppression system in the hangar if it wished to house its fuel trucks there. *See* Dkt. No. 164-3 at 14–15. Aero had disputed that determination and had requested a meeting with the Fire Marshall to resolve its concerns but had heard nothing about the matter from the Fire Marshall or the City in almost ten months. *See* Dkt. No. 164-5 at 254.

---

[13] In addition, Mr. Godfrey wrote in an email to Aero dated December 30, 2016, that, having "reviewed relevant airport documents and the FBO agreement," he found "no language that compels the airport to plow any portion of [Aero's] leasehold," and that "[i]n light of the new paradigm and in consideration of the limited resources of the airport; the airport cannot plow this section of the [Aero] leasehold." Dkt. No. 164-2 at 155. Even if Aero's speech did address a matter of public concern, then, Mr. Godfrey's refusal to continue extending to Aero a service not required by the parties' contract could likely be justified, in the context of City's continuing dissatisfaction with the parties' relationship, as another exercise of the City's prerogative to "stand firm on its rights" and "to bargain hard in a continuing contest." *Wilkie*, 551 U.S. at 557, 558 n.10. Although this justification is evident on the face of the record, including Mr. Godfrey's contemporaneous explanation for his action, *see* Dkt. No. 164-2 at 155, the City and Mr. Godfrey now disclaim it, *see* Dkt. No. 404 at 4 n.2. Because Aero's reliance on the Christmas Day incident fails to support its First Amendment claim for other reasons, the court need not consider whether it is bound by this surprising disclaimer.

Aero contends that Mr. Godfrey's dramatic revival of the issue was retaliation for the letter it sent to the City Council on January 5, 2017, regarding the Thanksgiving and Christmas snow removal incidents, as well as for the complaint it filed with the FAA one day later. Although it is a relatively close question, the court concludes that Mr. Godfrey is not entitled to qualified immunity with respect to this incident.

The court does have some doubts whether Aero's letter to the City Attorney raised matters of public concern given that it was focused primarily on "air[ing] grievances" about Aero's contractual relationship with the City. *Lighton*, 209 F.3d at 1225; *see also* Dkt. No. 206-50. The court need not resolve this question, however. Although it is a close question, the court believes that it cannot conclude, on this record, that Aero's FAA complaint did not raise matters of public concern.

This complaint accused the City of violating the grant assurances required for FAA funding. *See* Dkt. No. 164-2 at 159. Aero listed a litany of alleged violations that appear to go well beyond private grievances regarding Mr. Godfrey, snow removal, or its own direct economic interests. For example, Aero alleged that the City was violating 47 U.S.C. § 47107(a)(16) by failing to update its Airport Layout Plan. *See id.* at 160. Aero also alleged that various City ordinances violated the grant assurances. *See e.g., id.* at 159–60, 161–63. On its face, the FAA complaint thus appears to address—"at least in part"—matters of public concern. *Newton*, 491 F. Supp. 3d at 1062 (*citing Connick*, 461 U.S. at 147).

To be sure, the Tenth Circuit's decision in *Lighton* suggests that Aero's litany of accusations might still not constitute speech on matters of public concern if the FAA complaint was not filed "for the principal aim or Good Samaritan purpose of disclosing 'government misconduct,'" but rather for Aero's "own personal reasons for either getting even with, or using

leverage against" the City and Mr. Godfrey. 209 F.3d at 1225. Although the record certainly contains evidence that could *support* a conclusion that the latter motive predominated here, the court does not believe that the record would *require* such a conclusion. The court thus does not believe that it can conclude, on summary judgment, that the FAA complaint did not constitute protected speech under *Lighton*.

The court also concludes that Mr. Godfrey's action could "deter a reasonable person from exercising his or her First Amendment rights," *Brammer-Hoelter*, 492 F.3d at 1208—or at least that a reasonably jury could so find. To be sure, Mr. Godfrey is correct that the incident does not appear to have imposed any significant economic injury. But the court does not believe this is dispositive. The introduction of uniformed police officers appears to have constituted a significant escalation in the parties' long-running pattern of conflict and disagreement. And a reasonable contractor could find this escalation ominous and intimidating.

To be sure, John Womack, the Aero employee on duty at the time of the incident, testified that he was not intimidated by the incident. But based on his deposition, it does not appear that Mr. Womack understood why the police officers were there or why Mr. Godfrey was requesting that the fuel trucks be moved. *See* Dkt. No. 164-5 at 258–59. And the record does not indicate that Mr. Womack was privy to Aero's protected speech or the overall context in which the fuel-truck incident arose. It thus does not follow from the fact that Mr. Womack was not intimidated that Aero—let alone a hypothetical reasonable contractor—would not be.

The court does not doubt that the City had a significant interest in ensuring safety at its airport. And the County Fire Marshall had determined that if Aero wished to keep commercial trucks and fuel in hangars exceeding 5,000 square feet, "an automatic sprinkler system is required." Dkt. No. 164-3 at 25. The Fire Marshall also concluded that a Group I or Group II fire

50

suppression system was required if the "aggregate fuel capacity of the aircraft and fuel trucks" exceeded 7,500 gallons. *Id*. In addition, National Fire Protection Association Code 407 requires that "unattended aircraft fuel servicing tank vehicles" must be parked "[a] minimum of 15m (50 ft) from any parked aircraft and buildings other than maintenance facilities and garages for fuel servicing tank vehicles." Dkt. No. 164-3 at 52 (Section 5.18). It appears that the storage of Aero's 5,000-gallon fuel truck here may have contravened both the Fire Marshall's 2015 determination that some sort of automatic sprinkler system was required in the hangar and the National Fire Protection Association Code.

The circumstances here, however, raise some doubt regarding the strength of the City's safety interest. At the time of the 2015 determination, the Fire Marshall had offered to meet with Aero if it disagreed with the determination. Shortly afterward, Aero had stated its disagreement and requested a meeting, but the Fire Marshall had not responded. In addition, when the City informed Aero a year later that it would no longer be allowed to park its fuel trucks inside its hangar based on the Fire Marshall's determination, Aero again reiterated its disagreement with the determination and its continued desire for a meeting to address the issue; it also expressed its view that the 2015 determination was not yet a final decision. It does not appear that Aero received any response. Were the safety interest implicated by Aero's fuel truck truly compelling, it is doubtful that the Fire Marshall and the City would have let the matter rest in this manner.

To be sure, the City also had a legitimate interest in "standing firm on its rights" under the Ground Lease Agreement given its dissatisfaction with its relationship with Aero and its "right to bargain hard in a continuing contest." *Wilkie*, 551 U.S. at 558 n.10. The Ground Lease Agreement required Aero to comply with state law, *see* Dkt. No. 18-1 ¶ 3, and the Fire Marshall's determination rested on an interpretation of the International Fire Code, which has

been adopted by the State of Utah, *see* Dkt. No. 164-3 at 14–15.[14] But Aero had disputed the Fire

Marshall's interpretation of state law, the Fire Marshall had not responded, and, based on its

review of the Fire Marshall's determination and the relevant statutes, the court concludes that the

Fire Marshall's interpretation was fairly debatable.[15] Indeed, Aero represents that the Fire

Marshall subsequently agreed with Aero and now permits Aero to park its fuel trucks inside its

hangars. *See* Dkt. No. 404 at 23.

Based on these considerations, the court concludes that the City's interests here have less

force than might otherwise be the case. And in light of the timing of Mr. Godfrey's action and

the nature of the protected speech, the court cannot say, on the record as it exists at this stage of

the proceedings, that the City's legitimate interests in safety, enforcing its contractual rights, and

hard bargaining outweigh the First Amendment interests implicated by Mr. Godfrey's action.

It is possible that Mr. Godfrey has nevertheless made a *prima facie* showing that his

actions were objectively reasonable, given the City's interest in safety, the language of the

Ground Lease Agreement, the Fire Marshall's 2015 determination, and the guidance contained in

the National Fire Protection Association Code. Mr. Godfrey's sudden revival of an issue that the

City and the Fire Marshall had long let slumber despite Aero's stated disagreement with the 2015

---

[14] The National Fire Protection Association Code, however, though no doubt reflecting industry standards, does not have the force of law.

[15] The Fire Marshall relied on International Fire Code § 903.2.9(4), as adopted by the State of Utah, which provides that when an aircraft hangar is "used for the repair of commercial trucks or buses," and "the Fire Area exceeds 5,000 square feet," an automatic sprinkler is required, as well as section 914.8.2.1(7), which provides that a Group I or II fire suppression system is required when the "[f]uel capacity of all aircraft within the maximum single fire area [is] in excess of 7,500 gallons." The Fire Marshall concluded that, because Aero had "add[ed] commercial trucks and fuel to a fire area exceeding 5,000 square feet . . . an automatic sprinkler system is required." Dkt. No. 164-3 at 25. And the system had to be Group I or II, "the amount of aggregate fuel capacity of the aircraft and fuel trucks being 15,000 gallons (in excess of 7,500 gallons)." *Id.*

determination and its requests for a meeting to resolve the issue—just two days after Aero filed the FAA complaint—as well his introduction of police into the City's ongoing dispute with Aero may weigh against this conclusion, however.

Ultimately the court need not decide this issue because it concludes that, based on the current record, a reasonable jury could find that Mr. Godfrey's sudden revival of the long-neglected issue just days after Aero filed its FAA complaint and his injection of police officers into the parties' long-running dispute constitute "specific and concrete evidence" of "subjective motivating animus." *Gehl Grp.*, 63 F.3d at 1535. A reasonable jury could also find that emails sent by Mr. Godfrey to Mr. Boyer and Mr. Hancock on January 4, 2017, and to Councilmembers Crittenden and Franco the next day, constitute such evidence. In the January 4th email, Mr. Godfrey wrote,

> Well, I got the tiger by the tail. [Aero's CFO] Alan did it again today. He fired off an email to the Mayor, Mark Anderson and City Council demanding an immediate meeting to discuss [Aero]'s findings and concerns with respect to snow removal . . . and he includes a list of embellished deficiencies.

Dkt. No. 209-49 at 1. He then concluded,

> So much for giving [Aero's President] Bill the benefit of the doubt, clean slate and all that twaddle. Fights on! I think Ron [Crittenden] and others are beginning to see its either walk away and let [Aero] have run of the place or go through this costly fight and neutralize them.

*Id.* In the email he sent the following day, Mr. Godfrey lamented that "[u]nfortunately, we have now rewarded [Aero]'s tantrum from yesterday," Dkt. No. 122:19–21, and that he was "preaching to the choir a bit here . . . , [b]ut here we go again consuming time and resources reacting to [Aero]," *id.* at 124:11–13.

To be sure, Mr. Godfrey has offered a benign explanation for the timing and nature of his actions. In his sworn declaration and his motion for summary judgment, he represented that although he "was willing to look the other way with respect to [Aero's] storage of its fuel trucks

in more remote aircraft hangars, he reasonably believed that the storage of [Aero's] 5,000-gallon refueler truck immediately adjacent to the terminal buildings was an unacceptable safety threat." Dkt. No. 163 at 16. And Mr. Godfrey argues that it was reasonable to use police as neutral observers who could create an official report in light of the parties' contentious relationship, the filing of the FAA complaint—in which, Mr. Godfrey maintains, Aero misrepresented the events surrounding the snow removal incidents—and Aero's ongoing disagreement with the Fire Marshall's determination. *See id.* at 17. Mr. Godfrey also explains that the emails he sent on January 4th and 5th reflect only that he was "frustrated that, in his view, '[Aero] had no interest in negotiating a resolution to the various issues both sides have,'" Dkt. No. 230 at 6 (quoting Dkt. No. 209-49 at 1), and that he "was simply acknowledging the reality that [Aero] had no interest in a mutually acceptable resolution to the many then-outstanding Airport issues but would fight the City tooth and nail and find fault in everything that Godfrey would do," *id.* at 6.

A reasonable jury could accept these explanations and conclude that Mr. Godfrey is entitled to qualified immunity. But it would not be required to do so. It follows that summary judgment for Mr. Godfrey with respect to the fuel truck incident is not appropriate.[16]

### d.

On January 30, 2017, Mr. Godfrey noticed one of Aero's customer's aircraft parked outside of Aero's leasehold. Mr. Godfrey has represented in a declaration that parking aircraft at this location interfered with an adjacent hangar owner's ability to safely access his leased premises. *See* Dkt. No. 164-1 ¶ 37 at 22. He sent an email to Aero's General Counsel stating,

---

[16] The court concludes that the timing and nature of Mr. Godfrey's actions, as well as his January 4th and January 5th emails, also create genuine issues of material fact regarding whether Aero's speech was a motivating factor in Mr. Godfrey's actions during the fuel truck incident and whether he would have taken the same actions in the absence of any protected speech. It follows that summary judgment may not be granted on these grounds, either.

"[f]rankly, my first impulse was to contact the chief pilot . . . and have him direct it moved. I would rather not be heavy handed and involve your customer. Rather, I hope you get this message and direct FBO staff to move the aircraft by tomorrow morning." Dkt. No. 209-95 at 1. Aero contends that Mr. Godfrey sent this email in retaliation for Aero's letters to the City Council in early January 2017 regarding snow removal and its FAA complaint.

Especially given its express disclaimer of a "heavy handed" approach, the court is skeptical that the email could "deter a reasonable person from exercising his or her First Amendment rights." *Brammer-Hoelter*, 492 F.3d at 1208. It does not appear that complying with the request would have been particularly burdensome, and Aero has identified no evidence that Mr. Godfrey followed up on the email in any way.

Aero argues that even though the aircraft was parked outside its leasehold, it had parked aircraft in the same place for years without complaint. As already discussed, given the City's dissatisfaction with its existing relationship with Aero and the "continuing contest" in which they were engaged, Mr. Godfrey and the City had a significant interest in strictly enforcing its contractual rights and insisting on Aero's exact compliance with its obligations under the Ground Lease Agreement—both as a direct means of incrementally improving the City's position by ensuring that it actually obtained the benefits of its existing bargain, and also as an indirect means of more fundamentally improving the City's position by asserting pressure on Aero to agree to modifications of the existing bargain that the City believed would better serve its interests. Under these circumstances, the City was entitled to "stand firm on its rights," to "bargain hard in a continuing contest," and to employ "legitimate tactics designed to improve the Government's negotiating position," such as "strictly enforcing rules" and contractual "conditions." *Wilkie*, 551 U.S. at 557, 558 n.10.

In light of these interests, the nature and tone of Mr. Godfrey's email, and its effect on Aero, the court concludes that the City's "legitimate interests as a contractor, deferentially viewed, outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685. It follows that the email did not violate the First Amendment. Mr. Godfrey is therefore entitled to qualified immunity with respect to this issue.

**e.**

Finally, Aero argues that Mr. Godfrey retaliated against it for filing the FAA complaint by issuing a 90-day self-refueling permit to Mr. Hancock on May 3, 2017. Aero contends that Mr. Godfrey knew that Aero was the only entity at the Airport authorized to sell fuel and that allowing Mr. Hancock to self-fuel instead of requiring it to purchase fuel from Aero would hurt Aero's bottom line.

Even assuming that granting Mr. Hancock's self-refueling permit in these circumstances could "deter a reasonable person from exercising his or her First Amendment rights," *Brammer-Hoelter*, 492 F.3d at 1208, the court concludes that Mr. Godfrey's action was easily justified by the City's strong interest in complying with the statutory and regulatory requirements necessary to continue receiving FAA funding. Airports that receive FAA funds must "permit airport aeronautical users, including air carriers, the right to self-service and to use any of the airport's fixed-base operators." Federal Aviation Administration, Order 5190.6B, Airport Compliance Requirements 11.1. And such airports may not "exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees (including, but not limited to, maintenance, repair, and *fueling*) that it may choose to perform.'" *Id.* at 11.2 (emphasis added). The FAA "considers the right to self-service as prohibiting the establishment of any

unreasonable restriction on the owners or operators of aircraft regarding the servicing of their own aircraft and equipment." *Id.*

There can be little doubt that these FAA rules required Mr. Godfrey to allow Mr. Hancock to self-fuel if the Airport was to continue receiving FAA funding. Indeed, the FAA subsequently concluded that the Minimum Standard requirements that Mr. Godfrey waived to issue Mr. Hancock's self-fueling permit appeared to be economically discriminatory and to therefore violate the conditions of the Airport's funding. *See* Dkt. No. 164-3 at 138–44.

Under these circumstances, the court has no difficulty concluding that the City's interest in maintaining its eligibility for FAA funding by granting Mr. Hancock's self-fueling permit outweigh any impact this decision may have had on Aero's First Amendment interests. Because Mr. Godfrey's action did not violate the Constitution, he is entitled to qualified immunity on this ground.

Even if Mr. Godfrey's action did violate Aero's rights, moreover, it was surely objectively reasonable. Mr. Hancock came to him with a request to self-fuel. *See* Dkt. No. 163 ¶41 at 23; Dkt. No. 164-3 at 74. That request was backed by the assertion of a federal right to self-fuel. *See* Dkt. No. 163 ¶ 43 at 23; Dkt. No. 164-4 at 192. Attempting to avoid a conflict with Aero's long-claimed contractual rights, Mr. Godfrey first encouraged Mr. Hancock to buy his fuel from Aero and offered to assist him in working out a deal to do so. *See* Dkt. No. 164-3 at 77. It was only after months of deliberation, the threat of an FAA enforcement action arising out of an FAA complaint brought by another airport operator challenging the Airport's self-fueling restrictions, and Mr. Hancock's own threat to file an FAA complaint that Mr. Godfrey finally issued the permit. *See* Dkt. No. 163 ¶ 43 at 23.

Although it may overcome this *prima facie* showing of objective reasonableness by providing "specific and concrete evidence" of subjective animus, the only evidence Aero identifies in support of this burden is that Mr. Hancock was allowed to self-fuel despite not complying with the Minimum Standards and to continue to self-fuel after his temporary permit expired while his application for a permanent permit remained pending.

The record indicates, however, that once Aero told the City that Mr. Hancock was self-fueling without a permit, Mr. Godfrey told him to desist until his permit had issued. *See* Dkt. No. 209-57 at 62:13–63:16. While Mr. Hancock did in fact keep self-fueling, and Mr. Godfrey appears to have known of Mr. Hancock's actions, Mr. Hancock acted with the approval of the Fire Marshal. And, as discussed, a challenge to the Minimum Standards was pending with the FAA and Mr. Godfrey's forbearance reflected a correct forecast of the FAA's eventual determination of the issue. *See id.* at 63:19–22.

The court thus concludes that Aero has failed to rebut Mr. Godfrey's *prima facie* showing that his actions were objectively reasonable by producing specific and concrete evidence that Mr. Godfrey acted with subjective animus with respect to Mr. Hancock's self-fueling. Mr. Godfrey is thus entitled to qualified immunity on this ground as well.

*    *    *

Mr. Godfrey's Motion for Summary Judgment is accordingly GRANTED in part and DENIED in part.

**C.**

Aero also asserts its First Amendment retaliation claim against the City. Aero seeks to hold the City liable both for the actions of Mr. Boyer and Mr. Godfrey and also for certain actions taken by the City Council.

## 1.

It is well settled that municipalities may be held liable as "persons" under Section 1983. *See Monell v. Department of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). Municipalities may not be held liable for the acts of their employees on a theory of *respondeat superior*, however. *See id.* at 691. Rather, "municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

Because a municipality may be held liable only for "acts of the *municipality*" as opposed to "acts of *employees* of the municipality," *id.* (emphasis in original), "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (citations omitted). The requisite policy or custom can take five forms: "(1) 'a formal regulation or policy statement'; (2) an informal custom 'amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'; (3) 'the decisions of employees with final policymaking authority'; (4) 'the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval'; or (5) the 'failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter*, 602 F.3d at 1189–90). Regardless of its form, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal connection between the municipality and the deprivation of federal rights." *Brown*, 520 U.S. at 404–05 (cleaned up).

**2**.

The court first addresses Aero's argument that the City is liable for the various acts of Mr. Boyer and Mr. Godfrey already discussed. Because the court has concluded that all but one of these acts did not violate the constitution, it need only consider whether the City may be held liable for Mr. Godfrey's conduct during the fuel truck incident. Aero argues that the City may be held liable for this conduct on the ground that Mr. Godfrey was a final policymaker, or, in the alternative, that Mr. Godfrey's conduct was ratified by the City Council. *See* Dkt. No. 214 at 23–29. The court rejects both theories.[17]

To determine whether an official is a final policymaker, the court must examine "delegations of legal power" under state law. *Miligan-Hitt v. Bd. of Trs. of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1227 (10th Cir. 2008). Three questions guide this inquiry: "'(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'" *Brammer-Hoelter*, 602 F.3d at 1189–90 (citation omitted).

After Mr. Godfrey was hired, the City Council adopted Ordinance No. 2016-18 regarding the authority of the Airport Manager. *See* Dkt. No. 209-44. The ordinance provides that the

---

[17] Aero also argues that the City is liable "for the conduct of its officers, including its Airport Managers, because the City had a widespread practice of retaliating against [Aero] for its protected speech, and it enforced this policy by failing to enforce the rules against others while insisting on strict compliance by [Aero,] engaging in threats of prosecution and harassment, and refusing to process all lease requests that came from [Aero]." Dkt. No. 214 at 38. But given that the court has concluded that only one alleged instance of retaliation by the individual Defendants survives summary judgment, it cannot conclude that Aero has identified evidence that could support a reasonable jury finding that there was a municipal custom of retaliating against Aero's protected speech "that [was] so 'continuing, persistent, and widespread' that it ha[d] 'the force of law.'" *Jensen v. West Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (citation omitted). The court therefore rejects this theory of municipal liability as a matter of law.

duties of the Airport Manager are to "oversee the operations of the airport to ensure compliance with the FAA," to "assist in preparation of manuals and procedures related to airport operations," and to "coordinate and perform maintenance and inspection duties of the grounds." *Id.* at 1*; see also* HEBER CITY, UTAH, MUN. CODE § 2.30.020(A), (E), (G). The ordinance also explicitly states that the Airport Manager works "[u]nder the supervision of the City Council." Dkt. No. 209-44 at 1. Focusing on Mr. Godfrey's broad responsibilities under the ordinance, Aero argues that "in practice, the Council did not manage the Airport," but rather that Mr. Godfrey did so by "develop[ing] his own policies, albeit in an ad hoc manner, on these issues." Dkt. No. 214 at 26.

This argument fails because the ordinance clearly grants final authority to the City Council. Even though Mr. Godfrey may have had broad authority in practice, the relevant question is where *statutory* policymaking authority resides. For as the Supreme Court has explained, "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). The court must therefore "look only at where statutory policymaking authority lies, rather than where *de facto* authority may reside." *Wulf v. City of Wichita*, 883 F.2d 842, 869 (10th Cir. 1989); *see also Brammer-Hoelter*, 602 F.3d at 1189.

In the alternative, Aero's argues that the City ratified Mr. Godfrey's actions relating to the fuel truck incident because the City took no action to address the incident even though Mr. Godfrey informed two City Councilmembers of the incident by email three days after it occurred. *See* Dkt. No. 214 at 26–28. This argument fails for the simple reason that the alleged ratification took place *after* Mr. Godfrey ordered the fuel truck moved. Given that the court has rejected Aero's arguments that any of the other challenged actions taken by Mr. Boyer or Mr. Godfrey were unconstitutional, this is not a case where the retroactive ratification of one

unconstitutional action caused another, subsequent unconstitutional action that injured the plaintiff. And the Tenth Circuit has explained that "basic principles of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009). Thus, even if Aero were correct that the City retroactively ratified Mr. Godfrey's actions during the fuel truck incident, the City's action did not cause the asserted violation.

It follows that the City is not liable for Mr. Godfrey's conduct during the fuel truck incident.

### 3.

Aero argues that the City is also liable for the City Council's failure to approve a new lease for Aero in time for the McQuarrie Lease transaction to close. There is no question that the City Council had "final policymaking authority" on this matter and thus that the City can be liable for the Council's actions.[18]

---

[18] In its opposition to the City's motion for summary judgment, Aero also argues that the City is liable both for the Council's refusal to allow Aero to build a new hangar without first abandoning its Ground Lease Agreement, and for its refusal to issue lease extensions on two of its hangars. These actions were not alleged in Aero's Complaint, however. Although Tenth Circuit precedent permits the court to "interpret the inclusions of new allegations in a response to a motion for summary judgment, as a potential request to amend the complaint," *Adams v. C3 Pipeline Constr. Inc.*, 17 F.4th 40, 68 (10th. Cir. 2021) (cleaned up), the deadline for such amendments has long passed and Aero has provided no reasons to excuse its delay in asserting these additional allegations. The court accordingly declines to consider these asserted incidents of retaliation. *See Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1118 (10th Cir. 2021); *Gordon v. Jordan Sch. Dist.*, 333 F.R.D. 220, 224–25 (D. Utah 2019).

Aero also alleges in its Complaint that the City revised the Minimum Standards in retaliation for Aero's protected speech. But Aero did not identify any evidence or even offer any argument in support of this allegation in response to the City's motion for summary judgment. It is well settled that "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Because Aero has failed to do so, this unsupported allegation of retaliation cannot survive the City's motion for summary judgment.

The City Council did approve the assignment of Mr. McQuarrie's existing lease to Aero, and it did agree to issue Aero a new lease. And it took both actions on September 1, 2016, well before the September 30th closing date for the McQuarrie transaction. The City Council did not, however, issue Aero a new lease immediately. Rather, it agreed to issue a new lease to Aero "when it was available" and it made clear that "there was no guaranteed term or rate but it would be offered at that time." Dkt. No. 209-30. Aero argues that the City Council had recently approved a new lease form at a meeting in July and that it should have issued the lease on this form immediately. Aero contends that the City Council's failure to do so before September 30th made it so the McQuarrie transaction could not close.

Aero contends that the City Council acted deliberately to kill the transaction in retaliation for Aero's "vocal criticism." Dkt. No. 214 at 34–36. Aero does not, however, identify the specific criticism to which it refers, and this court does not believe Aero may survive summary judgment by relying on "criticism in the air." As evidence of animus, Aero does discuss an email sent by Councilmember Crittenden to Councilwoman Franco and Mr. Boyer in response to a letter from Aero on "a different issue." Dkt. No. 202 at 28; *see also* Dkt. No. 214 at 35; Dkt. No. 216-19. But it does not appear that this is the speech that Aero believes the City Council was retaliating against, and Aero does not identify the content of this letter in all events. Because Aero does not identify the speech that it believes prompted the City Council's decision, the court cannot conclude that the speech addressed a matter of public concern, and Aero's claim fails as a matter of law. *See Schalk*, 906 F.2d 491 at 495.

Even if Aero had identified specific speech on a matter of public concern, moreover—for example, if its briefing could be construed to argue that the City Council acted in retaliation for Aero's July 19, 2016, letter objecting to Mr. Boyer's hire[19]—its retaliation claim would still fail.

As an initial matter, Aero did not have any entitlement to receive a new lease on its desired terms or timeframe. To the contrary, "*[l]ike private individuals and businesses,*" the Government generally "enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will" do so. *Reeves*, 447 U.S. at 439 n.12 (emphasis in original). And it has significant interests "in retaining freedom to decide how, with whom, and for whose benefit to deal." *Id*. at 438 n.10.

Although Aero argues otherwise, the City Council's action did not breach its lease agreement with Mr. McQuarrie. Section XIV.A of that lease agreement provides that "Lessee shall not assign this Lease . . . without prior written approval of the City which approval shall not be unreasonably withheld." Dkt. No. 164-4 at 50. But the City Council approved the assignment of the lease to Aero—it did not withhold approval "unreasonably" or otherwise. Section XIV.A also says that "[i]n the event that Hangar is sold prior to the end of term, a new lease for the Buyer *may* be entered into between Heber City and Buyer at the above-mentioned Term and Rate consistent with market value as well as the 1% Transfer fee based on appraised value of said Hangar, *at the sole discretion of the City.*" *Id.* (emphases added). It is thus clear that the City was not required to enter into a new lease with Aero at all, let alone on Aero's desired terms or using any particular form. This fact may not be dispositive—the government, after all, may

---

[19] Although Aero generally discusses various other statements throughout its submissions, it appears that apart from the July 19th letter, all of the other speech specifically identified by Aero as the cause of other instances of claimed retaliation occurred after the City Council's September 1, 2016, decision regarding the McQuarrie lease and therefore could not have motivated that decision.

violate First Amendment rights by terminating an at-will contract—but it is certainly relevant in balancing the parties' respective interests.[20]

Aero argues that because the City Council had just approved a new standard lease at a meeting on July 21, 2016, there was no legitimate reason for the Council not to issue Aero a new lease using this standard form without delay. The minutes from the July 21st meeting also show that the Council discussed having recently retained outside counsel review the new standard lease, however, *see* Dkt. No. 164-1 at 102–07, and the minutes from the September 1st City Council meeting show that *before* it agreed to offer Aero "a new lease when it is available," Dkt. No. 216-31 at 13, the Council unanimously agreed to table discussion regarding a proposed amendment to the new standard lease pending review of the proposal by "the new Airport Manager and legal counsel," Dkt. No. 164-1 at 115–16. Given its difficult experience with Aero under its existing contracts, the City Council's decision to act on its previous plan that outside counsel review the new standard lease before the City entered yet another long-term contract with Aero is hardly surprising or sinister.

Indeed, in the context of its difficult and deteriorating relationship with Aero, the City's actions may well have been justified not only by a desire to have outside counsel confirm that the new standard lease was properly drafted to protect the City's interests, but also by its "right to

---

[20] To be sure, Section II.C of the lease does state that "the City will offer Lessee a new lease of the Leased Premises, under such terms and conditions, including rental rates and duration of the lease term and on the then-current lease form being offered by the City." Dkt. No. 164-4 at 44. But this provision applies when the *incumbent lessee* "desires to continue occupying the Leased Premises after the expiration of the one (1) Extended Term." *Id.* Such a request, moreover, must be made "not earlier than three-hundred sixty-five days and not later than one hundred twenty days prior to the expiration of the last Extended Term." *Id.* Aero, of course, was not the incumbent lessee and, even had Mr. McQuarrie wished to extend the lease for himself, such a request would have been premature given that the lease had begun in January 2016, and would continue until September 2020, and that Mr. McQuarrie was entitled to an additional five-year "Extended Term" before this renewal provision would even apply. *Id.*

bargain hard in a continuing contest." *Wilkie*, 551 U.S. at 558 n.10. As the Supreme Court has explained, "in many ways the Government deals with its neighbors as one owner among the rest (albeit a powerful one). Each may seek benefits from the others, and each may refuse to deal with the others by insisting for valuable consideration for anything in return. And as a potential contracting party, each neighbor is entitled to drive a hard bargain." *Id.* at 558

To be sure, Aero argues that the record contains evidence that the City Council's decision was motivated by animus. Aero first points to an email written by Councilman Crittenden to Mr. Boyer and Councilwoman Franco on August 6, 2016. In the email, Crittenden discussed a letter Aero sent to the city on an unrelated matter. Mr. Crittenden recommended that "[the City] just ignore it completely, no mention of their numbers or argument. We aren't planning any action now until we work through the process with the FAA, right? I just wish the council would resist engaging them in discussion, in our meetings or elsewhere." Dkt. No. 214 at 35. Aero next points to Councilwoman Franco's expressions of frustration at the September 1st City Council meeting that the Council had previously "missed many opportunities to renegotiate the lease with [Aero]," that the McQuarrie transaction was "another opportunity to put conditions on [Aero] . . . to take things out of [its] lease that are clearly against FAA standards, [its] veto authority, and yet that [was] not even being discussed." Dkt. No. 209-75 at 21:8–22:17. Finally, Aero cites an email that Mr. Boyer sent nearly a year later to a friend who was seeking a new lease. Mr. Boyer wrote that "[t]here ha[d] been one purchase [of a hangar lease] prior to yours . . . but since [Aero] was the buyer, the City Council got in deep trouble for tort[ious] interference in the sale by refusing to process the lease." Dkt. No. 209-76.

It is unclear how much to make of Aero's evidence. After all, because Councilman Crittenden and Councilwoman Franco both voted *against* the decision to offer Aero a new lease

66

when it became available, it is doubtful that any statements either of these individuals made can be attributed to the majority of the City Council who voted otherwise. Indeed, the City Attorney instructed Councilwoman Franco to "stop discussion with regard to those things immediately," Dkt. No. 209-75 at 22:21–25, which may suggest that her sentiments were not widely shared. In all events, it is far from clear that Council Member Crittenden's and Franco's statements are reasonably viewed as reflecting animus as opposed to frustration with, and a desire to change, the City's existing relationship with Aero. And although Mr. Boyer's email is certainly susceptible to competing interpretations, Mr. Boyer testified at his deposition in this case that he did not believe the City Council's decision was intended to harm Aero. *See* Dkt. No. 216-26 at 222:1–21. The court ultimately need not address this question, however, for as already explained, otherwise permissible "instance[s] of hard bargaining intended to induce the plaintiff to come to legitimate terms" remain so, even if "[t]he action claimed to be retaliatory may gratify malice in the heart of the official who takes it." *Wilkie*, 551 U.S. at 558 n.10.

Aero also argues that because the City did not issue a new lease before September 30th, it is responsible for the failure of Aero's transaction with Mr. McQuarrie. But Aero offers little explanation for why it could not waive the requirement of a new lease or otherwise modify its agreement with Mr. McQuarrie to salvage the deal. The City Council, after all, had approved the assignment of Mr. McQuarrie's lease to Aero. And Mr. McQuarrie's lease had taken effect on January 1, 2016—only nine months earlier—and ran until September 27, 2020—almost four years after Aero's deal with Mr. McQuarrie was scheduled to close. *See* Dkt. No. 164-4 at 40. In addition, the assignment gave Aero the right to exercise the option, set forth in the lease itself, of renewing the lease for an additional period of five years, with the possibility of additional extensions after that. And while Aero apparently wanted the City to issue a 20-year lease—far

longer than Mr. McQuarrie's existing lease—Aero offers no explanation at all for why it believes it was entitled to dictate, though its contract with Mr. McQuarrie, both the timing and the content of the City's exercise of its "sole discretion" under its separate contract with Mr. McQuarrie, let alone why it believes that Aero and Mr. McQuarrie's agreement could require the City, without its consent, to grant Aero greater rights than Mr. McQuarrie actually had. Given these considerations, the court is not persuaded that the entire economic impact of the failed transaction can fairly or reasonably be attributed to the City's actions.

In light of all this, the court concludes that the City's "legitimate interests as a contractor, deferentially viewed, outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685. The law would not require a private party to not only forego its explicit contractual rights and enter a contract with a partner that had already proved difficult to work with in other contexts, but also to do so on the exact terms and timeline demanded by that difficult partner without even being allowed time to obtain desired legal advice. Holding that the City was required to do all this simply because it is a governmental entity, Aero had criticized the City in the past, and some of the Councilmembers had expressed frustration with Aero and a desire to modify the City's relationship with Aero to better serve the City's perceived interests would turn *Pickering* and *Umbehr* on their heads.

* * *

The City's Motion for Summary Judgment is GRANTED as to Aero's Section 1983 claim.

## IV.

The court next considers the state law claims asserted by the parties in this case. The parties have not alleged that this court has diversity jurisdiction over these claims. *See* Dkt. No.

100 ¶¶ 6–8; Dkt. No. 102 ¶ 3; Dkt. No. 57 ¶ 4. Federal jurisdiction over these claims thus must

be based on 28 U.S.C. § 1367.

As relevant here, this statute provides that

in any civil action of which the district courts have original jurisdiction, the
district courts shall have supplemental jurisdiction over all other claims that are so
related in the action within such original jurisdiction that they form part of the
same case or controversy under Article III of the United States Constitution.

*Id.* § 1367(a). As the Supreme Court has explained, this statute codifies

principles of pendent and ancillary jurisdiction by which the federal courts'
original jurisdiction over federal questions carries with it jurisdiction over state
law claims that "derive from a common nucleus of operative fact," such that the
"relationship between the federal claim and the state claim permits the conclusion
that the entire action before the court comprises but one constitutional 'case.'"

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quoting *Mine Workers*

*v. Gibbs*, 838 U.S. 715, 725 (1966)).

Section 1367 also provides that

district courts may decline to exercise supplemental jurisdiction over a claim
under subsection (a) if—(1) the claim raises a novel or complex issue of State
law, (2) the claim substantially predominates over the claim or claims over which
the district court has original jurisdiction, (3) the district court has dismissed all
claims over which it has original jurisdiction, or (4) in exceptional cases, there are
other reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)–(4). Thus, "[e]ven where a 'common nucleus of operative fact' exists,

federal jurisdiction is not mandatory over pendant claims or parties." *Estate of Harshman v.*

*Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004). Rather,

"supplemental jurisdiction is not a matter of the litigants' right, but of judicial discretion." *Id.*

Defendants Boyer and Godfrey have both asserted Anti-SLAAP counterclaims against

Aero under state law. *See* Dkt. Nos. 57, 102. Aero has moved for summary judgment on both

counterclaims. *See* Dkt. No. 172 at 29. Although it is a close question, the court has at least some

doubt whether it has supplemental jurisdiction over these counterclaims. Because these

counterclaims arise out of Aero's filing of this lawsuit, it is far from clear that they "derive from a common nucleus of operative fact" with Aero's federal claim, which is based on Defendants' conduct before the lawsuit was filed.

The court need not decide this issue, however. For even if the court has supplemental jurisdiction over these counterclaims, it declines to exercise this jurisdiction. First, the Anti-SLAAP counterclaims raise the unresolved question of whether government officials may assert claims under Utah Annotated Code § 78B-6-1405, which provides a right of action to defendants "in an action involving public participation in the process of government." Aero argues that it does not, and Mr. Godfrey contends that it does, but neither has pointed to any state cases on point, relying instead on novel textual arguments best addressed by the Utah courts.

In addition, the court has granted summary judgment in Mr. Boyer's favor on all federal claims against him. Under these circumstances, the court is not inclined to keep Mr. Boyer as a party in the case based solely on a state-law claim. *Cf.* 28 U.S.C. § 1367(c)(3); *Crane v. Utah Dep't. of Corr.*, 15 F.4th 1296, 1314 (10th Cir. 2021) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (internal citation omitted)). Under these circumstances, and at least with respect to Mr. Boyer, the state law claim would "substantially predominat[e]" over any federal claim involving Mr. Boyer "over which the court has original jurisdiction." 28 U.S.C. § 1367(c)(2). The court will accordingly decline to exercise supplemental jurisdiction over this counterclaim and will instead dismiss it without prejudice.

And while a federal claim does remain pending against Mr. Godfrey, the court will likewise decline to exercise supplemental jurisdiction over his Anti-SLAAP counterclaim and instead dismiss it without prejudice given the novel state law issues that it raises and the fact that

Mr. Godfrey has not opposed Aero's motion for summary judgment on this claim. *See* Dkt. No. 196 at 30.

The court also declines to exercise supplemental jurisdiction over Aero's state law claims against the City for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and declaratory judgement regarding Section 3 of the Ground Lease Agreement. The court has granted summary judgement in the City's favor on Aero's federal claim against it and declines to keep the City as a party in this case based solely on state-law claims. *Cf.* 28 U.S.C. § 1367(c)(3); *Crane*, 15 F.4th at 1314.

Furthermore, these state law claims raise "complex issue[s] of State law," 28 U.S.C. § 1367(c)(1), and they also lack any meaningful factual or legal connection to what remains of the federal claim against Mr. Godfrey. They could also result in an award of damages against the City far in excess of the potential damages available to Aero on what is left of its federal claim.

"Whether viewed legally in terms of the number and complexity of the specific issues raised or practically in terms of real-world stakes, there can thus be no doubt that each of the state-law claims 'substantially predominates over' the single and discrete federal claim" that remains pending in this case. *Vox Mktg. Grp. v. Prodigy Promos,* 2021 WL 3710130 at *8 (D. Utah 2021); *see also* 28 U.S.C. § 1367(c)(2). The court accordingly declines to exercise supplemental jurisdiction over these claims and dismisses them without prejudice.

The only remaining state law claim is Aero's claim for Tortious Interference raised against Mr. Boyer and Mr. Godfrey. As for Mr. Boyer, the court has granted summary judgment in his favor on the federal claim against him and declines to keep him as a party in this case based solely on a state-law claim that has no meaningful factual or legal connection to what

remains of the federal claim against Mr. Godfrey. The court accordingly declines to exercise supplemental jurisdiction over this claim as it relates to Mr. Boyer.

Although it is a closer question, the court likewise declines to exercise supplemental jurisdiction over this claim as it relates to Mr. Godfrey. While Aero's First Amendment retaliation claim will remain pending against Mr. Godfrey based on his actions relating to the fuel truck incident, the claim of tortious interference does not arise out of this conduct. Rather, it is based on a broader swath of other conduct by Mr. Godfrey that the court has determined will not support a First Amendment retaliation claim. Under these circumstances, the court believes that the tortious interference claim would multiply the factual and legal issues remaining in this case and thus "substantially predominate" over what is left of the federal claim over which this court has original jurisdiction. The court will thus dismiss Aero's state-law claim for tortious interference without prejudice.

## V.

This is not a typical First Amendment retaliation case, to say the least. Usually when public employees or government contractors bring suit under *Pickering* and *Umbehr*, they have suffered termination or some other obvious injury. Here, Aero challenges as retaliatory a litany of harsh words, petty slights, and seemingly mundane actions that frustrated its interests. It challenges these actions, moreover, with seeming disregard of concrete consequence. Indeed, most of these actions seem quite trivial. And given the lengthy and contentious nature of Aero's relationship with the City, the list of challenged actions is extensive. As one of the Defendant aptly puts it, "[w]eaponizing the First Amendment, Aero claims virtually every adverse action taken by the City or its Airport Managers, no matter how mundane, was retaliation for Aero's opposition to the City's Airport policies." Dkt. No. 167 at 2.

In addition, at least when Aero bothers to identify the specific speech that it believes provoked the supposed retaliatory acts, the statements appear calculated primarily to "air grievances" relating to its contractual relationship with the City or to "ge[t] even with" or "us[e] leverage against" the City and its officials. *Lighton*, 209 F.3d at 1225. This matters, of course, because "*Pickering* unmistakably states . . . that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150. And although the court cannot say that *none* of Aero's speech involved matters of public concern, for the most part Aero appears to have spoken to advance or defend its own economic interests rather than "for the principal aim or Good Samaritan purpose of disclosing 'government misconduct'" or otherwise informing the public of matters of general interest. *Lighton*, 209 F.3d at 1225; *see also Comsys*, 893 F.3d at 472 (comparing statements that "seem designed to influence the performance of the contract" to unprotected speech under *Garcetti*).

As the Supreme Court has made clear, moreover, in cases alleging First Amendment retaliation, "the context in which the dispute arose is also significant." *Connick*, 461 U.S. at 153. The record in this case leaves no doubt that the City and Aero had fundamentally different visions of the proper future for the municipal airport and that the City viewed its existing relationship with Aero as an obstacle to achieving the City's vision. As a result of their clashing visions and conflicting interests, the City and Aero became embroiled in a "continuing contest" in which "each side ha[d] a legitimate purpose in taking action contrary to the other's interest." *Wilkie*, 551 U.S. at 558 & n.10. Both sides acted—and spoke—to advance or defend their own perceived interests. Certainly, the City and its officials "bargained hard by capitalizing on their discretionary authority" and on Aero's perceived "violation of various [contractual] terms." *Id*. at 561. But it is equally true that "truculence was apparent on *both* sides." *Id*. (emphasis added).

73

Although the result may have been a mix of acrimony, petty wrangling, and legitimate—though perhaps bare-knuckled—exercises of contractual rights, the actions Aero challenges as retaliatory appear to have had more to do with the parties' clashing visions and perceived economic interests than the City's reaction to any public value Aero's speech may have had.

The court is well aware that such considerations are usually addressed as a factual issue under the rubric of *Mt. Healthy*. *See* 429 U.S. at 285–86. But in this case, both parties' speech and conduct appear inextricably intertwined. Indeed, it seems likely that contractual disputes—particularly protracted disputes—are almost invariably accompanied by sharp words and verbal wrangling. Certainly that was the case here. As Judge Easterbrook explained in a similar context:

> Trying to isolate contract administration from speech may be impossible. Even when a contractor serves at a city's pleasure, the deal is unlikely to be called off without some reason. Terminations follow breakdowns of relations. During a breakdown, charges and countercharges are likely; it is impossible to imagine the end to a relation such as the one between [the plaintiff] and the City without either side saying something to the other. Words may be harsh and the exchanges acrimonious. If that were enough to permit recovery under the Constitution, however, then the federal courts will have displaced state contract law and effectively nullified agreements allowing termination without cause.

*Comsys*, 893 F.3d at 470–71. Although this case does not involve termination of a contract—with or without cause—Judge Easterbrook's analysis otherwise could have been written for this case.

In circumstances such as these, the court believes that any attempt to determine whether, and to what extent, Aero's speech—as opposed to Aero's conduct and the City's desire to advance its own perceived interests—played a causal role in the challenged actions would likely prove futile. Nor does the court believe that seeking to disentangle and isolate these potential causes is necessary to resolve this case. To the contrary, the court believes that the balancing inquiry outlined in *Pickering* and *Umbehr*, especially if applied with "substantial deference, as mandated by *Pickering* [and its progeny], to the government's reasonable view of its legitimate

interests," *Umbehr*, 518 U.S. at 678, is sufficiently flexible and capacious to account for the context and the various competing interests in a case such as this one. *Cf. Connick*, 461 U.S. at 153–54 (considering facts that did not "constitute a sufficient defense" under *Mt. Healthy* as "context" relevant to the *Pickering* analysis).

At the end of the day, Aero seeks to transform a messy, drawn-out conflict regarding two parties' contractual relationship into a constitutional case. Although it is a close question, the court does agree with Aero that a jury could find that one of the many challenged acts may have crossed constitutional lines. But with that exception, the court agrees with Defendants that "[t]here is simply no precedent for transforming the sort of routine operational disagreements and minor consequences that Aero alleges into a constitutional cause of action." Dkt. No. 167 at 3. To the contrary, as the Supreme Court explained in *Garcetti*, "[u]nderlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154). The same is no doubt true of contractual grievances such as those asserted here.

\*    \*    \*

For the foregoing reasons, the court grants summary judgment in favor of the Defendants on Aero's First Amendment claim, except to the extent that claim is based on the actions taken by Mr. Godfrey in connection with the January 8, 2017, fuel truck incident. With respect to this incident, the court concludes that genuine disputes of material fact foreclose summary judgment.

The court declines to exercise supplemental jurisdiction over the various state-law claims and counterclaims asserted by the parties. These claims and counterclaims are accordingly dismissed without prejudice.

Mr. Boyer and Heber City are terminated as Defendants to this action.[21]

**IT IS SO ORDERED.**

DATED this 28th day of April, 2022.

BY THE COURT:

_____

Howard C. Nielson, Jr.
United States District Judge

---

[21] The parties have filed various *Daubert* motions. Because nearly all of the disputed expert opinions are not relevant to the remaining claim, the court denies all of these motions without prejudice. If this case proceeds to trial, the court will issue a trial order establishing deadlines for motions *in limine* and other matters. The parties may then file motions *in limine* in accordance with those deadlines challenging any proposed expert testimony that remains relevant.